James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Chad J. Husnick
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MSR HOTELS & RESORTS, INC.,[1] | ) | Case No. 13-11512 (SHL) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DECLARATION OF DANIEL KAMENSKY OF MSR HOTELS
& RESORTS, INC. (A) IN SUPPORT OF ITS CHAPTER 11
PETITION AND (B) PURSUANT TO RULE 1007-2 OF THE LOCAL
BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

I, Daniel Kamensky, declare as follows:

1.      I serve as the Secretary and Treasurer of the above-captioned debtor (the "REIT")

in this chapter 11 case.  In addition to my role with the REIT, I also am a partner at an affiliate of

Paulson & Co. Inc.  I am generally familiar with the REIT's day-to-day operations, business

affairs, and books and records, as well as the REIT's restructuring efforts.  I submit this

declaration (this "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules

for the Southern District of New York (the "Local Bankruptcy Rules") to assist the court and

parties in interest in understanding the circumstances that compelled the commencement of this

---

[1]      The debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is
MSR Hotels & Resorts, Inc. (1873).  The location of the debtor's service address is:  c/o CNL-AB LLC, 1251
Avenue of the Americas, New York, New York 10020.

chapter 11 case and in support of the REIT's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date").

2.       Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the REIT's management, Pyramid Resort Asset Management LLC, and the REIT's advisors, my review of relevant documents and information concerning the REIT's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the REIT.

3.       To assist the Court in familiarizing itself with the REIT and its business, this Declaration is organized into three sections. Section I provides background information with respect to the REIT's corporate history and its business operations, as well as a summary of the REIT's assets and liabilities. Section II describes the circumstances leading to the commencement of this chapter 11 case. Section III provides an overview of the exhibits attached hereto that set forth certain additional information about the REIT, as required by Local Bankruptcy Rule 1007-2.

## INTRODUCTION

4.       The REIT is seeking protection under chapter 11 of the Bankruptcy Code to sell its remaining assets and wind down its estate in an efficient manner. This relief is necessary because Five Mile Capital SPE B LLC ("Five Mile") recently filed baseless claims against the REIT and its directors that have derailed what should have been an orderly sale and wind-down process. Five Mile's latest allegations are not only a continuation of its scorched-earth tactics from the REIT subsidiaries' chapter 11 cases, but directly offend the Court's prior findings.

2

Now, the REIT seeks the protection of chapter 11 to effectuate a sale and plan process, free and clear of the Five Mile litigation.

5.      The REIT is a real estate investment trust that formerly held the indirect equity in three resort properties:  (a) the Grand Wailea Resort Hotel & Spa in Maui, Hawaii (the "Grand Wailea"); (b) the La Quinta Resort & Club PGA West in La Quinta, California (the "La Quinta"); and (c) the Arizona Biltmore Resort & Spa in Phoenix, Arizona (the "Arizona Biltmore," and, together with the Grand Wailea and La Quinta, the "Resorts").  The REIT also owns certain registered and unregistered trademarks, service marks, trade names, and logos and various copyrights for promotional and operational materials and other works related to the Resorts (collectively, the "Resort Marks") that are collateral for the Resorts' mortgage loan.  The REIT's other remaining assets are approximately $60,000 in cash on hand, approximately $400,000 in restricted cash, property worth approximately $24,000, and approximately $74,000 in accounts receivable.  Recently, the REIT and its directors have become the target of the latest round of litigation brought by Five Mile, an out-of-the-money lender to certain of the REIT's subsidiaries and affiliates, that has severely disrupted the REIT's orderly wind-down and threatened the very individuals that worked for so long to maximize the value of the Resorts and Five Mile's potential recovery.

6.      On February 1, 2011, certain subsidiaries and affiliates of the REIT (collectively, the "Non-REIT Debtors"), including the entities that owned the Resorts, filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Non-REIT Debtors commenced their chapter 11 cases as part of a process to maximize the value of their estates for all of their stakeholders, beginning with the implementation of a series of restructuring initiatives.  Despite initial pressure from

3

senior creditors to implement a quick sale, the Non-REIT Debtors negotiated a grand bargain with their principal stakeholders that provided the Non-REIT Debtors with the time needed to use the chapter 11 tools to maximize the value of their assets, the Non-REIT Debtors' junior stakeholders with a full opportunity to make a restructuring proposal, and the Non-Debtor REIT's senior creditors with certainty regarding the Non-REIT Debtors' path to exit from chapter 11.

7.     After successfully completing their restructuring initiatives, the Non-REIT Debtors turned their attention to marketing their assets, including the Resorts, to potential sponsors for a plan of reorganization or an equity sale. Working with Five Mile, the Non-REIT Debtors' equity holders, including the REIT and entities structurally junior to the REIT, were active throughout the process and made a significant investment of time and capital in the Non-REIT Debtors based on Five Mile's and the equity holders' view of the value of the Resorts. The equity holders, including the REIT, therefore also believed that the Resort Marks would remain in place as part of any plan of reorganization or equity sale. After a thorough marketing process, however, it became clear that the Non-REIT Debtors' only viable option was a sale transaction with their second and third mezzanine lenders, 450 Lex Private Limited and C Hotel Mezz Private Limited (together, with their affiliates, "GIC RE"), subject to higher or otherwise better bids through a bankruptcy court-approved auction process. Ultimately, no alternative bids materialized, and the Non-REIT Debtors moved forward with a chapter 11 plan based on the sale transaction with GIC RE (the "MSR Plan"). The Non-REIT Debtors' equity holders, including the REIT, were not party to the GIC RE proposal, nor were they a proponent of the MSR Plan.

K&E 25884803

8.      Confirmation of the MSR Plan was highly contentious and required the bankruptcy court to confirm the plan over the objections of both (a) Five Mile and (b) the United States (the "IRS").  Five Mile and the IRS objected on a number of grounds, all of which were either resolved or overruled by the bankruptcy court.  In addition, Five Mile began a scorched earth assault on the Non-REIT Debtors' directors and officers without any factual or legal support that continues to this day.  Before the confirmation hearing, the Non-REIT Debtors modified the MSR Plan to provide that the mortgage lenders' rights with respect to the Resort Marks were fully preserved.  Ultimately, the Non-REIT Debtors other than MSR Sub Intermediate Mezz LLC, with the support of the overwhelming majority of their creditors, obtained entry of an order confirming the MSR Plan on February 22, 2013 (the "Confirmation Order"), and consummated the MSR Plan on February 28, 2013.

9.      As noted, the Non-REIT Debtors' prepetition mortgage lender, represented by Midland Loan Services, Inc. ("Midland"), held a security interest not only in the Resorts but also in the Resort Marks.  And Midland continues to assert this security interest in the Resort Marks. Moreover, because the Non-REIT Debtors that owned the Resorts were disregarded entities for tax purposes, the consummation of the MSR Plan likely triggered a future tax liability against the REIT for which the IRS is expected to hold a significant unliquidated claim.

10.      Since consummation of the MSR Plan, the REIT has continued to consider its options to monetize the value of the Resort Marks, finalize the REIT's wind-down, and maximize recoveries to its creditors.  To this end, the REIT has engaged in discussions with the IRS, Midland, and the most likely purchaser of the Resort Marks, GIC RE, regarding the potential settlement of their claims, a potential sale of the Resort Marks, and the possible allocations of the proceeds from a sale.

11.     These efforts suffered a setback on April 9, 2013, when Five Mile filed a baseless complaint against the REIT and certain of its current and former directors, asserting direct and derivative claims on account of their actions and omissions in connection with the MSR Plan and Resort Marks, collaterally attacking the Court's prior findings.  Although these allegations lack any factual basis or legal merit, Five Mile's latest holdup tactic has constrained the REIT's ability to sell the Resort Marks in an out-of-court process.  The REIT therefore intends to use the tools available in chapter 11 to develop a consensual sale and plan process, to bring final resolution to Five Mile's litigation, and to effectuate the wind down of the REIT's estate.

## I.     GENERAL BACKGROUND

**A.     Company Business and Overview.**

12.     The REIT is a Maryland real estate investment trust whose primary assets consist of interests in the Resort Marks relating to the Resorts.  The REIT does not have any business operations or employees.

13.     As of March 30, 2013, the REIT's financial statements reflect assets totaling approximately $785,419 and liabilities totaling approximately $59,245,379.  The REIT had revenue of approximately $3,207 in the first three months of 2013, and approximately $32,576 in annual revenue in 2012.[2]

---

[2]     On February 1, 2011, certain subsidiaries of the REIT, the Non-REIT Debtors, filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court, which cases were consolidated for procedural purposes only under the caption *In re MSR Resort Golf Course LLC, et al.*, No. 11-10372 (SHL) (Bankr. S.D.N.Y.).  On February 22, 2013, the Court confirmed the MSR Plan for each Non-REIT Debtor other than MSR Sub Intermediate Mezz LLC, providing for the sale of substantially all of the assets of the Non-REIT Debtors to GIC RE.  On February 28, 2013, the MSR Plan became effective.

The REIT is affiliated with the Non-REIT Debtors and requests that if this chapter 11 case is initially assigned to a different judge, the clerk of the United States Bankruptcy Court for the Southern District of New York transfer this case to the Honorable Sean H. Lane, the presiding judge for the Non-REIT Debtors' chapter 11 cases.  *See* Local Bankruptcy Rule 1073-1(b).  The REIT, however, is not requesting that this chapter 11 case be jointly administered with the Non-REIT Debtors' chapter 11 cases.

K&E 25884803

**B.      The REIT's Corporate History and Organizational Structure.**

14.      In April 2007, Morgan Stanley Real Estate, an affiliate of Morgan Stanley, together with certain other investors (collectively, the "CNL Acquirers"), acquired CNL Hotels & Resorts, Inc. n/k/a MSR Hotels & Resorts, Inc., the debtor in this chapter 11 case, at the peak of the market for approximately $4 billion.   At the time of the acquisition, the new owners largely retained the organizational structure that had been in place, and renamed each of the entities that was a "CNL" entity as a "MSR" entity.   Accordingly, CNL Hotels & Resorts, Inc. became MSR Hotels & Resorts, Inc.

15.      On January 28, 2011, the REIT became a wholly-owned indirect subsidiary of non-debtor CNL-AB LLC ("CNL-AB").   CNL-AB is a joint venture consisting of affiliates of Paulson & Co. Inc.,[3] Winthrop Realty Trust, and Capital Trust, Inc.   CNL-AB became the indirect parent of the REIT following CNL-AB's foreclosure on 100% of the membership interests in MS Resorts III, LLC (a non-debtor indirect parent of the REIT).

16.      Before consummation of the MSR Plan, the REIT and its subsidiaries, including certain of the Non-REIT Debtors, were structurally organized in a fashion typical for the ownership and operation of resort properties.   Specifically, certain Non-REIT Debtors owned the land, buildings, and improvements on the Resorts (the "Fee Owners").   Certain other Non-REIT Debtors leased the Resorts from and paid rent to the Fee Owners under lease agreements.   The Fee Owners were each borrowers under a Mortgage Loan (as defined below) secured by the Resorts and certain other assets, including the Resort Marks.

17.      The Fee Owners were owned by certain other Non-REIT Debtors that were borrowers under four levels of mezzanine loans (collectively, the "Mezzanine Borrowers").

---

[3]      As discussed above, in addition to my role with the REIT, I am a partner at Paulson & Co. Inc.

Each Mezzanine Borrower pledged, as security for the mezzanine loans, the equity of the entity that each Mezzanine Borrower owned directly to the respective lenders (collectively, the "Mezzanine Lenders," as further defined herein). None of the Mezzanine Borrowers had assets other than the equity of its subsidiary Mezzanine Borrower or Fee Owner, as applicable. There were three Mezzanine Borrowers for each level of mezzanine debt.

18.     The REIT currently has no operations and no longer owns any interest in the Non-REIT Debtors.[4]   Under the MSR Plan, GIC RE purchased the Resorts and the equity interests in the Non-REIT Debtors were transferred to a liquidating trust.

19.     MS Resorts I, LLC owns 100% of the equity in the REIT. As noted above, CNL-AB is the indirect parent of the REIT through its 100% equity interest in MS Resorts III, LLC. In addition, to meet the ownership requirements for a real estate investment trust, the REIT also previously issued 123 preferred shares, each held by a different shareholder. A diagram of the REIT and its affiliates' current organizational structure is attached hereto as **Exhibit A**.

## C.     Prepetition Capital Structure.[5]

20.     The REIT and its former subsidiaries' capital structure is explained in further detail below.

### 1.     Mortgage Loan.

21.     The Fee Owners were each borrowers under that certain Loan and Security Agreement, dated January 9, 2006, as amended, restated, replaced, supplemented, or otherwise

---

[4]     The REIT does not own an equity interest in MSR Resort Sub Intermediate Mezz LLC.

[5]     The descriptions of the REIT's prepetition debt obligations and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the REIT regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest or any other fact with respect thereto, and the REIT reserves all rights to challenge or dispute any of the foregoing on any basis whatsoever.

K&E 25884803

modified from time to time (the "Mortgage Loan Agreement"), by and among the Fee Owners

and U.S. Bank, National Association, as successor to Bank of America, National Association and

LaSalle Bank, National Association, as trustee for the Certificate Holders of Deutsche

Mortgage & Asset Receiving Corporation, COMM 2006-CNL2 Commercial Mortgage Backed

Certificates (as successor in interest to German American Capital Corporation) (the "Mortgage

Lender"), in the principle amount of $1 billion (the "Mortgage Loan").  The Mortgage Loan was

secured by, among other things, cross-collateralized and cross-defaulted first priority mortgages

on certain of the Non-REIT Debtors' assets, including the Resorts, and the products and proceeds

thereof, including the cash generated by the Resort operations.  The Mortgage Loan was also

secured by the Resort Marks under that certain Trademark Security Agreement, dated as of

January 9, 2006, by and among the REIT, as successor in interest to CNL Hotels & Resorts, Inc.,

MSR Desert Resort, LP, as successor in interest to CNL Desert Resort, LP, MSR Resort Hotel

LP, as successor in interest to CNL Resort Hotel LP, MSR Resort Silver Properties, LP, as

successor in interest to CNL Resort Silver Properties, LP, MSR Grand Wailea Resort, LP, as

successor in interest to CNL Grand Wailea Resort, LP, MSR Claremont Resort, LP, as successor

in interest to Claremont Resort, LP, MSR Biltmore Resort, LP, as successor in interest to CNL

Biltmore Resort, LP, and German American Capital Corporation (the "Trademark Security

Agreement").

        22.    The interests in the Mortgage Loan were placed in trust and sold, in the form of

certificates of beneficial interest in the trust, to investors (the "Certificate Holders").  The rights

of the Certificate Holders are governed by the Trust Agreement and the Servicing Agreement,

each dated as of February 1, 2006, by and among Deutsche Mortgage & Asset Receiving

Corporation, as depositor, LNR Partners, Inc., as initial special servicer, Midland, as master

9

servicer, and Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as trustee. As noted above, Midland currently acts as the special servicer of the Mortgage Loan. The Mortgage Loan matured on February 1, 2011, the same day the Non-REIT Debtors commenced their chapter 11 cases.

23.    As noted above, the Mortgage Loan was also secured by a lien on the Resort Marks under the Trademark Security Agreement. Under the Trademark Security Agreement, the REIT granted a lien in the Resort Marks to the Mortgage Lender as security for payment of all sums due under the Mortgage Loan. The Trademark Security Agreement terminates pursuant to its express terms after the Mortgage Loan has been paid in full to the Mortgage Lender.

24.    In addition, the REIT currently licenses the Resort Marks under that certain License Agreement, dated as of December 9, 2011, and effective as of April 12, 2007 (the "IP License Agreement") to GIC RE, as assignee of certain of the Non-REIT Debtors under the Plan. The IP License Agreement and any proceeds of the IP License Agreement are also collateral for the Mortgage Loan under the Trademark Security Agreement. The IP License Agreement is terminable on 30-days' prior written notice by the REIT.

25.    In connection with the Non-REIT Debtors' chapter 11 cases, the Mortgage Lender received payment of the principal amount of the Mortgage Loan plus non-default interest, fees, expenses, and certain default interest. The Mortgage Lender did not receive the balance of its default interest, which now totals more than $59 million, and reserved its rights with respect to this default interest. Midland now asserts a claim secured by the Resort Marks of more than $59 million on account of the Mortgage Loan against the REIT.

**2.    Mezzanine Loan Agreements.**

26.    The Mezzanine Borrowers were borrowers under four separate Mezzanine Loan Agreements, each dated as of January 9, 2006 (collectively, the "Mezzanine Loan Agreements").

10

Under the MSR Plan, the lenders under the first, second, and third Mezzanine Loan Agreements received a distribution in full and final satisfaction, settlement, release, and compromise of any claims against the Non-REIT Debtors.  In addition, except as to MSR Sub Intermediate Mezz LLC (an entity in which the REIT does not own an equity interest), the fourth Mezzanine Loan Agreement was cancelled without any distribution to Five Mile or any other party on account of such claims.

### 3.    Non-Recourse Carveout Guaranty.

27.    The REIT is party to a Guaranty of Recourse Obligations with the Mortgage Lender and each Mezzanine Lender, each as predecessor in interest to German American Capital Corporation, dated January 9, 2006 (each, a "Recourse Guaranty").  Pursuant to section 2 of the Recourse Guaranty, the REIT would be obligated to guarantee payment of all obligations and liabilities of the applicable borrower to the applicable lender if the applicable borrower or its affiliates violated certain carveouts from the non-recourse limitations set forth in section 18.1 of each of the Mortgage Loan Agreement and Mezzanine Loan Agreements, giving rise to "recourse" liability against the applicable borrower—i.e., if the borrower or its affiliates commits a "bad boy" act under the applicable loan document.  Importantly, the Recourse Guaranty has not been triggered to date, no recourse liability has been incurred by any applicable borrower, and the REIT has no liability to any party on account of the Recourse Guaranty.

## II.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    The Non-REIT Debtors' Chapter 11 Cases.

28.    The Non-REIT Debtors filed for chapter 11 protection on February 1, 2011, in the face of a decline in liquidity attributable to both the lingering effect of the global economic crisis on the hospitality industry and the Non-REIT Debtors' considerable debt load.  The Non-REIT Debtors spent two years focused on executing their three primary restructuring

initiatives and consummating a value-maximizing chapter 11 plan process. During that time, the Non-REIT Debtors' indirect equity owners, including the REIT and entities structurally junior to the REIT, remained active in the chapter 11 cases and the restructuring process. Indeed, the Non-REIT Debtors' indirect equity owners, including the REIT and entities structurally junior to the REIT, and Five Mile were integral components to the creditor settlements that constituted the grand bargain in the chapter 11 cases and provided the Non-REIT Debtors with the time needed to maximize the value of their assets using the tools of chapter 11, the Non-REIT Debtors' junior stakeholders with a full opportunity to make a restructuring proposal, and the Non-REIT Debtors' senior creditors with certainty regarding the Non-REIT Debtors' path to exit from chapter 11. As part of the settlement with GIC RE (the "GIC RE Settlement"), Five Mile consented to the process and sale that followed.

29.     After it appeared the equity holders and Five Mile would not make the August interest payment required under the GIC RE Settlement and no new equity investment was forthcoming, the Non-REIT Debtors engaged GIC RE regarding a stalking horse bid for the Resorts, among other assets, consistent with the Non-REIT Debtors' obligations under the GIC RE Settlement. Soon thereafter, the Non-REIT Debtors entered into a stalking horse agreement with GIC RE to purchase the Non-REIT Debtors' assets under a chapter 11 plan subject to higher or otherwise better offers at an auction. Around this time, Five Mile commenced a campaign of value-destructive litigation to extract value on account of its out-of-the-money claims against certain of the Non-REIT Debtors that continues to this day. The GIC RE bid did not address the Resort Marks, and the REIT was not a party to the GIC RE bid.

K&E 25884803

30.     The Non-REIT Debtors failed to receive any alternative bids, and they moved forward with confirmation of the MSR Plan that contemplated a sale of substantially all of the Non-REIT Debtors' assets to GIC RE.  Importantly, the Non-REIT Debtors expressly excluded the Resort Marks from the MSR Plan transaction and amended the MSR Plan to reserve parties' rights with respect to the Resort Marks.  The IRS and Five Mile objected to the MSR Plan.  As the Court is aware, because the GIC RE bid was structured as an asset sale and the relevant Non-REIT Debtors were disregarded entities for tax purposes, the MSR Plan was expected to result in a substantial tax liability against the REIT.  In response to the IRS objection, the Non-REIT Debtors, the REIT, and GIC RE considered and negotiated a variety of plan structures with stakeholders but were unable to find a feasible alternative that would be certain to not trigger the tax.  For its part, Five Mile did not stop at the Non-REIT Debtors; it leveled senseless accusations of bad faith against the Non-REIT Debtors' directors, all of which were resoundingly overruled by the Court in its exculpatory findings.  In the end, the Non-REIT Debtors other than MSR Resort Sub Intermediate Mezz LLC, with the support of the overwhelming majority of their creditors, obtained confirmation of the MSR Plan on February 22, 2013.  The Non-REIT Debtors consummated the MSR Plan on February 28, 2013.

## B.     Prepetition Restructuring Efforts.

31.     Since the consummation of the MSR Plan, the REIT has considered its options regarding the Resort Marks, the REIT's most significant remaining asset.  Among other efforts, the REIT approached GIC RE, the most logical party to purchase the Resort Marks, about a potential sale of the Resort Marks, subject to higher and better offers.  The REIT also engaged Midland and the IRS regarding a means of distributing the proceeds of the REIT's estate.  To date, the REIT has not accepted any bid for the Resort Marks or reached an agreement for the

K&E 25884803

distribution of sale proceeds, but the REIT is confident that it will achieve these objectives in chapter 11.

**C.    The Five Mile Litigation.**

32.    An out-of-court sale and wind-down process soon became untenable when, on April 9, 2013, Five Mile filed a complaint in the Supreme Court of the State of New York, County of New York, Index No. 651267/2013, against the REIT and certain of its current and directors, asserting direct and derivative claims on account of their actions and omissions in connection with the MSR Plan and the Resort Marks.  After pursuing a number of unsuccessful objections during the Non-REIT Debtors' chapter 11 cases, described by the Court as having only "the most slender reed for support,"[6] Five Mile has apparently now directed its attacks against the REIT and certain of its current and former directors.  Five Mile's claims are meritless on their face and conflict with the reality of the Non-REIT Debtors' chapter 11 cases.

33.    At its core, Five Mile's complaint advances the notion that the REIT should have sought to detract from the value of its own assets—the Resorts—to steal value in direct contravention of every applicable legal document and principle.  But the fact that the Resort Marks were pledged to the Mortgage Lender made this impossible, and would have been in direct contravention to the interests of Five Mile and the ongoing efforts to pay claims in full in those chapter 11 cases.  One can only imagine the reaction of Five Mile, other creditors, and this Court, if the Non- REIT Debtors' indirect equity holders had attempted to extract value from the Resorts during those chapter 11 cases.  For certain, Five Mile and the Non-REIT Debtors' indirect equity holders would not have been given two years to maximize the value of the assets and attempt to preserve value for their claims and interests.  Moreover, as the Court has already

---

[6]    *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 20, 2013) Hr'g Tr. 64:11.

found on numerous occasions, the actions taken during the Non-REIT Debtors' chapter 11 cases were intended to maximize the value of the Resorts for the benefit of all stakeholders, including Five Mile, the REIT, and stakeholders junior to the REIT.

34.     Five Mile's complaint rests on another false premise:  Five Mile is not a stakeholder in the REIT.  Under the mezzanine loan documents, Five Mile only had recourse against the REIT in limited circumstances and to a limited extent.  Yet, now, Five Mile argues that the "bad boy" guaranty was in fact a full recourse, unconditional guarantee without any support whatsoever in the applicable loan documents.  Five Mile also cites implausible "bad boy" acts that it alleges occurred in the Non-REIT Debtors' chapter 11 cases.  Each and every one of these theories fails.  Simply put, Five Mile is not a creditor of the REIT.

35.     On May 1, 2013, the REIT and the directors removed the action to the United States District Court for the Southern District of New York under 28 U.S.C. § 1334(b) as "arising in" or "relating to" the Non-REIT Debtors' chapter 11 cases.  The Debtor seeks to end Five Mile's continued terrorization of directors that the Court previously found acted in good faith to pursue their only available alternative.

**D.      Chapter 11 Relief.**

36.     On the date hereof, the REIT filed a petition with the Court under chapter 11 of the Bankruptcy Code to provide the REIT with the opportunity to expeditiously resolve relevant claims and causes of action, liquidate its remaining assets, and wind down its estate.  The REIT believes that chapter 11 protection will allow it to accomplish these goals in an efficient and streamlined manner that will inure to the benefit of the REIT's estate and its stakeholders.  The action similarly arises in and is related to this case.  The REIT now seeks to end Five Mile's continued terrorization of directors that the Court has previously found acted in good faith to pursue their only available transaction.

15

### III.    INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

37.    Local Bankruptcy Rule 1007-2 requires certain information related to the REIT, which I have provided in the exhibits attached hereto as **Exhibit B** through **Exhibit M**. Specifically, these exhibits contain the following information with respect to the REIT:[7]

- pursuant to Local Bankruptcy Rule 1007-2(a)(3), **Exhibit B** provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in this chapter 11 case, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation;

- pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit C** provides the following information with respect to each of the holders of the REIT's twenty largest unsecured claims, excluding claims of insiders: the creditor's name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of person(s) familiar with the REIT's account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured;

- pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit D** provides the following information with respect to each of the holders of the five largest secured claims against the REIT: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time;

- pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit E** provides a summary of the REIT's assets and liabilities;

- pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Exhibit F** provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.;

- pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit G** provides a list of the property comprising the premises owned, leased, or held under other arrangement from

---

[7]    The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the REIT.  The REIT reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

16

which the REIT operates its business.  The REIT maintains no offices but rather conducts business through third parties and affiliates out of the Company's equity owners, located at c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10036;

- pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit H** sets forth the location of the REIT's substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the REIT outside the territorial limits of the United States;

- pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Exhibit I** provides information on the REIT's outstanding publicly held securities;

- pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit J** provides a list of the nature and present status of each action or proceeding, pending or threatened, against the REIT or its property where a judgment or seizure of their property may be imminent;

- pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit K** sets forth a list of the names of the individuals who comprise the REIT's existing senior management, their tenure with the REIT, and a brief summary of their relevant responsibilities and experience;

- pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit L** provides the estimated amount of payroll to the REIT's employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the REIT, for the 30-day period following the Petition Date; and

- pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit M** provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of this chapter 11 case, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 8, 2013                              Respectfully submitted,


                                                 */s/ Daniel Kamensky*
                                                 Daniel Kamensky
                                                 Secretary and Treasurer,
                                                 MSR Hotels & Resorts, Inc.


17

# EXHIBIT A

**REIT's Corporate Structure Chart**

## Corporate Structure



**LEGEND**

Non-Debtor

Debtor Seeking Relief Under Chapter 11

- CNL-AB LLC
- 100%
- MS Resorts III, LLC
- 100%
- MS Resorts II, LLC
- 100%
- MS Resorts I, LLC
- 100%
- MSR Hotels & Resorts, Inc.
- 100% — MSR Hospitality LP Corp.
- 100% — MSR Hospitality GP Corp.
- 80% LP / 20% GP — MSR Hospitality Partners, LP
- 99% / 1% — MSR Hospitality Services, Inc.
- 100% — MSR Resort Holdings GP, LLC
- 99.9% LP — MSR Resort Hospitality, LP
- 0.1% GP
- 100% — MSR Resort Junior MREP, LLC
- MSR Resort Hospitality GP, LLC — 0.1% GP
- 99.9% LP — MSR Resort Recreation, LP
- MSR Resort Sub Junior Mezz GP, LLC — 0.1% GP
- 99.9% LP — MSR Resort Sub Junior Mezz, LP
- MSR Resort Junior Mezz GP, LLC — 0.1% GP
- 99.9% LP — MSR Resort Junior Mezz, LP

## **EXHIBIT B**

**Informal Committees Organized Prior to the Order for Relief**

There were no informal committees organized prior to the order for relief in the REIT's chapter 11 case.

## EXHIBIT C

### List of the Holders of the REIT's Twenty Largest Unsecured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a list of the REIT's creditors holding the twenty largest unsecured claims (the "Creditor List") based on the REIT's unaudited books and records as of the petition date. The Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the twenty largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the REIT. The REIT reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | NAME OF CREDITOR, COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured, also state value of security)* |
|---|---|---|---|---|
| 1. | CNL Plaza Ltd.<br>P.O. Box 535370<br>Atlanta, GA 30353-5370 | Rent | | $118,634.19 |
| 2. | Retrievex<br>P.O. Box 415938<br>Boston, MA  02241-5938<br>Tel:  877-345-3546 | Trade Debt | | $2,642.98 |
| 3. | Iron Mountain<br>P.O. Box 27178<br>New York, NY  10087-7128<br>Tel:  888-365-4766 | Trade Debt | | $1,030.34 |
| 4. | Superior Data Storage Inc<br>P.O. Box 5785<br>Lincoln, NE  68505<br>Tel:  402-464-0260<br>Fax:  402-464-5899 | Trade Debt | | $289.78 |
| 5. | Abby's Mini Storage<br>3311 Truxtun Ave.<br>Bakersfield, CA  93301<br>Tel:  661-395-1137 | Trade Debt | | $220.00 |
| 6. | Midland Loan Services, Inc.<br>Attn:  Kevin S. Semon<br>10851 Mastin, 6th Floor<br>Overland Park, KS 66210<br>Tel:  913-253-9000<br>Fax:  913-253-9001 | Deficiency Claim under Trademark Security Agreement | Contingent, Unliquidated, Disputed | $0.00 |
| 7. | Five Mile Capital SPE B LLC<br>Attn:  Jim Glasgow<br>Three Stamford Plaza<br>301 Tresser Blvd., 9th Floor<br>Stamford, CT 06901<br>Tel:  203-905-0950<br>Fax:  203-905-0954 | Pending Litigation | Contingent, Unliquidated, Disputed | $0.00 |

2

<u>**EXHIBIT D**</u>

**List of the Holders of the REIT's Five Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the REIT as of the Petition Date.  The REIT is aware of three asserted secured claims against the REIT.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the REIT.  The REIT reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | **Creditor Name and Address** | **Amount of Claim** | **Collateral Description and Value** |
|---|---|---|---|
| 1. | Midland Loan Services, Inc. 10851 Mastin, 6th Floor Overland Park, KS 66210 Attn: Kevin S. Semon | $59,129,686.34 | Intellectual property |
| 2. | Zurich American Insurance Company Tower 2, 9th Floor 1400 American Lane Schaumburg, IL 60196-1056 | $250,000.00 | Cash |
| 3. | Hartford Fire Insurance Company One Hartford Plaza Hartford, CT 06155 | $150,000.00 | Cash |

## EXHIBIT E

### Summary of the REIT's Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the REIT's total assets and liabilities.  The following financial data is the latest available information and reflects the REIT's financial condition as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the REIT. The REIT reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value) | $785,419 |
| Total Liabilities | $59,245,379.34 |

<u>**EXHIBIT F**</u>

**Summary of the REIT's Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the REIT's property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the REIT is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the REIT's ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical if not impossible.  The following chart lists the REIT's property held by third parties as determined after a reasonable inquiry.

| Location of REIT's Property | Name, Address, & Telephone Number (if Available) of Person or Entity in Possession of the Property | Location of Court Proceeding (if Applicable) | Summary of Property |
|---|---|---|---|
| 1 Travelers Square Hartford, Connecticut 06183 | Travelers Insurance Salvatore Marino (860) 277-6701 | | $225,000 cash deposit for potential insurance claims |
| 101 S. Tyron Street Charlotte, North Carolina | Bank of America | | $125,142.19 balance in checking account |
| 101 S. Tyron Street Charlotte, North Carolina | Bank of America | | $252,529.29 loan collateral account, certificate of deposit |
| 101 S. Tyron Street Charlotte, North Carolina | Bank of America | | $150,000.00 loan collateral account, certificate of deposit |
| P.O. Box 8 13 Library Place St. Helier, Jersey, JE4 8NE Canada | Barclays Private Client International Limited | | $25,814.32 Canadian dollars |

| Location of REIT's Property | Name, Address, & Telephone Number (if Available) of Person or Entity in Possession of the Property | Location of Court Proceeding (if Applicable) | Summary of Property |
|---|---|---|---|
| BMP Capital Markets 234 Simcoe Street Toronto, Ontario M5T 1T4 Canada | CNL Montreal Tennant Inc. | | $9,462.87 Canadian dollars |

2

## <u>EXHIBIT G</u>

**Summary of the REIT's Property From Which the REIT Operates Its Businesses**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the REIT operates its businesses as of the Petition Date.

The REIT maintains no offices but rather conducts business through third parties and affiliates out of the REIT's equity owner's offices, located at c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10036.

## EXHIBIT H

**Location of the REIT's Substantial Assets, Books and Records, and Nature and Location of REIT's Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the REIT's substantial assets, books and records, and the nature, location, and value of any assets held by the REIT outside the territorial limits of the United States as of the Petition Date.

| REIT's Assets | Location | Value |
|---|---|---|
| REIT's Substantial Assets | Pyramid Resort Asset Management<br>One Post Office Square<br>Suite 3100<br>Boston, MA 02109<br><br>The REIT:<br>c/o CNL-AB LLC<br>1251 Avenue of the Americas<br>New York, NY 10020 | N/A |
| REIT's Books and Records | Pyramid Resort Asset Management<br>One Post Office Square<br>Suite 3100<br>Boston, MA 02109<br><br>The REIT:<br>c/o CNL-AB LLC<br>1251 Avenue of the Americas<br>New York, NY 10020 | N/A |
| REIT's Assets Outside the United States | See **Exhibit F** - Summary of the REIT's Property Held by Third Parties. | $35,277.19 Canadian dollars |

<u>**EXHIBIT I**</u>

**Summary of the Publicly Held Securities of the REIT**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the REIT that are publicly held, and the number of holders thereof as if the Petition Date.

There are no shares of stock, debentures, or other securities of the REIT that are publicly held.  The REIT's directors and officers do not own any shares of publicly-held securities of the REIT.

## EXHIBIT J

### Summary of Legal Actions Against the REIT

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the REIT or its property where a judgment against the REIT or a seizure of its property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the REIT and, if necessary, will be supplemented in the corresponding schedules to be filed by the REIT in this chapter 11 case.

| REIT | Potential Counterparty | Nature of the Action (Claim Amount) | Status |
|---|---|---|---|
| MSR Hotels & Resorts, Inc. | Five Mile Capital SPE B LLC | Civil Complaint ($58,665,716.26) | Pending |

<u>**EXHIBIT K**</u>

**The REIT's Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the REIT's existing senior management, their tenure with the REIT, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| **Michael Barr**<br>President | Michael Barr is the Portfolio Manager of the Paulson Real Estate Recovery Fund, a fund of Paulson & Co. Inc. Mr. Barr formerly was a Managing Director of Real Estate Private Equity at Lehman Brothers. Mr. Barr has worked exclusively in real estate since 1992 when he started at Merrill Lynch Real Estate Investment Banking after graduating from the University of Wisconsin. | Appointed 1/31/2011. |
| **Daniel Kamensky**<br>Secretary and Treasurer | Daniel Kamensky is a Partner at Paulson & Co. Inc. Mr. Kamensky formerly was a Senior Vice President at Barclays Capital and Lehman Brothers. Mr. Kamensky also worked as an attorney at Simpson Thacher & Bartlett LLP and holds law and undergraduate degrees from Georgetown University. | Appointed 1/31/2011. |
| **Jonathan Shumaker**<br>Vice President | Jonathan Shumaker is a Vice President at Paulson & Co. Inc. Mr. Shumaker formerly was a Vice President of Real Estate Private Equity at Lehman Brothers. Mr. Shumaker is a graduate of Cornell University and Harvard Business School. | Appointed 1/31/2011. |
| **James Dina**<br>Vice President | James Dina is Chief Operating Officer at Pyramid Hotel Group. Mr. Dina has previously been the Chief Operating Officer or Red Lion Hotel and the Vice President of Pacific Northwest Operations at Doubletree Hotels. Mr. Dina also previously worked at Sheraton Hotels, Westin Hotel, and Guest Quarters Suites Hotels. | Appointed 4/12/2007. |
| **Warren Fields**<br>Vice President | Warren Fields is Chief Investment Officer and founding partner of Pyramid Hotel Group. Mr. Fields is the former vice president of development and operations of Promus Hotel Corporation, and Vice President of Development for Guest Quarters Hotels and Doubletree Hotels. | Appointed 4/12/2007. |

| | | |
|---|---|---|
| **Christopher Devine**<br>Vice President | Christopher Devine is the Chief Financial Officer at Pyramid Resort Asset Management. Mr. Devine joined Pyramid Resort Asset Management in 2007. Mr. Devine has extensive experience in mergers and acquisitions, loan restructurings, and working on equity and debt offerings for publicly-traded real estate investment trusts. Mr. Devine previously spent nine years in public accounting working exclusively with real estate and hospitality companies. He was most recently a Senior Manager in the real estate group at PricewaterhouseCoopers LLP. He is a Certified Public Accountant in Massachusetts. | Appointed 2/12/2009. |

<u>**EXHIBIT L**</u>

**The REIT's Payroll for the Thirty (30) Day Period Following the Filing of the
REIT's Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the REIT's employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by the REIT.

As described herein, the REIT has no employees and generally does not participate in any management and operational activities. Accordingly, the REIT has no payroll expenses.

| Payments | Payment Amount[1] |
|---|---|
| Payments to Employees (Not Including Officers, Directors, and Stockholders) | $0 |
| Payments to Officers, Stockholders, and Directors | $0 |
| Payments to Financial and Business Consultants | $0 |

---

[1]    Payment amount for the 30 day period following the filing of the REIT's chapter 11 petitions.

## EXHIBIT M

**The REIT's Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the REIT's estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $73,634.19 |
| Cash Disbursements | $0 |
| Net Cash Gain | $73,634.19 |
| Unpaid Obligations (excluding professional fees) | $4,183.10 |
| Unpaid Receivables (excluding professional fees) | $0 |