**Hearing Date:  July 23, 2013 at 2:00 p.m.**
**Objection Deadline:  July 10, 2013 at 5:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                :

In re:                           :        Chapter 11
                                :

MSR HOTELS & RESORTS, INC.,    :        Case No. 13-11512 (SHL)
                                :

               Debtor.        :
----------------------------------------------------------x

**MOTION OF FIVE MILE CAPITAL PARTNERS LLC FOR AN
ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7
PURSUANT TO 11 U.S.C. § 1112(b) OR, IN THE ALTERNATIVE,
APPOINTING A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)**

David M. Friedman (DFriedman@kasowitz.com)
Adam L. Shiff (AShiff@kasowitz.com)
Robert M. Novick (RNovick@kasowitz.com)
Daniel N. Zinman (DZinman@kasowitz.com)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel to Five Mile Capital Partners LLC*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.  General............................................................................................................... 3

    B.  Five Mile's Claim. ............................................................................................ 4

    C.  The Subsidiaries' Bankruptcy.......................................................................... 8

    D.  The Debtor's Bidding Procedures Motion and DIP Financing Motion........... 11

JURISDICTION ..................................................................................................................... 13

RELIEF REQUESTED ........................................................................................................... 13

ARGUMENT .......................................................................................................................... 13

    A.  The Debtor's Bankruptcy Case Should be Converted to Chapter 7 for Cause.............. 13

        1.  There is Continuing Loss to and Diminution of the Debtor's Estate and No Reasonable Likelihood of Rehabilitation. ........................................................... 15

            a.  There is Continuing Loss to and Diminution of the Estate. ............................ 15

            b.  There is No Reasonable Likelihood of Rehabilitation. .................................... 16

        2.  Management's Pervasive, Disabling Conflicts and Gross Mismanagement Constitute Cause to Convert This Case. .................................................................. 18

            a.  Debtor's Management is Conflicted with Respect to the Management Adversary Proceeding. .................................................................................. 19

            b.  Management is Conflicted with Respect to the Sale Process........................... 23

        3.  The Best Interests of Creditors and the Debtor's Estate Require Conversion to Chapter 7 Rather Than Dismissal........................................................................ 26

    B.  In the Alternative, This Court Should Appoint a Chapter 11 Trustee. ........................... 28

NOTICE.................................................................................................................................. 32

CONCLUSION........................................................................................................................ 33

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cohen v. Nat'l Union Fire Ins. Co. (In re County Seat Stores, Inc.)*,
   280 B.R. 319 (Bankr. S.D.N.Y. 2002) ..................................................................................19

*In re 15375 Mem'l Corp. v. Bepco, L.P.*,
   589 F.3d 605 (3d Cir. 2009).................................................................................................25

*In re 210 West Liberty Holdings, LLC*,
   No. 08-677, 2009 Bankr. LEXIS 1706 (Bankr. N.D. W. Va. May 29, 2009) .......................26

*In re BH S & B Holdings, LLC*,
   439 B.R. 342 (Bankr. S.D.N.Y. 2010) ........................................................................ *passim*

*In re Clinton Centrifuge, Inc.*,
   85 B.R. 980 (Bankr. E.D. Pa. 1988) ...................................................................................30

*In re Creekside Senior Apts., L.P.*,
   489 B.R. 51 (B.A.P. 6th Cir. 2013)................................................................................15, 16

*In re Emergystat of Sulligent, Inc.*,
   No. 07-51394, 2008 Bankr. LEXIS 566 (Bankr. E.D. Tenn. Feb. 29, 2008) ........................26

*In re Eurospark Indus.*,
   424 B.R. 621 (Bankr. E.D.N.Y. 2010)...........................................................................19, 31

*In re FRGR Managing Member LLC*,
   419 B.R. 576 (Bankr. S.D.N.Y. 2009) .................................................................................14

*In re Gardner*,
   No. 02-43420 (ALG), 2003 Bankr. LEXIS 250 (Bankr. S.D.N.Y. Mar. 14, 2003) ...............25

*In re Gen. Growth Props.*,
   426 B.R. 71 (Bankr. S.D.N.Y. 2010) ...................................................................................19

*In re Greenfield Drive Storage Park*,
   207 B.R. 913 (B.A.P. 9th Cir. 1997)....................................................................................18

*In re Hampton Hotel Investors, L.P.*,
   270 B.R. 346 (Bankr. S.D.N.Y. 2001) .................................................................................25

*In re LG Motors, Inc.*,
   422 B.R. 110 (Bankr. N.D. Ill. 2009) ..................................................................................16

*In re Lodge at Big Sky, LLC*,
No. 10-62229-11, 2011 Bankr. LEXIS 2296 (Bankr. D. Mont. June 8, 2011).......................31

*In re Marvel Entertainment Group*,
140 F.3d 463 (3d Cir. 1998)......................................................................... 29-30, 31

*In re Natural Plants and Lands Mgmt. Co.*,
68 B.R. 394 (Bankr. S.D.N.Y. 1986)........................................................................25

*In re Prisco Properties, LLC*,
No. 10-21719, 2010 Bankr. LEXIS 3885 (Bankr. D.N.J. Nov. 10, 2010)............................18

*In re Sco Group*,
No. 07-11337 (KG), 2009 Bankr. LEXIS 4731 (Bankr. D. Del. Aug. 5, 2009).....................20

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999)......................................................................................14

*In re Taaf, LLC*,
No. 10-00171-8-RDD, 2010 Bankr. LEXIS 449 (Bankr. E.D.N.C. Feb. 12, 2010)...............31

*In re V. Savino Oil & Heating Co.*,
99 B.R. 518 (Bankr. E.D.N.Y. 1989)........................................................................30

*Loop Corp. v. United States Tr.*,
379 F.3d 511 (8th Cir. 2004)..................................................................................17

*Rand v. Porsche Fin. Srvs. (In re Rand)*,
No. AZ-10-1160-BaPaJu, 2010 Bankr. LEXIS 5076 (B.A.P. 9th Cir. Dec. 7, 2010) ............16

*State St. Mortg. Corp. v. Palmer (In re Palmer)*,
134 B.R. 472 (Bankr. D. Ct. 1991) ...........................................................................20

**STATUTES**

11 U.S.C. § 105(a) .....................................................................................................13

11 U.S.C. § 541 ........................................................................................................19

11 U.S.C. § 723 ........................................................................................................18

11 U.S.C. § 1104 ......................................................................................................31

11 U.S.C. § 1104(a) ............................................................................................ *passim*

11 U.S.C. § 1104(a)(1).........................................................................................13, 31

11 U.S.C. § 1104(a)(2).........................................................................................13, 30

11 U.S.C. § 1112 .................................................................................................. 13

11 U.S.C. § 1112(b) ...................................................................................... *passim*

11 U.S.C. § 1112(b)(1) ....................................................................................... 14

11 U.S.C. § 1112(b)(2) ....................................................................................... 14

11 U.S.C. § 1112(b)(4) ....................................................................................... 14

11 U.S.C. § 1112(b)(4)(A) ......................................................................... 15, 16, 18

11 U.S.C. § 1112(b)(4)(B) ................................................................................. 26

28 U.S.C. § 157 ................................................................................................. 13

28 U.S.C. § 1334 ............................................................................................... 13

28 U.S.C. § 1408 ............................................................................................... 13

28 U.S.C. § 1409 ............................................................................................... 13

**RULES**

Fed. R. Bankr. P. 1017 ..................................................................................... 13

Fed. R. Bankr. P. 2002 ..................................................................................... 13

Fed. R. Bankr. P. 2002(a) ................................................................................. 32

Fed. R. Bankr. P. 2007.1 .................................................................................. 13

Fed. R. Bankr. P. 9013 ..................................................................................... 13

Fed. R. Bankr. P. 9014 ..................................................................................... 13

Five Mile Capital Partners LLC, on behalf of itself and its affiliates ("Five Mile"), hereby moves (the "Motion") for entry of an order converting the chapter 11 case of the above-captioned debtor and debtor-in-possession's (the "Debtor") to a case under chapter 7 pursuant to section 1112(b) of the Bankruptcy Code ("Section 1112(b)") or, in the alternative, ordering the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) ("Section 1104(a)").  In support of this Motion, Five Mile respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

In important respects, this case is highly dissimilar to the recently confirmed and consummated cases of MSR Resort Golf Course LLC and the other Subsidiaries of the Debtor – chapter 11 cases where the Subsidiaries sought to reorganize or ultimately sell five iconic luxury properties that were operating and producing substantial cash flow.  Here, the Debtor conducted no business on the Petition Date, nor seemingly for years prior to the Petition Date.  In fact, in the Subsidiaries' chapter 11 proceedings, the Debtor's directors and current proposed advisors believed (and in one case even testified) that the Debtor was an asset-less shell.

There is no valid reason for such a debtor to accumulate administrative expenses in pointless pursuit of a chapter 11 plan.  The Debtor has only three significant creditors – movant Five Mile, Midland, a previously repaid lender with a non-recourse claim for a remnant of interest, and the Internal Revenue Service – and only two meaningful assets, the IP Assets and the Management Adversary Proceeding.  The Debtor has almost no money and thus has sought $2 million of post-petition financing from insiders just to pay the anticipated professional costs of a chapter 11 case, most of which appears earmarked to shift insiders' defense costs to the estate and fund the directors' efforts to reduce the value of estate's causes of action against them.

---

[1]    Any capitalized terms in the Preliminary Statement not otherwise defined herein are intended to have the meaning ascribed to them in the body of this Motion.

With such a simple set of affairs, why did the Debtor even file for bankruptcy protection?  No creditor was foreclosing on or threatening the Debtor's assets, and the Management Adversary Proceeding, which the Debtor claims was its motivation for filing, was in its infancy and had already been removed to Federal Court.

While any such case would cry out for conversion, this Debtor is infected with an additional disorder:  management that has proven to be incompetent and deeply conflicted.  The Debtor's primary business assets are a set of valuable hospitality brands associated with iconic resorts.  Those brands are used, on a non-exclusive basis, by the owners (now GIC) of a portfolio of $1.5 billion of resort properties (the "Resorts"), in exchange for which the Debtor receives nothing (and has received nothing for many years).  Not only has the Debtor failed to obtain compensation for the use of its valuable brands by the Resorts' owner, but it has not pursued any opportunities to gain additional revenue by licensing them to other entities for other uses.  According to its bankruptcy filings and its agents' prior testimony, (i) the Debtor has no idea what its brands are worth, (ii) the Debtor has proposed to sell its brands in a naked auction without having received any prior advice on the proper methodology to maximize value, including whether to pursue licenses in advance of or as part of a sale, and (iii) the Debtor's directors have presided over the Debtor for years without even knowing that it owned the IP Assets, let alone having taken rudimentary steps to maximize their value.  The Debtor's response to all of this is that the Debtor and its Subsidiaries operated as a single enterprise, such that no purpose would have been served to obtain arm's-length compensation for the Debtor's IP Assets.  That response rings hollow given the directors' ignorance of the facts and is belied by the record of the confirmed Subsidiaries' cases, a hallmark of which was the separateness of each Subsidiary and the arm's-length relationships between and among each one.

There is a high probability that the Debtor holds significant claims against its directors for their abject and continuing failure to manage the Debtor's brands properly to generate value and revenue for the Debtor, which is why Five Mile commenced a derivative action seeking damages from the directors for the harm their misconduct inflicted upon the Debtor.  Absent conversion to chapter 7 or the appointment of a trustee, the Debtor remains under the control of the litigation defendants and cannot, and will not, prosecute those claims.  In fact, the Debtor, acting under conflicted management, has taken the unprecedented step of moving to dismiss its own claims to destroy this asset.  A non-conflicted estate fiduciary thus is necessary to evaluate the Debtor's claims against its insiders and to maximize their value.

There is no reason for this Debtor to incur the expense of a chapter 11 case – complete with proposed, nationally reputed, top-dollar professionals and millions of dollars of post-petition borrowings to pay them – just to liquidate non-operating assets and distribute them to several creditors.  In all events, the Debtor's management is demonstrably incompetent and hopelessly conflicted.  Therefore, conversion to chapter 7 or the appointment of a trustee, is warranted and in the best interest of creditors and the estate.

## BACKGROUND

A.    General.

1.    On May 8, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has no employees and no operations other than overseeing its bankruptcy case.  Each of the Debtor's directors is a defendant in the Management Adversary Proceeding.  As far as Five Mile can discern, the only reason the Debtor commenced this case was to try to shift the cost of defending the individual directors in the Management Adversary Proceeding to the estate.

3

2.     The Debtor is a real estate investment trust whose principal assets consist of:
(1) hospitality brands comprised of interests in certain registered and unregistered trademarks, service marks, trade names, and logos and various copyrights for promotional and operational materials and other works (collectively, the "REIT IP Assets") relating to the Grand Wailea Resort Hotel & Spa (the "Grand Wailea"), the La Quinta Resort and Club PGA West (the "La Quinta"), and the Arizona Biltmore Resort & Spa (the "Biltmore"); and (2) claims against its directors for, among other things, their complete multi-year failure to develop, utilize or otherwise exploit the IP Assets for the benefit of the Debtor.  MS Purchaser LLC ("MS Purchaser"), an affiliate of the Debtor, owns registered and unregistered trademarks, service marks, trade names, and logos and various copyrights for promotional and operational materials and other works related to the Claremont Resort & Spa (collectively with the REIT IP Assets, the "IP Assets").  The Debtor's Schedules of Assets and Liabilities for MSR Hotels & Resorts, Inc. [Docket No. 18] (the "Schedules") list the value of the REIT IP Assets as "unknown."

3.     The Debtor's Schedules list only eight claims.  Of those, four total less than $5,000 in the aggregate.  Other than a claim by CNL Plaza Ltd., a landlord that seems to have been paid pre-petition in the ordinary course, the remaining claims consist of the claims of (i) the IRS, whose claim has not matured, (ii) Midland Loan Services, Inc. ("Midland"), whose claim is non-recourse, and (iii) Five Mile.  (Schedules E and F).  The claims of Midland and Five Mile are listed as "disputed."

**B.     Five Mile's Claim.**

4.     In January 2006, affiliates of MSR Hotels' predecessor (CNL Hotels & Resorts, Inc.) borrowed $1 billion (the "Mortgage Loan") pursuant to a Loan and Security Agreement, dated as of January 9, 2006, between certain of the Subsidiaries and the lender German American Capital Corporation ("GACC" or the "Mortgage Lender").  Pursuant to a chapter 11

4

plan confirmed in the Subsidiaries' bankruptcy cases, the Mortgage Lenders repaid the Mortgage Loan in full, including with fees and interest, except for a portion of contractual default interest which the servicer for the Mortgage Lender did not demand.

5.      In addition to the Mortgage Loan, other Subsidiaries incurred:  (i) a First Mezzanine Loan in the amount of $115 million; (ii) a Second Mezzanine Loan in the amount of $110 million; (iii) a Third Mezzanine Loan in the amount of $250 million; and (iv) a Fourth Mezzanine Loan in the amount of $50 million.  The First Mezzanine Loan, Second Mezzanine Loan and Third Mezzanine Loan have been satisfied in full pursuant to the Subsidiaries' confirmed chapter 11 plan.

6.      GACC, the predecessor in interest to Five Mile as Fourth Mezzanine Lender, made the Fourth Mezzanine Loan to CNL Resort Sub Intermediate Mezz, LP (n/k/a MSR Resort Sub Intermediate Mezz, LP) ("MSR Intermediate") on or about January 9, 2006, in the principal amount of $50,000,000, pursuant to the terms of a "Mezzanine Loan and Security Agreement (Fourth Mezzanine)."  In connection with the Fourth Mezzanine Loan, MSR Intermediate also executed:  (i) a Mezzanine Note (Fourth Mezzanine) (the "Fourth Mezzanine Note"), promising to pay the Fourth Mezzanine Lender the principal amount under the Fourth Mezzanine Loan, together with interest and fees as provided in the Fourth Mezzanine Note; and (ii) a Pledge and Security Agreement (Fourth Mezzanine), pledging MSR Intermediate's interests to secure its obligations under the Loan Agreement.

7.      The Fourth Mezzanine Loan matured on February 1, 2011.  Five Mile has never received any payment of principal due under the Fourth Mezzanine Note.  The amount due to Five Mile under the Fourth Mezzanine Loan and the documents evidencing and securing that

5

loan (the "Loan Documents")[2] as of January 31, 2013 was $58,665,716.26 (the "Five Mile

Indebtedness"), comprised of $50,000,000 principal, approximately $4,315,155 accrued and

unpaid interest, and approximately $4,350,562 of estimated collection costs.

8.     The Debtor executed a "Guaranty of Recourse Obligations (Fourth Mezzanine),"

made as of January 9, 2006, for the benefit Five Mile, as successor in interest to GACC (the

"Guaranty").[3]  Under the Guaranty, the Debtor is liable for all obligations and liabilities of MSR

Intermediate under sections 18.1.1 and 18.1.2 of the Loan Agreement.  Section 2 of the Guaranty

provides:

> **Guaranty.**  Guarantor hereby absolutely and unconditionally
> guarantees to Fourth Mezzanine Lender [*i.e.*, Five Mile] the
> prompt and unconditional payment of all obligations and liabilities
> of Fourth Mezzanine Borrower for which Fourth Mezzanine
> Borrower shall be personally liable pursuant to Section 18.1 of the
> [Mezzanine] Loan Agreement (collectively, the Guaranteed
> Obligations).

9.     Section 18.1.1 of the Loan Agreement provided that MSR Intermediate, as the

Fourth Mezzanine Borrower, generally was exculpated from personal liability beyond the value

of the assets securing the Fourth Mezzanine Loan.  The Guaranty, however, is a Recourse

Guaranty and section 18.1.1 nullifies MSR Intermediate's exculpation in the context of the

Guaranty.  Section 18.1.1 of the Loan Agreement expressly provided that the partial exculpation

of the Mezzanine Borrower shall not prevent the Mezzanine Lender from enforcing its rights to

payment in full as to the Guaranty:

---

[2]   Copies of the Loan Documents are attached to the "Affirmation of Chad J. Husnick In Support of (A)
Confirmation of the Proposed Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC,
et al., Pursuant to Chapter 11 of the Bankruptcy Code and (B) the Debtors' Reply in Support of Confirmation of
the Proposed Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant
to Chapter 11 of the Bankruptcy Code" [Subsidiaries' Docket No. 2020] ("Husnick Aff.").

[3]   A copy of the Guaranty is attached to Husnick Aff. as DS Ex. No. 273.

**Section 18.1    <u>Exculpation</u>**

18.1.1    Exculpated Parties.
Except as set forth in this Section 18.1, the Recourse Guaranty and the Environmental Indemnity, no personal liability shall be asserted, sought or obtained by Mezzanine Lender or enforceable against (i) Mezzanine Borrower, (ii) any Affiliate of Mezzanine Borrower . . . (iii) any Person owning, directly or indirectly, any legal or beneficial interest in Mezzanine Borrower or any Affiliate of Mezzanine Borrower or (iv) any direct or indirect partner, member, principal, officer, Controlling Person, beneficiary, trustee, advisor, shareholder, employee, agent, Affiliate or director of any Persons described in clauses (i) through (iii) above (collectively, the **Exculpated Parties**) and none of the Exculpated Parties shall have any personal liability (whether by suit, deficiency, judgment or otherwise) in respect of the Obligations (Fourth Mezzanine) … if any, being expressly waived by Mezzanine Lender. ***The foregoing limitation* shall not in any way limit or affect Mezzanine Lender's right to any of the following and Mezzanine Lender shall not be deemed to have waived any of the following**:

. . .

**(e) the liability of any given Exculpated Party with respect to any separate written guaranty or agreement given by any such Exculpated Party in connection with the Loan (including, without limitation, the Recourse Guaranty…)**

(Loan Agreement, § 18.1.1) (emphasis added). Thus, under section 18.1.1, the Guaranty is

expressly excluded from the exculpation of MSR Intermediate. Accordingly, as to the Guaranty,

there is no exculpation of liability that limits the scope of the Guaranty.

10.    The Guaranty also guarantees payment by the Debtor of specific personal

obligations of MSR Intermediate under Section 18.1.2 of the Loan Agreement. Section 18.1.2 is

entitled "Carveouts From Non-Recourse Obligations" and provides that, notwithstanding any

exculpation otherwise offered by Section 18.1.1, MSR Intermediate has personal liability for

damages with respect to, among other things: (1) any transfer by MSR Intermediate without

Five Mile's prior written consent; (2) non-compliance by MSR Intermediate or its affiliates with

certain single purpose entity criteria set forth in the Non-Consolidation Opinion; (3) monies

received by MSR Intermediate, the Mortgage Borrower, or any of their affiliates after a default

or bankruptcy that is not applied to payment of the obligations under the Mortgage Loan, Fourth

Mezzanine Loan, or other mezzanine loans, or used to pay normal expenses of the secured

property; and (4) intentional misrepresentations by MSR Intermediate or any of its affiliates.

Five Mile holds claims against the Debtor under the foregoing provisions.  They are set forth

more fully in the Complaint in the adversary proceeding *Five Mile Capital SPE B LLC v. MSR*

*Hotels & Resorts, Inc., et al.*, Adv. Pro. No. 13-01365 (SHL) (the "Management Adversary

Proceeding"), and are supported in detail in Five Mile's "Memorandum of Law in Opposition to

Defendants' Motion to Dismiss the Complaint in its Entirety" [Management Adversary

Proceeding Docket No. 4], incorporated herein by reference, which was filed on or about July 1,

2013.

**C.    The Subsidiaries' Bankruptcy.**

11.    On February 1, 2011, the Subsidiaries,[4] including MSR Intermediate, filed chapter

11 petitions in this Court.  At that time, certain of the Subsidiaries owned the Resorts (the

"Property Owning Subsidiaries").  Prior to the Subsidiaries' bankruptcy filing, the Debtor gave

the Property Owning Subsidiaries a free license to use the IP Assets.  *See* License Agreement

---

[4]    The Subsidiaries were debtors in *In re MSR Resort Golf Course LLC, et al.*, Case No. 11-10372 (SHL) and
include:  MSR Resort Golf Course LLC; MSR Biltmore Resort, LP; MSR Claremont Resort, LP; MSR Desert
Resort, LP; MSR Grand Wailea Resort, LP; MSR Resort Ancillary Tenant, LLC; MSR Resort Biltmore Real
Estate, Inc.; MSR Resort Desert Real Estate, Inc.; MSR Resort Hotel, LP; MSR Resort Intermediate Mezz GP,
LLC; MSR Resort Intermediate Mezz LLC; MSR Resort Intermediate Mezz, LP; MSR Resort Intermediate
MREP, LLC; MSR Resort Lodging Tenant, LLC; MSR Resort REP, LLC; MSR Resort Senior Mezz GP, LLC;
MSR Resort Senior Mezz LLC; MSR Resort Senior Mezz, LP; MSR Resort Senior MREP, LLC; MSR Resort
Silver Properties, LP; MSR Resort SPE GP II LLC; MSR Resort SPE GP LLC; MSR Resort Sub Intermediate
Mezz GP, LLC; MSR Resort Sub Intermediate Mezz LLC; MSR Resort Sub Intermediate Mezz, LP; MSR
Resort Sub Intermediate MREP, LLC; MSR Resort Sub Senior Mezz GP, LLC; MSR Resort Sub Senior Mezz
LLC; MSR Resort Sub Senior Mezz, LP; and MSR Resort Sub Senior MREP, LLC (collectively, the
"Subsidiaries")

(the "<u>License Agreement</u>").[5]  The License Agreement is non-exclusive, meaning the Debtor

retained the right to obtain revenues and augment the value of its brands by licensing the IP

Assets to other entities for other uses (*e.g.*, additional resorts, condominium and other types of

real estate development, co-branded merchandising).  *See id.*, § 1.1.  The License Agreement is

terminable by the Debtor without cause on 30 days' notice.  *See id.*, § 6.2.  Thus, the Debtor was

never locked into allowing royalty-free use of the IP Assets.  Although the License Agreement

was entered into on December 9, 2011, the Debtor's chief financial officer,  Christopher Devine,

made it effective as of April 12, 2007, back-dating it over four and half years.  *Id.* at 1.

12.     In connection with their chapter 11 plan, certain Subsidiaries sold the Resorts

(other than the Doral, which was previously sold to a third party) and related assets to affiliates

of 450 Lex Private Limited and C Hotel Mezz Private Limited ("<u>GIC</u>").  The IP Assets were not

sold to GIC.  Instead, GIC received an assignment of the Property Owning Subsidiaries' interest

in the License Agreement (the non-exclusive and Debtor-terminable, but completely free, use of

the IP Assets).  The Debtor continues to allow GIC to use the IP Assets for no compensation.  To

Five Mile's knowledge, the Debtor has not issued a notice to terminate the IP License

Agreement.

13.     During the Subsidiaries' bankruptcy cases, the Debtor, not yet in bankruptcy,

acting under the direction of the management defendants and through their present proposed

counsel, filed a pleading supporting confirmation that stated that the Debtor had no assets,

describing the Debtor as "the asset-less REIT."  (Response of CNL Recovery Acquisition LLC

and MSR Hotels & Resorts, Inc. in Reply to Objections to Confirmation of Debtors' Second

---

[5]    A copy of the License Agreement is attached as Exhibit 1 to the "Declaration of Daniel N. Zinman," filed
contemporaneously herewith.

Amended Joint Plan of Reorganization [Subsidiaries' Docket No. 1999], at ¶ 1).  The

Subsidiaries, who shared common management with the Debtor, initially maintained that they

also believed that the Debtor had no assets other than its equity ownership of its subsidiaries.

For example, Mohsin Meghji, who was at the time the only "independent" director of the Debtor

and the Subsidiaries, when asked at confirmation whether the Debtor "conducts any business

other than owning shares of its subsidiaries," answered "No.  It's a pass-through entity.  It's a

pass-through entity."  (Tr., Confr. Hr'g, 2/5/2013 at 224:4-7).  Saul Burian, a managing director

of Houlihan Lokey Capital, Inc., the financial advisor to the Subsidiaries and proposed financial

advisor to the Debtor, testified that the Debtor's "only real asset is the equity of its immediate

subsidiaries."  (Tr., Confr. Hr'g, 2/4/2013 at 129:23-130:2).  On February 12, 2013, after the

close of the Subsidiaries' confirmation hearing, Mr. Burian corrected his testimony to disclose

that the Debtor owned the IP Assets.[6]  Mr. Meghji also testified that for a period of time he had

forgotten that he was a director of the Debtor.[7]

     14.     Although the Subsidiaries' chapter 11 plan contained releases, the releases did not

– and upon the forgoing record, plainly could not – release the claims asserted in the

Management Adversary Proceeding.  During the confirmation process, the Subsidiaries,

addressing an objection by Five Mile, modified the releases to exclude claims related to the IP

Assets:  "The [Subsidiary] Debtors modified the releases by Holders of Claims and Interests . . .

to exclude any claims by or against [GIC] or the REIT [*i.e.*, the Debtor here] on account of or

with respect to the rights to the [IP Assets]."[8]

---

[6]     Supplemental Declaration of Saul Burian in Support of Confirmation of the Proposed Second Amended Joint
        Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code
        [Subsidiaries' Docket No. 2030] ("Suppl. Burian Decl."), at ¶ 5.

[7]     Tr., Confr. Hr'g, 2/5/2013 at 220:22-222:11.

[8]     *See* Motion of MSR Resort Golf Course LLC, et al., for Entry of an Order Approving Immaterial Modifications
        to the Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant to

15.    The filing of the Management Adversary Proceeding came as a surprise to no one. It was clear to all parties during the confirmation process that Five Mile intended to pursue causes of action against and on behalf of the Debtor by reason of its Guaranty.  The Debtor, not then in bankruptcy itself, repeatedly and unsuccessfully sought to obtain a finding in the Confirmation Order that Five Mile consented to the sale of the Resorts to GIC, clearly attempting to advantage the Debtor's management in anticipated future litigation predicated upon Five Mile having a claim under the Guaranty.  (Tr., Bench Ruling on Confirmation, 2/20/2013 at 78:14-17, 79:6-9).  This Court denied that request and did not issue such a finding.  *Id.* at 80:25-81:11. This Court also acknowledged the possibility of a future suit, stating in denying the requested finding, "[i]f I need to interpret my order in some other dispute in the future, then I'll do that and I certainly have jurisdiction to do that."  *Id.* at 80:11-13.

D.    **The Debtor's Bidding Procedures Motion and DIP Financing Motion.**

16.    On June 10, 2013, a month after the Petition Date, the Debtor filed its first substantive motion in this case, its "Motion of MSR Hotels & Resorts, Inc. for Entry of an Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof and an Order Approving the Sale of the Resort Marks" [Docket No. 34] (the "Bidding Procedures Motion").  The Bidding Procedures Motion, which is scheduled to be heard at the same time as this Motion, seeks authority for the Debtor to sell the IP Assets, although the Debtor does not have a purchaser or transaction in hand.  The Bidding Procedures Motion also does not reveal any prior advice sought or received by the Debtor from any expert as to the proper method for monetizing the IP Assets so as to maximize their value.  As will be detailed more fully in Five Mile's forthcoming

---

Chapter 11 of the Bankruptcy Code without the Need for Further Solicitation of Votes [Subsidiaries' Docket No. 2029], at ¶ 7.

objection to the Bidding Procedures Motion, the Debtor has not demonstrated any justification for conducting a sale, as opposed to other steps that could be taken to maximize the value of the IP Assets.  In addition, even if there is a sale, the Debtor appears to have taken or failed to take steps that will likely result in a far lower sale price than the Debtor can obtain, including, *inter alia*, that:

(a) The Debtor has failed to obtain any value for GIC's continued use of the IP Assets, notwithstanding the fact that GIC's right to use the IP Assets can be terminated on thirty days notice;

(b) The Debtor has determined to sell the IP Assets immediately on a tight time frame, notwithstanding that there would be little cost to the Debtor to taking more time to ensure that it obtains the highest possible value for the IP Assets through a more rational process; and

(c) The Debtor has determined to sell the IP Assets in their entirety, rather than attempt to sell separate licenses for use and/or parts of the IP Assets.  For example, the Debtor could seek to sell to GIC a perpetual, non-exclusive license, while simultaneously selling the IP Assets in parts or as a whole, subject to that license, to other parties.  A party that is interested in the IP Assets for the Resorts in California may not be interested in the IP Assets related to the Resorts in Hawaii or Arizona.  Such parties could include real estate developers interested in using the trademarked names (*e.g.*, Arizona Biltmore), among many others. Indeed, it does not appear that the Debtor ever considered any value-maximizing actions.

17.     On June 11, 2013, the Debtor filed its "Motion of MSR Hotels & Resorts, Inc. for Entry of an Order Authorizing the Debtor to Obtain Postpetition Financing" [Docket No. 38] (the "<u>DIP Financing Motion</u>"), through which the Debtor seeks authority to borrow up to two million dollars (the "<u>DIP Financing</u>") from an affiliate of its management, CNL DIP Recovery Acquisition LLC (the "<u>DIP Lender</u>").  The DIP Motion does not indicate that the Debtor went to the market to seek financing before agreeing to the insider transaction.  The DIP Motion does not explain how or with whom the DIP Lender negotiated the proposed terms of the DIP Financing, nor does it explain why up to $2 million is necessary to fund professional fees in this case.  The Debtor apparently did not require a $2 million loan when it was putatively preparing to sell the IP Assets outside of bankruptcy.

## JURISDICTION

18.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 1104(a)(1), 1104(a)(2) and 1112(b) of the Bankruptcy Code, and Rules 1017, 2002, 2007.1, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

19.     Five Mile requests that this Court enter an order converting this case to a case under chapter 7 of the Bankruptcy Code pursuant to section 1112(b) of the Bankruptcy Code or, in the alternative, appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

## ARGUMENT

**A.      The Debtor's Bankruptcy Case Should be Converted to Chapter 7 for Cause.**

20.     Section 1112 of the Bankruptcy Code provides that:

13

> [O]n request of a party in interest, and after notice and a hearing,
> absent unusual circumstances specifically identified by the court
> that establish that the requested conversion or dismissal is not in
> the best interests of creditors and the estate, <u>the court shall convert
> a case under this chapter to a case under chapter 7</u> or dismiss a case
> under this chapter, whichever is in the best interests of creditors
> and the estate, <u>if the movant establishes cause</u>.

11 U.S.C. § 1112(b)(1) (emphasis added).  *See also In re BH S & B Holdings, LLC*, 439 B.R.

342, 346-47 (Bankr. S.D.N.Y. 2010).

21.    Although the statute does not define "cause," section 1112(b)(4) contains an

illustrative list of sixteen examples, any one of which may constitute cause, including:  "(A)

substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation; [and] (B) gross mismanagement of the estate."  11 U.S.C.

§ 1112(b)(4).  The list is illustrative, not exhaustive, and courts are free to consider other

grounds.  *See, e.g.*, *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("The 'list'

contained in § 1112(b) 'is not exhaustive.  The court will be able to consider other factors as they

arise. . . .'") (*quoting* H.R. Rep. No. 595, at 405, *reprinted in* 1978 U.S.S.C.A.N. 5963, 6362);

*BH S & B Holdings*, 439 B.R. at 346 (the section 1112(b)(4) list "is not exhaustive and courts are

free to consider other factors."); *In re FRGR Managing Member LLC*, 419 B.R. 576, 580 (Bankr.

S.D.N.Y. 2009) (same).

22.    Once cause has been shown, courts must convert (or dismiss) unless:

> (A) there is a reasonable likelihood that a plan will be confirmed
> . . . within a reasonable period of time; and (B) the grounds for
> granting such relief include an act or omission of the debtor other
> than under paragraph 4(A) – (i) for which there exists a reasonable
> justification for the act or omission; and (ii) that will be cured
> within a reasonable period of time fixed by the Court.

11 U.S.C. § 1112(b)(2).

14

23.    The Court should convert this case to chapter 7 because (1) there is a continuing loss to and diminution of the Debtor's estate and the absence of a reasonable likelihood of rehabilitation; (2) management's pervasive, disabling conflicts and gross mismanagement requires that they be supplanted by an estate fiduciary and constitute cause to convert this case; and (3) the best interests of creditors and the Debtor's estate requires conversion.

**1.    There is Continuing Loss to and Diminution of the Debtor's Estate and No Reasonable Likelihood of Rehabilitation.**

24.    Section 1112(b)(4)(A) requires conversion (or dismissal) of a chapter 11 case if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  Both of these requirements are satisfied.

**a.    There is Continuing Loss to and Diminution of the Estate.**

25.    To satisfy the first requirement of section 1112(b)(4)(A), "a movant may demonstrate 'that the debtor continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief.'"  *In re Creekside Senior Apts., L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (quoting *In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010)).  The loss needs to be substantial or continuing, but does not need to be both.  *Id.*

26.    There can be no dispute that there will be a substantial and continuing loss to the Debtor's estate if it remains in chapter 11.  According to the Debtor's schedules, the Debtor's assets consist of modest amounts of cash in various forms (*e.g.*, cash deposit for potential insurance claims, bank accounts), the IP Assets, a vacant parcel of land that the Schedules list as having a value as low as $324, office equipment and furnishings.  *See* Schedule B [Docket No. 18].  The only income from "operations" that the Debtor's Statement of Financial Affairs discloses is a sublease, the payments on which are offset by lease payments to CNL Plaza II Ltd., and which the Debtor presumably knew about – rents come in monthly – when it characterized

15

itself as "asset-less."  *See* Statement of Financial Affairs [Docket No. 19] ("SOFA"), schedule 1

(listing sublease income), schedule 3b (listing payments to CNL Plaza),[9] and paragraph 13,

*supra*.

27.     The Debtor has no operations and no employees, and does not appear to have any

plans to generate any regular income.  Indeed, the Debtor's cash position is so poor that the

Debtor has sought approval of a DIP loan from an affiliate of its own management just to pay

professional fees.  *See* Debtor's Motion for Entry of an Order Authorizing the Debtor to Obtain

Postpetition Financing [Docket No. 38] (the "DIP Financing Motion") at ¶ 1).  In short, the

Debtor's estate is shrinking every day due to the costs of this chapter 11 case and will continue to

do so in the future.  Accordingly, the first element of section 1112(b)(4)(A) is amply met:  there

is a continuing loss to and a diminution of the Debtor's estate.

**b.     There is No Reasonable Likelihood of Rehabilitation.**

28.     As for the second element of section 1112(b)(4)(A), this Debtor has no chance

whatsoever at rehabilitation, let alone a "reasonable likelihood of rehabilitation."  Rehabilitation

is not reorganization.  Rather, it is a "much more demanding standard than 'reorganization.'"  *In*

*re Creekside Senior Apts., L.P.*, 489 B.R. at 61 (quoting in full *In re Brutsche*, 476 B.R. 298, 301

(Bankr. D.N.M. 2012)).  "The issue of rehabilitation for purposes of § 1112(b)(4)(A) 'is not the

technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business

prospects justify continuance of the reorganization effort.'"  *Rand v. Porsche Fin. Srvs. (In re*

*Rand)*, No. AZ-10-1160-BaPaJu, 2010 Bankr. LEXIS 5076, *1, *13 (B.A.P. 9th Cir. Dec. 7,

2010) (quoting *In re Wallace*, No. 09-20496-TLM, 2010 Bankr. LEXIS 261, at *1, *13-14

(Bankr. D. Idaho Jan. 26, 2010)).  *Accord In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D.

---

[9]     There appears to be an inconsistency with regard to the identity of the lessor.  The SOFA lists payments to CNL
Plaza II Ltd. (SOFA, schedule 3b).  However, the Schedules list CNL Plaza Ltd. as having a claim for rent in
approximately the same amount as the prior payments.  (Schedule F).

Ill. 2009). "[R]ehabilitation means to put back in good condition and reestablish on a sound

basis." *In re BH S & B Holdings, LLC*, 439 B.R. at 347 (citation omitted).

    29.    Here, the Debtor has no business prospects and has no plans to re-establish itself,

on a sound basis or otherwise.  Indeed, the Debtor concedes that its purpose is simply a "wind-

down."  (Declaration of Daniel Kamensky of the Debtor (A) in Support of its Chapter 11 Petition

and (B) Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New

York [Docket No. 2] ("Kamensky Decl."), at ¶ 5).  While Five Mile of course recognizes that

chapter 11 is sometimes used to produce a plan of liquidation, there is no cause to do so here.

The Debtor *entered* bankruptcy with no operations and seemingly has not conducted any for

years.  The Debtor only has three large creditors – an unmatured tax claim, a non-recourse claim

for stub interest and Five Mile -- and perhaps a few additional de minimis creditors.  The

Debtor's only significant assets are the IP Assets, which the Debtor is proposing to sell outside

of a plan, and the Management Adversary Proceeding, which the Debtor has moved to dismiss

outside of a plan.  The DIP Financing Motion does not mention funding a plan at all.  As a result

of long-term management negligence, the IP Assets are generating no income and the Debtor is

not taking any steps to "operate" the IP Assets as a business until they are sold.  The Debtor's

stated intention in this case is to liquidate its assets and distribute the proceeds.  "Because the

debtor[] here intend[s] to liquidate [its] assets rather than restore [its] business operations, [the

Debtor] ha[s] no reasonable likelihood of rehabilitation." *Loop Corp. v. United States Tr.*, 379

F.3d 511, 516 (8th Cir. 2004) ("In the context of a debtor who has ceased business operations

and liquidated virtually all of its assets, any negative cash flow-including that resulting only from

administrative expenses-effectively comes straight from the pockets of the creditors."). *See also*

17

*In re BH S & B Holdings, LLC*, 439 B.R. at 347 ("[T]he Debtors' intention to liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation.").

30.     Moreover, the real purpose behind the Debtor's chapter 11 filing appears to be to derail the Management Adversary Proceeding and to foist the costs of the Defendants onto the Debtor.  Going through the motions of pursuing a plan would be an expensive charade to keep the designees of the ultimate equity owner ("Paulson") in control to try to fend off their personal liability.  Chapter 11 will accomplish no legitimate purpose that cannot be achieved by a chapter 7 trustee (or, for that matter, outside of bankruptcy) at lower cost and without the blot of conflicts.  Because the Debtor's estate continues to operate at a loss and because there is no reasonable likelihood of rehabilitation, paradigmatic cause exists to convert this case to chapter 7 under section 1112(b)(4)(A).

> **2.      Management's Pervasive, Disabling Conflicts and Gross Mismanagement Constitute Cause to Convert This Case.**

31.     An additional cause for conversion recognized by the courts is where a debtor has "disabling conflicts of interest."  *In re Prisco Properties, LLC*, No. 10-21719, 2010 Bankr. LEXIS 3885, *1, *10 (Bankr. D.N.J. Nov. 10, 2010) (ruling that debtor's managing member's "mixed allegiances" with respect to various parties in interest "make it impossible for him to assess the value of pursuing litigation against those entities objectively.").  *See also In re Greenfield Drive Storage Park*, 207 B.R. 913, 916, n.3 (B.A.P. 9th Cir. 1997) (general partner was conflicted in causing debtor partnership to oppose conversion to chapter 7 because of the general partner's interest in avoiding personal liability for the debtor's debts under Bankruptcy Code section 723, ruling that the debtor itself "had no reason to oppose conversion since it would not be adversely affected by the conversion.").  The Debtor's management is hopelessly conflicted on every significant issue that has arisen and is likely to arise in this case.

a.    **Debtor's Management is Conflicted with Respect
to the Management Adversary Proceeding.**

32.    The other significant asset of the Debtor besides its brands is the Management

Adversary Proceeding, brought by Five Mile derivatively on behalf of the Debtor, in which each

of the Debtor's directors is an individual defendant.  Upon the commencement of the Debtor's

bankruptcy case, the claims in the Management Adversary Proceeding became property of the

estate and subject to the control of the Debtor.  *In re Gen. Growth Props.*, 426 B.R. 71, 76

(Bankr. S.D.N.Y. 2010) (derivative claim became property of the estate pursuant to section 541

of the Bankruptcy Code); *Cohen v. Nat'l Union Fire Ins. Co. (In re County Seat Stores, Inc.)*,

280 B.R. 319, 326 (Bankr. S.D.N.Y. 2002) (same).

33.    If the Management Adversary Proceeding is successful, the estate stands to gain

tens of millions of dollars (there is liability insurance and the directors could have additional

rights of indemnity from Paulson and/or GIC).  Given that all of the Debtor's directors are

defendants, the Debtor and its management are not capable of investigating, let alone

prosecuting, claims against themselves.  It is not possible to appoint a special committee or take

the other usual steps that some corporations are able to take when faced with claims against

insiders.

34.    Courts have found that an independent fiduciary should evaluate claims involving

the debtor arising from acrimonious litigation which current management cannot be expected to

approach with disinterest.  *In re Marvel Entertainment Group*, 140 F.3d 463, 473 (3d Cir. 1998)

(holding that an "unhealthy conflict of interest . . . manifest in the 'deep-seeded conflict and

animosity' between [conflicted management] and the [creditors]" supported a finding of cause to

appoint an independent fiduciary (a chapter 11 trustee)); *see also In re Eurospark Indus.*, 424

B.R. 621, 630-31 (Bankr. E.D.N.Y. 2010) (finding creditors' lack of trust in management to

19

administer the estate's remaining asset in the best interests of the estate supported appointment of

a chapter 11 trustee).

     35.    There is no room for doubt about the extent of this Debtor's infection by

management's conflict.  Immediately (hours) prior to commencing this chapter 11 case, the

Debtor's directors caused the Debtor itself to move to dismiss its estate's own claims against the

directors, and the Debtor has continued to press its motion since filing for bankruptcy.  The

Debtor's management cannot possibly exercise independent judgment about the claims and this

is ample cause for conversion.  *See, e.g.*, *In re Sco Group*, No. 07-11337 (KG), 2009 Bankr.

LEXIS 4731, at *1, *18 (Bankr. D. Del. Aug. 5, 2009) (finding cause to convert the case exists

where "strife between Debtors and [creditors] in hard fought litigation makes a considered

decision by Debtors on the handling and disposition of the cases unlikely"); *State St. Mortg.

Corp. v. Palmer (In re Palmer)*, 134 B.R. 472, 476 (Bankr. D. Ct. 1991) (In converting

individual chapter 11 case to chapter 7, rejected debtor's argument in favor of dismissal that the

debtor was best able to prosecute the debtor's claims as "overlook[ing] the possibility that one of

the estate's claims might be against [the debtor].").

     36.    In response to this conflict, the Debtor has argued that the alleged conflict is

irrelevant because the defendants in the Management Adversary Proceeding pronounce it

without merit.  The Debtor is, of course, incapable of articulating any other opinion concerning

the Management Adversary Proceeding.  In a separate pleading, Five Mile has addressed the

motion to dismiss filed by the directors and the Debtor and explained why the claims in the

Management Adversary Proceeding have substantial merit.  For the purposes of this Motion,

however, there is one important point:  there is no independent estate fiduciary to act for the

Debtor.  If an independent fiduciary controlled the Debtor and concluded that the derivative

claims were not valuable, that fiduciary would never incur administrative expense moving to dismiss its own claims on the merits. It would offer the claims for sale to bring money into the estate or, failing that, simply abandon them at no cost to the estate. Alternatively, an independent fiduciary might seek competent plaintiff's counsel to take the case on contingency, eliminating downside exposure of the estate but maintaining upside in the event the litigation succeeds.

37.    The Debtor has taken none of these steps. Instead, it is diminishing the estate by spending significant amounts of money for the purpose of destroying a valuable asset, putting the interests of management ahead of those of creditors and the estate. At the same time, management is also striving to prevent any objective investigation, let alone prosecution, of the claims by anyone else. The Debtor's proposed DIP Financing provides that "[n]o proceeds of the DIP Facility may be used to <u>investigate, commence, prosecute or join in</u> any action against or adverse to the interests of the DIP Lender or any of its affiliates or to pay the fees and expenses incurrent in connection with investigating, preparing, or prosecuting any claim or cause of action against the DIP Lender or any of its affiliates." (DIP Financing Motion at 5) (emphasis added). Unlike creditor-supplied DIP financing, where such self-serving provisions at least are negotiated at arm's-length and usually have carve-outs for committee action, this condition comes in a proposed DIP Financing that was "negotiated" where Debtor management, the proposed DIP lender and the litigation defendants are all related parties.

38.    Existing management brings nothing to the estate to warrant leaving it in place. This is not the case involving specialized management operating a large or complex business. The Debtor has no business operations, although it *should have had* a business licensing, growing and protecting the value of its brands. This requires expertise and experience that

21

management ostensibly and demonstrably does not have.  In the meantime, the Debtor has been

paid nothing for GIC's use of the IP Assets.  Indeed, until a few months ago, management did

not even know that the Debtor owned the IP Assets.  (*Compare* Tr., Confr. Hr'g, 2/4/2013 at

129:23-130:2; Tr., Confr. Hr'g, 2/5/2013 at 224:4-7; with Suppl. Burian Decl. at ¶ 5; Conf.

Order, ¶ 15 [Subsidiaries' Docket No. 2071]).  Nor can management claim to have experience

with this Debtor.  During the Subsidiaries' bankruptcy cases, Mr. Meghji, the only

"independent" director, could not recall whether he was a director of the Debtor.  (Tr., Confr.

Hr'g, 2/5/2013 at 220:22-222:11).  Moreover, upon information and belief, none of the directors

are experienced in licensing of trademarks.

39.     The Debtor may also argue that it is appropriate for the Debtor to oppose the

Management Adversary Proceeding because the Debtor is a defendant in the proceeding.  This is

a red herring.  While it is true that Five Mile made the Debtor a nominal defendant in the

Management Adversary Proceeding, that was for the purpose of establishing Five Mile's claim.

The Management Adversary Proceeding was originally filed in state court before the Debtor

filed for bankruptcy.  At that time, in order to collect on Five Mile's claim and establish standing

to seek derivative standing to sue the non-Debtor defendants, Five Mile needed to include the

Debtor has a defendant.  Now, however, the Debtor is in bankruptcy and the Bankruptcy Code

provides normative procedures for a claims allowance process.  The fact that the claim is being

litigated in the Management Adversary Proceeding is a vestige of its origins as a state court suit

and does not justify the efforts the Debtor has made with respect to that suit.

40.     Furthermore, it makes no sense for the Debtor to press an objection right away.

The Debtor has speculated that it may not have enough funds to pay administrative expenses, let

alone have funds left over to distribute to unsecured creditors.  (DIP Financing Motion at ¶ 1)

(opining that the proceeds from the sale of the IP Assets may be insufficient to cover

professional fees).  Why borrow money to incur administrative expenses to object to a claim that

may never see a distribution?  Independent fiduciaries like chapter 7 trustees normally wait until

there is a reasonable basis to assume there will be funds to distribute before launching highly

contested objections to unsecured claims.  By pressing the issue of Five Mile's claim now, the

Debtor is devoting estate resources to a fight it may not need to have to aid management in

defeating claims against them that are property of the entire estate.  There is no doubt that

management is hopelessly conflicted with respect to the Management Adversary Proceeding.

That, together with the fact that management has caused the Debtor to use the estate's resources

for their own benefit at the expense of the Debtor's estate and its creditors, is good cause for

conversion.

b.   <u>Management is Conflicted with Respect to the Sale Process.</u>

41.    The Debtor's management is also conflicted with respect to the sale process.  The

Debtor has argued that the sale of the IP Assets is the "main purpose of this Chapter 11 case."

(Tr., 5/13/13, 5:24-25).  Yet, by virtue of being defendants in the Management Adversary

Proceeding, management is perversely incentivized to obtain a *low* price for the IP Assets,

because the less the IP Assets appear to be worth, the lower the potential damages in the

Management Adversary Proceeding.

42.    The sale process itself is fraught with problems.  As will be detailed more fully in

Five Mile's forthcoming objection to the Bidding Procedures Motion, the Debtor appears to have

taken steps that will likely result in a far lower sale price than otherwise could be obtainable.  For

example, the Debtor's determination to sell the IP Assets immediately, rather than attempt to

license them first, could rob the Debtor of significant value.  From the Bidding Procedures

Motion, it seems clear that the only real option the Debtor ever considered was a sale of the IP

23

Assets outright.  There are many other possibilities.  For example, the Debtor could seek to sell to GIC a perpetual, non-exclusive license, while simultaneously selling the IP Assets, subject to that license, to other parties.  There are many entities that conceivably could be interested in the IP Assets in that situation.  It does not take much imagination to conceive of a major real estate developer being interested in the right to name a housing development in Phoenix "Arizona Biltmore Estates," for example.  In addition to being conflicted, it appears that the Debtor lacks the capacity, and has failed, to examine and analyze these and other possibilities before tossing up their brands as, at best, a jump ball.

43.    Furthermore, what explanation can there be for the Debtor's continuing failure to attempt to obtain any value for the IP Assets after GIC purchased the Resorts?  The Debtor has inexcusably continued to let GIC use the IP Assets for free, notwithstanding the fact that the license is terminable at will upon 30 days notice.  (License Agreement, § 6.2).  An independent fiduciary, at the very least, would have obtained payments from GIC for use of the IP Assets until a final disposition could be completed.

44.    Not only has the Debtor failed to obtain any payment for GIC's ongoing use of the IP Assets, but the Debtor has seemingly rushed to judgment, and possibly impaired value, by publicly declaring from the first day of this case that GIC was the most likely owner of the Resorts and that they intended to sell the IP Assets.  *See, e.g.*, Kamensky Decl. at ¶ 10 (declaring GIC is "the most likely purchaser of the Resort Marks"); Bidding Procedures Motion at ¶ 2 (same)).  Management made this decision despite the fact that the Debtor claims in its Schedules that it does not know what the assets are worth.

45.    Moreover, it is clear from the Bidding Procedures Motion that management has decided to sell the IP Assets without any analysis of value of the brands, without determining an

appropriate royalty rate, a discount rate, the cost to GIC to replace the brands (*e.g.*, replacing signage, websites, advertising, monogrammed towels and other sundries), or any of the other important financial metrics that are necessary to determining what actions would maximize the value of the IP Assets.

46.    Thus, through its actions the Debtor has made clear the conflicts it has with respect to the sale of the IP Assets and has acted contrary to its fiduciary duty to maximize the value of the estate.  Together with the other conflicts surrounding the Management Adversary Proceeding, the best interests of the estate and creditors are served and caused exists to convert the case to chapter 7.  *See, e.g.*, *In re Natural Plants and Lands Mgmt. Co.*, 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986) (converting a case from chapter 11 to chapter 7 because, *inter alia*, there was a question as to whether the debtor would be as impartially motivated to: (1) collect amounts due from its affiliates; and (2) determine whether or not otherwise avoidable transfers had been made to these affiliates or to its principal shareholder); *see also In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 357-60 (Bankr. S.D.N.Y. 2001) (converting a case to chapter 7 because the general partner managing a debtor partnership faced a conflict of interest between maximizing the assets of the partnership available for satisfaction of creditor claims and looking to his personal resources to satisfy those claims); *In re Gardner*, No. 02-43420 (ALG), 2003 Bankr. LEXIS 250, at *1, *16-17 (Bankr. S.D.N.Y. Mar. 14, 2003) (converting case from chapter 11 to chapter 7 after debtor "rejected any possibility of challenging" his ex-wife's lien and "since even a belated expression by him of an intent to conduct an examination would be subject to suspicion, there is a need for a trustee in this case").  *Cf. In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 624-25 (3d Cir. 2009) (Debtor's bankruptcy filing was made in bad faith based, in part, on the debtors' manager's conflicting loyalties between the debtors and their non-filing

25

parents and affiliates, which "mixed allegiances prevented him from adequately protecting the Debtors' interests.")

47.    With respect to the Management Adversary Proceeding and the IP Assets, the Debtor's conflicts have resulted in the Debtor taking actions that it should not have taken, and to failing to take actions that it should have taken.  This has wasted estate resources to the detriment of the Debtor's estate and its creditors, and constitutes gross mismanagement that justifies conversion pursuant to section 1112(b)(4)(B).  *See, e.g.*, *In re 210 West Liberty Holdings, LLC*, No. 08-677, 2009 Bankr. LEXIS 1706, at *1 (Bankr. N.D. W. Va. May 29, 2009) (converted chapter 11 case to chapter 7 based on, in part, gross misconduct including failure to pursue potential claims against insiders); *In re Emergystat of Sulligent, Inc.*, No. 07-51394, 2008 Bankr. LEXIS 566, at *1, *25 (Bankr. E.D. Tenn. Feb. 29, 2008) (Cause under section 1112(b) established because "at a minimum, [debtor's management]'s actions in placing the interests of [the debtor's parent] over those of the Debtor constitute gross mismanagement.").

### 3.    The Best Interests of Creditors and the Debtor's Estate Require Conversion to Chapter 7 Rather Than Dismissal.

48.    Once cause has been established, "a court must examine whether dismissal or conversion of a case under chapter 7 is in the best interests of the creditors and the estate."  *In re BH S & B Holdings, LLC*, 439 B.R. at 346.  Courts have considered "multiple factors to determine which action better serves the interests of creditors and the estate," including:

1.    Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

2.    Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

3.    Whether the debtor would simply file a further case upon dismissal.

26

4. The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors

5. In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.

6. Whether any remaining issues would be better resolved outside the bankruptcy forum.

7. Whether the estate consists of a "single asset."

8. Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

9. Whether a plan has been confirmed and whether any property remains in the estate to be administered.

10. Whether the appointment of a trustee is desirable to supervise the estate.

*Id*. at 346-47 (*quoting* 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[6]).

49.     The majority of these factors strongly support conversion to chapter 7 over dismissal.  As discussed above, there are several claims and assets of the estate (*e.g.*, the Management Adversary Proceeding, the sale of the IP Assets) that must be handled by an independent fiduciary.  Only an independent fiduciary such as a chapter 7 trustee can be relied upon to determine the appropriate course of action with respect to the Debtor's claims and other assets free of the disabling conflicts of the Debtor's current management.  Conversion, rather than dismissal, is necessary to separate management's conflicted interests from the interests of the Debtor's estate and its creditors.  Thus, factors four, five, eight and ten support conversion.

50.     Factor nine supports conversion, as there has been no plan proposed, let alone confirmed, and substantial assets remain in the estate to be administered.  What plan could there be?  The Debtor appears to be set to give proceeds of the sale of the IP Assets to Midland, the insider DIP Lender, and the Debtor's professionals outside of a plan pursuant to various motions it has filed or indicated that it will file.  Factor three supports conversion, rather than dismissal,

27

because, in the event of a dismissal, the Debtor's management would have every incentive to cause the Debtor to file another bankruptcy case to further delay the Management Adversary Proceeding.[10]   Accordingly, conversion of this case to a case under chapter 7 is in the best interests of the Debtor's estate and its creditors.

**B.      In the Alternative, This Court Should Appoint a Chapter 11 Trustee.**

51.      Although the problem of the Debtor's management can also be solved by the appointment of a chapter 11 trustee, because the Debtor's estate is simple, with no business operations and very few creditors, the Debtor's estate and its creditors are best served by conversion.  A chapter 7 proceeding is likely to be significantly cheaper and more efficient than a chapter 11 case, especially given the manner in which the Debtor seeks to conduct this one.  In addition to ensuring there is an independent fiduciary, a chapter 7 proceeding avoids the expense of preparing, arguing and gaining approval of a disclosure statement and seeking confirmation of a plan that is not necessary to accomplish anything.  There will be no reorganization, as the IP Assets are being sold outside of a plan.  In fact, it seems unlikely that any "classes" of creditors one might concoct in an effort to construct a plan would contain more than one creditor (other than, perhaps a class of general unsecured claims which would total approximately $5,000). Moreover, given the tenor of these cases, it is inevitable that in a chapter 11, management would use their positions to seek to obtain releases and exculpations and related findings of fact in a plan, something that would be the subject of considerable litigation and, possibly, lengthy appeals.  Thus, a chapter 7 proceeding would avoid significant time and expense in connection with a plan over a chapter 11 case.

---

[10]    As for factor one, whether there are potential preferences, the Debtor's SOFA reveals several significant payments within 90 days of the bankruptcy.  Accordingly, factor one may support conversion over dismissal as well.

52.     It is a sure bet that a chapter 7 case would be less expensive even with respect to

actions that would be common to both the chapter 7 and the chapter 11 proceedings (*e.g.*, sale of

the IP Assets).  Although the Debtor seeks to retain a prestigious slate of professionals, they are

costly and unnecessary for a case of this small size and simplicity.  A chapter 7 trustee typically

employs professionals who are more affordable and narrowly focused on the limited tasks at

hand.  With respect to certain potential estate claims (*e.g.*, preferences, prosecution of the

Management Adversary Proceeding), it is possible that a chapter 7 trustee would employ

contingency-fee counsel, greatly reducing the upfront cost and risk to the estate for those matters.

On a purely economic basis, the best interests of the Debtor's estate and its creditors support a

finding of cause for conversion to chapter 7.  However, in the event that this Court declines to

convert this case to chapter 7, Five Mile respectfully requests that the Court appoint a chapter 11

trustee – as there is no doubt an independent fiduciary is needed no matter which chapter the

case is in – and is far better than allowing this Debtor to remain in control.

53.     Section 1104(a) of the Bankruptcy Code provides that the court must order the

appointment of a trustee at any time after the commencement of the case but prior to

confirmation of a plan, on request of a party in interest or the United States Trustee, upon either

of the following two grounds:

> (1)  for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current
> management . . . ; or
>
> (2)  if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate . . . .

11 U.S.C. § 1104(a).

54.     Because there is no statutory definition of "cause" and the examples in the statute

are illustrative, not exclusive, courts determine cause on a case by case basis.  *In re Marvel*

*Entertainment Group, Inc.*, 140 F.3d at 472 ("§1104(a)(1) does not promulgate an exclusive list

of causes for which a trustee may be appointed"); *In re V. Savino Oil & Heating Co.*, 99 B.R.

518, 525 (Bankr. E.D.N.Y. 1989) ("Under § 1104(a)(1), the words 'including' and 'or similar

cause' before and after the enumerated examples of cause and 11 U.S.C. § 102(3) indicate that

the grounds for appointing a reorganization trustee are not even limited to the derelictions

specifically enumerated."); *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa.

1988) (decision as to whether appointment of a Chapter 11 trustee is needed is made on case by

case basis).

55.    For the same reasons discussed above, both grounds enumerated in section

1104(a) are present.  First, the appointment of a chapter 11 trustee would clearly benefit the

estate as compared to leaving pre-petition management in place.  A chapter 11 trustee would

make independent decisions for the benefit of the Debtor's estate and its creditors, not for the

benefit of its management, concerning, among other things:  (a) whether to prosecute the

Management Adversary Proceeding as plaintiff; and (b) the proper timing and structure for a sale

of the IP Assets so as to maximize value.  Additionally, a chapter 11 trustee would avoid the

numerous wasteful actions taken by the Debtor, such as:  (a) making extensive efforts to move to

dismiss the Debtor's own claims against its management; (b) opposing derivative standing to

allow a creditor to bring claims of the Debtor at the creditor's expense; (c) pressing an objection

to Five Mile's claim when third parties - the management defendants - are already pressing that

objection, and when the Debtor's opine that there may never be any distributions on that claim

even if allowed; and (d) hiring costly professionals to perform  routine bankruptcy tasks that do

not require their level of expertise and expense.  These considerations amply support the second

enumerated ground for appointment of a chapter 11 trustee pursuant to section 1104(a)(2).

56.     These same considerations also support the first enumerated ground for the

appointment of a chapter 11 trustee: that there has been "incompetence, or gross

mismanagement of the affairs of the debtor."  11 U.S.C. § 1104(a)(1).  As discussed above, the

Debtor's management is conflicted on virtually every major issue and asset in this case, and the

Debtor has taken wasteful actions that have actively harmed the interests of the Debtor's estate

and its creditors, while supporting the interests of Debtor's management.  These conflicts amply

support the appointment of a chapter 11 trustee.  *See In re Marvel Entertainment Group*, 140

F.3d at 473 (An "unhealthy conflict of interest . . . manifest in the 'deep-seeded conflict and

animosity' between [conflicted management] and the [creditors]" and "the lack of confidence all

creditors had in the [conflicted managers'] ability to act as fiduciaries" supports a finding of

cause to appoint an independent fiduciary, a chapter 11 trustee under section 1104); *see also In

re Eurospark Indus.*, 424 B.R. 621, 630-31 (Bankr. E.D.N.Y. 2010) (creditors' lack of trust in

management to administer the estate's remaining asset in the best interests of the estate supports

appointment of a chapter 11 trustee).

57.     In addition, section 1104(a)(1) includes consideration of both pre- and post-

petition mismanagement of the Debtor.  *In re Lodge at Big Sky, LLC*, No. 10-62229-11, 2011

Bankr. LEXIS 2296, at *1, *20-21 (Bankr. D. Mont. June 8, 2011) (noting that evidence of pre-

petition mismanagement supports appointment of a trustee under section 1104(a) while a

showing of gross mismanagement after commencement of the case supports both the

appointment of a trustee and conversion under section 1112(b)); *In re Taaf, LLC*, No. 10-00171-

8-RDD, 2010 Bankr. LEXIS 449, at *1, *6 (Bankr. E.D.N.C. Feb. 12, 2010) ("A court may

consider both the pre-petition and post-petition misconduct of the management when

determining if cause exists for the appointment of a chapter 11 Trustee.").  As detailed fully in

31

the complaint in the Management Adversary Proceeding, which is incorporated herein by

reference, the Debtor's affairs, managed by the same individuals as currently manage the Debtor,

were managed incompetently at best, and grossly mismanaged at worst, including the utter

failure to obtain any value for the IP Assets and supporting the Subsidiaries' efforts to sell the

Resorts in a structure that foisted a massive tax claim on the Debtor.  Accordingly, the pre-

petition mismanagement also supports appointment of a trustee.

### NOTICE

58.    Notice of the relief being requested in this Motion is being provided to:  (a) the

Debtor, (b) Midland Loan Services, Inc., (c) the United States Internal Revenue Service, (d) the

Office of the United States Trustee, (e) all creditors listed in the Schedules and the mailing

matrix filed by the Debtor in this case, and (f) any other party that has requested notice in this

case.  Five Mile submits that such notice is proper and sufficient and complies with Fed. R.

Bankr. P. 2002(a) and the Order Establishing Certain Notice, Case Management, and

Administrative Procedures [Docket No. 11].

## CONCLUSION

WHEREFORE, Five Mile respectfully requests that the Court enter an order,

substantially in the form annexed hereto as Exhibit A, (a) granting this Motion; (b) converting

this case to a case under chapter 7 of the Bankruptcy Code or, in the alternative, appointing a

chapter 11 trustee; and (c) granting such other and further relief in favor of Five Mile as may be

just and proper.

Dated: New York, New York
       July 2, 2013

                            KASOWITZ, BENSON, TORRES
                             & FRIEDMAN LLP

                            By: /s/ David M. Friedman
                            David M. Friedman (DFriedman@kasowitz.com)
                            Adam L. Shiff (AShiff@kasowitz.com)
                            Robert M. Novick (RNovick@kasowitz.com)
                            Daniel N. Zinman (DZinman@kasowitz.com)
                            1633 Broadway
                            New York, New York 10019
                            Telephone:  (212) 506-1700
                            Facsimile:  (212) 506-1800

                            *Counsel to Five Mile Capital Partners LLC*