Hearing Date and Time:  July 23, 2013, at 2:00 p.m. (prevailing Eastern Time)

James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Chad J. Husnick
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MSR HOTELS & RESORTS, INC.,[1] | Case No. 13-11512 (SHL) |
| Debtor. | |

**OBJECTION OF MSR HOTELS & RESORTS, INC. TO MOTION OF FIVE MILE CAPITAL PARTNERS LLC FOR AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(B) OR, IN THE ALTERNATIVE, APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(A)**

---

[1] The debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is MSR Hotels & Resorts, Inc. (1873).  The location of the debtor's service address is: c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10020.

# TABLE OF CONTENTS

Page

Preliminary Statement ...................................................................................................1

Background ....................................................................................................................6

I.      This Chapter 11 Case. ....................................................................................6

II.     The Resort Marks. ..........................................................................................7

III.    The Five Mile Litigation. ...............................................................................8

IV.     The Sale Process and Financing of this Chapter 11 Case. ............................9

Argument .....................................................................................................................12

I.      Five Mile Does Not Have Standing to Bring the Conversion Motion. ........12

II.     Five Mile Has Not Established Cause to Convert this Chapter 11 Case. .....14

        A.      Five Mile Has Not Shown Both that the REIT has Suffered a Substantial
                or Continuing Loss and that the REIT is Unable to Rehabilitate. ..........15

        B.      Five Mile Has Not Shown that the REIT's Management Has Mismanaged
                the Estate. ...............................................................................................19

        C.      Five Mile Cannot Manufacture a Conflict to Show that the REIT Has
                Mismanaged the Estate. ..........................................................................22

III.    The Appointment of a Trustee Is Unwarranted Under the Facts and Circumstances
        of this Chapter 11 Case. ...............................................................................23

        A.      Five Mile Fails to Demonstrate "Cause" Under Section 1104(a)(1) of the
                Bankruptcy Code. ....................................................................................24

                1.      Five Mile's Allegation of Purported Conflicts Do Not Rise to the
                        Level of Cause to Appoint a Trustee. ............................................24

        B.      The Appointment of a Trustee Is Not In the Best Interests of Creditors,
                Equity Interests, or the Estate Under Section 1104(a)(2) of the
                Bankruptcy Code. ....................................................................................26

Conclusion ...................................................................................................................28

i

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Five Mile Capital SPE B LLC v. MSR Hotels & Resorts, Inc.*,
    Adv. Pro. No. 13-01365 (SHL) (Bankr. S.D.N.Y.) ............................................................ 8, 9

*In re 221–06 Merrick Blvd. Assocs. LLC*,
    No. 10-45657 (JBR), 2010 WL 5018265 (Bankr. E.D.N.Y. Dec. 3, 2010)............................ 15

*In re Abijoe Realty Corp.*,
    943 F.2d 121 (1st Cir. 1991)............................................................................................ 12, 13

*In re Adbrite Corp.*,
    290 B.R. 209 (Bankr. S.D.N.Y. 2003) ........................................................................ 14, 15, 16

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006)
    *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ........................................................................... 23, 24

*In re Aerovox, Inc.*,
    269 B.R. 74 (Bankr. D. Mass. 2001) ....................................................................................... 21

*In re Ag Serv. Ctrs., L.C.*,
    239 B.R. 545 (Bankr. W.D. Mo. 1999)..................................................................................... 24

*In re Amatex Corp.*,
    755 F.2d 1034 (3d Cir. 1985)................................................................................................... 12

*In re Amicus Wind Down Corp. f/k/a Friendly Ice Cream Corp.*,
    No. 11-13167 (KG) (Bankr. D. Del. Apr. 20, 2012).............................................................. 16

*In re BH S & B Holdings, LLC*,
    439 B.R. 342 (Bankr. S.D.N.Y. 2010) ............................................................................. 15, 17

*In re Cardinal Indus. Inc.*,
    109 B.R. 755 (Bankr. S.D. Ohio 1990).................................................................................... 25

*In re Chipwich, Inc.*,
    54 B.R. 427 (Bankr. S.D.N.Y. 1985)........................................................................................ 21

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ....................................................................................... 16

*In re East End Dev., LLC*,
    No. 12-76181 (REG), 2013 WL 1820182 (Bankr. E.D.N.Y. Apr. 30, 2013)........................ 16

ii

**TABLE OF AUTHORITIES (CONT'D)**

Page

*In re Fall*,
   405 B.R. 863 (Bankr. N.D. Ohio 2009)
   *aff'd, Fall v. Farmers & Merchants State Bank*, Nos. 08-cv-3012, 09-cv-304, 2009 WL
   974538 (N.D. Ohio Apr. 9, 2009) ........................................................................................ 20

*In re Gen. Growth Props., Inc.*,
   409 B.R. 43 (Bankr. S.D.N.Y. 2009) .................................................................................... 17

*In re Global Crossing Ltd.*,
   295 B.R. 726 (Bankr. S.D.N.Y. 2003) .................................................................................. 21

*In re Halal 4 U LLC*,
   No. 08-15216 (MG), 2010 WL 3810860 (Bankr. S.D.N.Y. Sept. 24, 2010).................... 15, 20

*In re Hyatt*,
   479 B.R. 880 (Bankr. D.N.M. 2012) ..................................................................................... 20

*In re Ionosphere Clubs, Inc.*,
   101 B.R. 844 (Bankr. S.D.N.Y. 1989) .................................................................................. 12

*In re Ionosphere Clubs, Inc.*,
   184 B.R. 648 (S.D.N.Y. 1995) .............................................................................................. 16

*In re J.M. Check Cashing Corp.*,
   49 B.R. 273 (Bankr. E.D.N.Y. 1985) .................................................................................... 13

*In re Johnston*,
   149 B.R. 158 (9th Cir. B.A.P. 1992) ..................................................................................... 13

*In re Keeley and Grabanski Land P'ship*,
   455 B.R. 153 (B.A.P. 8th Cir. 2011) ................................................................................ 23, 24

*In re Lizeric Realty Corp.*,
   188 B.R. 499 (Bankr. S.D.N.Y. 1995) .................................................................................. 17

*In re Loco Realty Corp.*,
   No. 09-11785 (AJG), 2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009) ........................ 14

*In re Manawa Implement & Serv.*, Inc.,
   No. 86, 1988 WL 1571425 (Bankr. S.D. Iowa July 11, 1988) ............................................. 12

*In re Marvel Entm't Grp.*,
   140 F.3d 463 (3d Cir. 1998)................................................................................................... 24

*In re MSR Resort Golf Course LLC, et al.*,
   No. 11-10372 (SHL) (Bankr. S.D.N.Y.) ........................................................................... 7, 16

**TABLE OF AUTHORITIES (CONT'D)**

**Page**

*In re Parker Grande Dev., Inc.*,
    64 B.R. 557 (Bankr. S.D. Ind. 1986) ................................................................. 23

*In re Refco, Inc.*,
    505 F.3d 109 (2d Cir. 2007) ............................................................................... 12

*In re Rubio*,
    No. 09-75163 (AST), 2011 WL 124458 (Bankr. E.D.N.Y. Jan. 13, 2011) ............ 17

*In re SRJ Enters., Inc.*,
    151 B.R. 189 (Bankr. N.D. Ill. 1993) ................................................................. 26

*In re Stein & Day, Inc.*,
    87 B.R. 290 (Bankr. S.D.N.Y. 1988) .................................................................. 24

*In re The 1031 Tax Grp., LLC*,
    374 B.R. 78 (Bankr. S.D.N.Y. 2007) ............................................................. 14, 17

*In re Toyota of Yonkers, Inc.*,
    135 B.R. 471 (Bankr. S.D.N.Y. 1992) ................................................................ 17

*In re United Retail Grp., Inc.*,
    No. 12-10405 (SMB) (Bankr. S.D.N.Y. June 14, 2012) ...................................... 16

*Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*,
    374 B.R. 556 (Bankr. M.D. Pa. 2007) ........................................................... 15, 20

*Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. f/k/a GAF Corp. (In re G-I Holdings, Inc.)*,
    385 F.3d 313 (3d Cir. 2004) ............................................................................... 25

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*,
    330 F.3d 548 (3d Cir. 2003) .......................................................................... 22, 27

*Petit v. New England Mtg. Servs. Inc. (In re Petit)*,
    182 B.R. 64 (D. Me. 1995) ................................................................................. 24

*Schuster v. Dragone*,
    266 B.R. 268 (D. Conn. 2001) ........................................................................... 25

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*,
    779 F.2d 901 (2d Cir. 1985) .......................................................................... 22, 23

**Statutes**

11 U.S.C. § 1104 .................................................................................................... 27

**TABLE OF AUTHORITIES (CONT'D)**

**Page**

11 U.S.C. § 1104(a) ........................................................................................................ 1

11 U.S.C. § 1104(a)(1) ........................................................................................ 26, 28, 29

11 U.S.C. § 1104(a)(2) ............................................................................................. 26, 29

11 U.S.C. § 1109(b) ..................................................................................................... 12

11 U.S.C. § 1112(b) ..................................................................................................... 15

11 U.S.C. § 1112(b)(2) ................................................................................................. 26

11 U.S.C. § 1112(b)(4) ................................................................................................. 15

11 U.S.C. § 1112(b)(4)(A) ......................................................................... 15, 16, 20, 22

11 U.S.C. § 1112(b)(4)(B) ............................................................................................ 22

11 U.S.C. § 1123(b)(4) ................................................................................................. 17

11 U.S.C. § 1124(b)(4)(A) ........................................................................................... 18

11 U.S.C. § 503(b)(1)(A) ............................................................................................. 30

v

MSR Hotels & Resorts, Inc. (the "REIT") submits this objection to the *Motion of Five Mile Capital Partners LLC for an Order Converting the Debtor's Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) or, in the Alternative, Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)*, filed July 2, 2013 [Docket No. 49] (the "Conversion Motion").  In support hereof, the REIT submits the declaration of Saul Burian (the "Burian Declaration"), filed in connection herewith.  In further support hereof, the REIT respectfully states as follows.

### Preliminary Statement[1]

1.     The Conversion Motion is Five Mile Capital Partners LLC's ("Five Mile") latest attempt to extract value for its out-of-the-money investment in the Non-REIT Debtors.  Having failed time and time again in all of its prior attempts, Five Mile now asks this Court to derail a chapter 11 case that Five Mile has *no* stake in, imperiling prospective recoveries for actual stakeholders who must continue to endure and indirectly bear the expense of fending off Five Mile's exceedingly aggressive and desperate litigation tactics.  Each issue that Five Mile trots out in the Conversion Motion parrots the allegations that are the subject of the Five Mile Litigation.  As will become clear in adjudicating the Five Mile Litigation, Five Mile is not a creditor of the REIT with standing to pursue the Conversion Motion and there is no value to the claims raised in the Five Mile Litigation.  Thus, Five Mile's request for conversion or appointment of a chapter 11 trustee must be denied.

2.     Five Mile is not a creditor of the REIT with standing to pursue the Conversion Motion.  Five Mile holds a highly contingent *non-recourse* carveout guaranty against the REIT that has yet to be triggered and, in fact, is highly unlikely to ever be triggered given that the

---

[1]    Capitalized terms used but not otherwise defined in this preliminary statement shall have the meanings ascribed to them herein.

underlying Resorts have been sold.  Five Mile, in better days, consented to the sale of the Resorts in the Non-REIT Cases and cannot now argue that the sale was a "bad boy" act.  *See* GIC RE Stipulation, at 8 ("Five Mile shall not directly or indirectly seek . . . any . . . relief that would affect the milestones . . . or otherwise interfere with the auction of the Debtors' assets.").  Five Mile also invokes a tortured, circular reading of the non-recourse guaranty that renders it fully recourse.  It is not.  Five Mile's reading runs contrary to the clear text and intent of the documents, principles of real estate structured finance, and common sense.  Five Mile's arguments will fail and it will be clear that Five Mile is NOT a creditor of the REIT.  And once Five Mile has been determined not to have an economic stake in the outcome of this chapter 11 case, the REIT and its actual stakeholders will no longer have to shoulder the burden of dealing with Five Mile's continued litigation.   For this reason alone, the Court should reject the Conversion Motion.

3.      Even assuming the Conversion Motion should be considered on the merits in advance of or simultaneously with the adjudication of the Five Mile Litigation, the legal theories on which the Conversion Motion rests are woefully inadequate.  The REIT filed for chapter 11 to complete a sale process free of the Five Mile Litigation.  Since the commencement of this chapter 11 case and despite the overhang of Five Mile's continued litigation, the REIT has stayed consistently on task, filing bid procedures, securing debtor-in-possession financing, and negotiating a deal-in-principal with Midland.  Subject to negotiation of definitive documentation, Midland, the REIT's secured creditor, has agreed to a carve-out from the sale proceeds to fund professional fees incurred in connection with the chapter 11 sale process and potentially provide a recovery to other creditors of the REIT's estate.  In addition, the REIT has a commitment for up to $2 million in postpetition financing to cover professional fees to the extent that the

2

proceeds from the sale of the Resort Marks are insufficient to cover such professional fees.  The REIT also made significant progress in negotiating with GIC RE on the terms of a potential stalking horse bid for the Resort Marks.    Recently, the REIT became aware that on June 20, 2013, an affiliate of GIC RE acquired the Default Interest Certificate, which represents the entitlement to the payment of default interest for the Non-REIT Debtors' mortgage loan.  Given this development, the REIT is considering its alternatives and the terms on which it is prepared to go forward with the Midland settlement and/or the GIC RE stalking horse bid.  Accordingly, the REIT is clearly taking actions to implement a fair and efficient sale process that will maximize the value of the Resort Marks for the benefit of all stakeholders.

4.    Rather than support the REIT's efforts to maximize value, Five Mile seeks to impede the REIT's progress by filing the Conversion Motion and objecting to every single substantive pleading filed in this case, including the bidding procedures and sale motion that it previously recognized "probably makes sense."    *See* May 13, 2013 Hr'g Tr. 8:16–17 (Five Mile's counsel: "I think, inherently, a sales process probably makes sense.").    Five Mile's continued vexatious litigation is a costly diversion from the REIT's goal of maximizing the value of the Resort Marks for the benefit of its true stakeholders.

5.    In any event, Five Mile has failed to carry its burden on the Conversion Motion.  The fact that the REIT is liquidating its assets does not—standing alone—constitute a basis for converting the chapter 11 case or appointing a chapter 11 trustee.  Chapter 11 liquidating plans are ubiquitous, and the Resort Marks are being sold pursuant to an orderly process that has the support of the REIT's secured lender.  The REIT is not sustaining either a continuing or substantial loss through this process, and Five Mile has failed to show otherwise.  The costs of administering the REIT's chapter 11 case and running a sale process would also arise in

3

chapter 7 or a non-bankruptcy sale process.  In fact, the only costs that arguably would not arise in a chapter 7 case are the costs associated with defending against Five Mile's seemingly endless litigation.  Five Mile should not be heard to complain about the costs caused by Five Mile itself. And, notably, none of the REIT's actual stakeholders—i.e., neither Midland nor the IRS—has joined in Five Mile's Conversion Motion.

6.      Five Mile's bald allegations of "gross mismanagement" are likewise insufficient to support the Conversion Motion.  As discussed above, the REIT is working closely with its actual stakeholders to maximize the value of the Resort Marks.  Five Mile's allegations of gross mismanagement—e.g., that the REIT should have charged the Non-REIT Debtors that owned the Resorts for the use of the Resort Marks during the chapter 11 cases and terminated the existing license agreement with GIC RE—are misguided.  It is obvious that the REIT's strategy for maximizing value has never involved trying to steal value from its secured lender, Midland, whose collateral package has always included the proceeds from any licensing fees for the Resort Marks under the Non-REIT Debtors' mortgage loan and the related trademark security agreement.  Thus, there was no reason to charge the Non-REIT Debtors for the Resort Marks because the proceeds from licensing fees would be Midland's collateral whether they were held at the Non-REIT Debtors or at the REIT.  It should also come as no surprise that the REIT's strategy for maximizing the value of the Resort Marks now that they are no longer tethered to the preexisting corporate structure of the Non-REIT Debtors does not include playing a dangerous game of "chicken" by terminating on a whim the existing license agreement with the most logical purchaser for the Resort Marks—GIC RE.   Instead, the REIT is maintaining its relationship with GIC RE as part of its efforts to maximize the value of the Resort Marks in a responsible and constructive manner.

4

7.       Finally, Five Mile's alleged conflict of interest cannot support the Conversion Motion.  Conflicts of interest are not created every time a disgruntled litigation party files a baseless complaint against a company and its directors and officers and the company seeks to defend such litigation.  Instead, a debtor always has an interest in disposing of spurious litigation asserted against its board, especially here, where Five Mile seeks to establish purported "bad acts" by the REIT's directors which threaten to result in claims against the REIT itself. Specifically, Five Mile asserts that the REIT's current and former directors should have monetized the Resort Marks by charging the Non-REIT Debtors to use the Resort Marks.  But if the REIT attempted to charge the Non-REIT Debtors for the use of the Resort Marks, the REIT would either have had to (a) turnover the proceeds of any licensing fees directly to Midland resulting in no additional value for the REIT to distribute to other creditors or (b) somehow divert the proceeds of any licensing fees from Midland thereby triggering a "bad boy" act under the Guaranty of Recourse Obligations and likely causing the REIT to lose ownership in the Resort Marks to Midland.  It is therefore clear that the REIT could not have taken Five Mile's asserted course of action without creating a claim against the REIT.  As adjudication of the Five Mile Litigation will make clear, the claims against the REIT's current and former directors have no value whatsoever and cannot serve as a basis to create a conflict of interest.

8.       Five Mile's alternative request for appointment of a chapter 11 trustee fails for many of the same reasons.  The appointment of a trustee is an extraordinary remedy not warranted under the circumstances of this case.  There has been no evidence of gross mismanagement, fraud, dishonesty, or incompetence.  There is no conflict of interest.  And, not a single *true* stakeholder supports the remedy as being in the best interests of the estate.  In any event, there is no benefit to the estate from the appointment of a chapter 11 trustee because the

5

Court will determine the validity of Five Mile's claims through the adjudication of the Five Mile Litigation.

9.    Accordingly, the REIT respectfully submits that the Conversion Motion should be denied because Five Mile is not a creditor of the REIT with standing to pursue the Conversion Motion and, if the Court finds such a determination necessary, Five Mile fails to meet its burden to show that either conversion to chapter 7 or the appointment of a chapter 11 trustee is appropriate in this case.

## Background[2]

## I.    This Chapter 11 Case.

10.    On May 8, 2013 (the "Petition Date"), the REIT filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The REIT continues to manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed a statutory committee of unsecured creditors in the chapter 11 case.

11.    The REIT is a real estate investment trust whose primary assets consist of interests in certain registered and unregistered trademarks, service marks, trade names, and logos and various copyrights for promotional and operational materials and other works (collectively, the "Resort Marks") relating to the Grand Wailea Resort Hotel & Spa in Maui, Hawaii, the La Quinta Resort & Club PGA West in La Quinta, California, and the Arizona Biltmore Resort &

---

[2]    The facts and circumstances supporting this objection are set forth in the *Declaration of Daniel Kamensky of MSR Hotels & Resorts, Inc. (A) In Support of Debtor's Chapter 11 Petition and First Day Motions and (B) Pursuant to Local Rule 1007-2* (the "First Day Declaration") [Docket No. 2], the Adversary Motion to Dismiss (as defined herein), and the Adversary Reply (as defined herein), each of which is incorporated herein by reference.

Spa in Phoenix, Arizona (collectively, the "Resorts").  The REIT does not have any remaining business operations or employees.

12.    On February 1, 2011, certain subsidiaries of the REIT (such affiliates, collectively, the "Non-REIT Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court, which cases were consolidated for procedural purposes only under the caption *In re MSR Resort Golf Course LLC, et al.*, No. 11-10372 (SHL) (Bankr. S.D.N.Y.) (the "Non-REIT Cases").  On February 22, 2013, the Court confirmed a chapter 11 plan (the "Non-REIT Plan") for each Non-REIT Debtor other than MSR Sub Intermediate Mezz LLC providing for the sale of substantially all of the assets of the Non-REIT Debtors, including the Resorts, to affiliates of 450 Lex Private Limited and C Hotel Mezz Private Limited (together, "GIC RE").  On February 28, 2013, the Non-REIT Plan became effective.  This chapter 11 case is not jointly administered with the Non-REIT Cases.

## II.    The Resort Marks.

13.    As noted above, the REIT owns certain Resort Marks that are related to the Resorts that were sold to GIC RE pursuant to the Non-REIT Plan.  The Non-REIT Debtors expressly excluded the Resort Marks from the transaction contemplated by the Non-REIT Plan, and the REIT continues to own the Resort Marks at this time.  The Non-REIT Debtors' prepetition mortgage lender, represented by Midland Loan Services, Inc. ("Midland"), asserts a claim against the REIT secured by the Resort Marks of more than $59 million on account of the Non-REIT Debtors' mortgage loan and the Trademark Security Agreement.[3]

---

[3]    The "Trademark Security Agreement" is that certain Trademark Security Agreement, dated as of January 9, 2006, by and among the REIT, as successor in interest to CNL Hotels & Resorts, Inc., MSR Desert Resort, LP, as successor in interest to CNL Desert Resort, LP, MSR Resort Hotel LP, as successor in interest to CNL Resort Hotel LP, MSR Resort Silver Properties, LP, as successor in interest to CNL Resort Silver Properties, LP, MSR Grand Wailea Resort, LP, as successor in interest to CNL Grand Wailea Resort, LP, MSR

(Continued…)

14.     After consummation of the Non-REIT Plan, the REIT considered its options to monetize the value of the Resort Marks, finalize its wind-down, and maximize recoveries to its creditors.[4]   Among other efforts, the REIT approached GIC RE, the most logical party to purchase the Resort Marks, about a potential sale of the Resort Marks, subject to higher and better offers.   The REIT also engaged Midland and the IRS regarding the potential settlement of their claims, the potential sale of the Resort Marks, and the allocation of the proceeds from a sale.   In addition, Midland has pressed the REIT to administer a sale process to bring the remaining issues related to the Non-REIT Debtors' mortgage loan to their ultimate conclusion.

### III.    The Five Mile Litigation.

15.     An out-of-court sale and wind-down process became untenable, however, when Five Mile filed a complaint in the Supreme Court of the State of New York, County of New York, Index No. 651267/2013, on April 9, 2013, against the REIT and certain of its current and former directors, asserting direct and derivative claims on account of their actions and omissions in connection with the Non-REIT Plan and the Resort Marks (together with the related adversary proceeding, *Five Mile Capital SPE B LLC v. MSR Hotels & Resorts, Inc.*, Adv. Pro. No. 13-01365 (SHL) (Bankr. S.D.N.Y.), the "Five Mile Litigation").   Specifically, the Five Mile Litigation ensured that any party interested in purchasing the Resort Marks would need the protection of a court process to acquire the Resort Marks free and clear of all liens, claims, and encumbrances.  Thus, on the Petition Date, the REIT commenced this chapter 11 case to provide

---

Claremont Resort, LP, as successor in interest to Claremont Resort, LP, MSR Biltmore Resort, LP, as successor in interest to CNL Biltmore Resort, LP, and German American Capital Corporation.

[4]   In addition, because the Non-REIT Debtors that owned the Resorts were disregarded entities for tax purposes, the consummation of the Non-REIT Plan likely triggered a future tax liability against the REIT for which the Internal Revenue Service (the "IRS") is expected to hold a significant unliquidated claim.

8

it with the opportunity to expeditiously resolve relevant claims and causes of action, effectuate a sale and plan process free of the Five Mile Litigation, and wind down its estate.

16.    On May 1, 2013, the REIT and its current and former directors removed the Five Mile Litigation to federal court.  On May 9, 2013, the REIT and its current and former directors filed a motion to dismiss and the *Memorandum of Law in Support of Motion of Defendants to Dismiss Complaint in its Entirety* (the "Adversary Motion to Dismiss").  On May 28, 2013, the Honorable George B. Daniels of the United States Court for the Southern District of New York referred the Five Mile Litigation to this Court.  The Five Mile Litigation is currently pending as an adversary proceeding, *Five Mile Capital SPE B LLC v. MSR Hotels & Resorts, Inc.*, Adv. Pro. No. 13-01365 (SHL) (Bankr. S.D.N.Y.), which is a related matter to this chapter 11 case.  On July 1, 2013, Five Mile filed the *Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint in its Entirety* [Docket No. 4, Adv. Pro. No. 13-01365] (the "Five Mile Response").  The REIT will file its reply (the "Adversary Reply") to the Five Mile Response on July 12, 2013.

**IV.    The Sale Process and Financing of this Chapter 11 Case.**

17.    To implement its in-court sale process, the REIT filed the *Motion of MSR Hotels & Resorts, Inc. for Entry of an Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof and an Order Approving the Sale of the Resort Marks* [Docket No. 34] (the "Bidding Procedures Motion") on June 10, 2013.  Pursuant to the Bidding Procedures Motion, the REIT seeks approval of certain proposed procedures (the "Bidding Procedures") that will allow it to monetize the Resort Marks through a sale to the highest or otherwise best purchaser after a thorough marketing period.  Importantly, the Bidding Procedures do not impair the REIT's ability to consider all qualified bid proposals or to modify the procedures as

9

necessary or appropriate to maximize value for its estate. In short, the Bidding Procedures provide the REIT maximum flexibility in its effort to effectuate the best transaction for this estate and its creditors.

18.      Notably, Midland supports this process and has agreed to the timeline proposed in the Bidding Procedures. In fact, and as disclosed in the Bidding Procedures Motion, the REIT and Midland have reached an agreement in principal on the allocation of the proceeds from the sale of the Resort Marks. Significantly, and subject to definitive documentation, Midland has agreed to fund a carve-out from the sale proceeds to cover professional fees associated with the sale and potentially provide a recovery to other creditors of the REIT's estate, including the IRS. In addition, the REIT has made substantial progress in negotiating with GIC RE regarding a potential stalking horse bid for the Resort Marks. Recently, however, the REIT became aware that on June 20, 2013, an affiliate of GIC RE became the owner of the COMM 2006-CNL2 Commercial Mortgage Backed Certificates Class DE Certificate (the "Default Interest Certificate"), the certificate representing the entitlement to the payment of default interest for the Non-REIT Debtors' mortgage loan. Given the REIT's intent to implement a fair and efficient sale process that will maximize the value of the Resort Marks for all valid stakeholders, the REIT is considering this development, its alternatives, and the terms on which it is prepared to go forward with the Midland settlement and/or the GIC RE stalking horse bid.

19.      The REIT has also obtained financing to cover the costs of this chapter 11 case. On June 11, 2013, the REIT filed the *Motion of MSR Hotels & Resorts, Inc. for Entry of an Order Authorizing the Debtor to Obtain Postpetition Financing* [Docket No. 38] (the "DIP Motion"). Pursuant to the DIP Motion, the REIT seeks authorization to enter into a debtor-in-possession financing facility in the principal amount not to exceed $2 million

10

(the "DIP Facility").  Although the REIT hopes to be able to satisfy all administrative claims from the proceeds of the sale process, the DIP Facility may be necessary to the extent the estate's share of the sale proceeds is insufficient to cover professional fees incurred during the chapter 11 case, especially those resulting from Five Mile's exceedingly aggressive litigation tactics.  This DIP Facility does not require a commitment fee and is favorable to the REIT in nearly every respect, including that the DIP Facility will be junior to valid, perfected, and non-avoidable prepetition existing liens, including the REIT's obligations to Midland on account of the Non-REIT Debtors' mortgage loan.  The REIT is seeking approval of the Bidding Procedures and the authorization to enter into the DIP Facility at the hearing currently scheduled for July 23, 2013.

20.    Notwithstanding the REIT's efforts to date and the clear benefits that the Bidding Procedures and the DIP Facility will have on the REIT's estate, Five Mile is taking every conceivable action to impede the REIT's progress in this chapter 11 case.  Indeed, Five Mile has objected to every single substantive motion filed thus far in this case, including filing the *Objection of Five Mile Capital Partners LLC to Motion of MSR Hotels & Resorts, Inc. for Entry of an Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof and an Order Approving the Sale of the Resort Marks* [Docket No. 57] and the *Objection of Five Mile Capital Partners LLC to Motion of MSR Hotels & Resorts, Inc. for Entry of an Order Authorizing the Debtor to Obtain Postpetition Financing* [Docket No. 56].  These efforts are meant to drive up the costs of this chapter 11 case in an attempt to extract some value for Five Mile's out-of-the-money claim in the Non-REIT Cases.  Five Mile now also requests that the Court convert the REIT's chapter 11 case to a chapter 7 or, in the alternative, appoint a

11

chapter 11 trustee.  For the reasons discussed below, Five Mile's Conversion Motion should be denied.

**Argument**

**I.      Five Mile Does Not Have Standing to Bring the Conversion Motion.**

21.      Five Mile lacks standing.  A motion to convert a chapter 11 case may be brought only by a "party in interest," which the Bankruptcy Code defines to include "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."   11 U.S.C.  § 1109(b); *see also In re Manawa Implement & Serv.*, Inc., No. 86-1021, 1988 WL 1571425, at *1 (Bankr. S.D. Iowa July 11, 1988) (holding that non-creditor lacked standing to file motion to convert chapter 11 case to chapter 7 or 12 proceeding).  Although standing in bankruptcy proceedings is broad, an "[o]verly lenient standard[] may potentially over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization."  *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850 (Bankr. S.D.N.Y. 1989).  Thus, the determination as to whether a party has standing must be made on a case-by-case basis guided by the facts and circumstances before the court.  *In re Refco, Inc.*, 505 F.3d 109, 118 n.13 (2d Cir. 2007).

22.      It is clear that "if a party is not affected by the reorganization process it should not be considered a party in interest."  *Ionosphere Clubs*, 101 B.R. at 849.  Rather, a party must have "a sufficient stake in the proceedings so as to require representation."  *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).  A party lacking a colorable claim against the debtor does not have standing to seek to dismiss or convert a chapter 11 cases.  *See In re Abijoe Realty Corp.*, 943 F.2d 121, 125 n.6 (1st Cir. 1991) (noting that a "claim meritless on its face cannot confer 'standing' pending a determination of its allowability, if the claim has been challenged *and no*

12

colorable substantiation is forthcoming from the holder"); *see also In re Johnston*, 149 B.R. 158, 161 (9th Cir. B.A.P. 1992) (noting that "merely filing a meritless claim does not afford a claimant standing"); *In re J.M. Check Cashing Corp.*, 49 B.R. 273, 277 (Bankr. E.D.N.Y. 1985) (holding that a facially meritless proof of claim which evidences no "right to payment," disputed or otherwise, cannot confer creditor standing upon the holder).

23.     Here, once the Five Mile Litigation is resolved, the REIT is confident that it will have shown that Five Mile is not a party in interest with standing to bring the Conversion Motion because it holds no valid claims against the REIT. *See Abijoe Realty Corp.*, 943 F.2d at 125 n.6. Specifically, and as explained in detail in the Adversary Motion to Dismiss and the Adversary Reply, Five Mile is not a valid creditor of the REIT because the REIT has not committed a "bad boy" act that would trigger liability under (a) section 2 of the Guaranty of Recourse Obligations, dated January 9, 2006, between the REIT and Five Mile (the "Guaranty of Recourse Obligations"), and (b) section 18.1.1 of the Mezzanine Loan and Security Agreement (Fourth Mezzanine), dated January 9, 2006, between certain of the Non-REIT Debtors and Five Mile (the "Mortgage Loan Agreement").   Five Mile consented to the sale process to GIC RE when it entered into a clearly worded and intentioned stipulation with the REIT, the Non-REIT Debtors, and GIC RE during the Non-REIT Cases. *See Order Approving the Debtors' Stipulation with GIC RE and Five Mile* [Docket No. 865, Case No. 11-10372] (the "GIC RE Stipulation"), at 8 ("Five Mile shall not directly or indirectly seek . . . any . . . relief that would affect the milestones . . . or otherwise interfere with the auction of the Debtors' assets."). Recognizing the futility in this argument, Five Mile now advocates a circular reading of the Guaranty of Recourse Obligations to make it fully recourse. This reading, however, runs contrary to the plain text of the underlying documents, the clear intent of the parties, and common sense. Accordingly, it is

13

appropriate for the Court to determine whether Five Mile is a creditor of the REIT in connection

with adjudicating the Five Mile Litigation before reaching the merits of the Conversion Motion.

## II. Five Mile Has Not Established Cause to Convert this Chapter 11 Case.

24.     Even if Five Mile has standing to pursue the Conversion Motion, the Conversion

Motion fails on the merits as well.  Section 1112(b) of the Bankruptcy Code establishes that a

court must convert a chapter 11 case to chapter 7 if a party in interest establishes "cause."

11 U.S.C. § 1112(b).  It is the movant's burden to show that there is "cause" to convert a chapter

11 case pursuant to section 1112(b) of the Bankruptcy Code.  *In re Loco Realty Corp.*,

No. 09-11785 (AJG), 2009 WL 2883050, *2 (Bankr. S.D.N.Y. June 25, 2009).  The court has

"wide discretion" on whether cause exists to convert a chapter 11 case.  *In re The 1031 Tax Grp.,
LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007).  Section 1112(b)(4) sets out a non-exclusive list

of 16 illustrative examples (not elements, as Five Mile incorrectly states in the Conversion

Motion) for when "cause" exists.  *Id.*  Courts consider other factors as well in deciding whether

"cause" exists, including for a bad faith filing of a chapter 11 petition.  *See In re Adbrite Corp.*,

290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (listing additional factors that have been used to

either convert or dismiss a chapter 11 case).

25.     Here, Five Mile relies on two bases to show "cause" to convert this chapter 11

case:  (a) the REIT has incurred a "substantial or continuing loss to or diminution of the estate"

and does not have a "reasonable likelihood of rehabilitation," *see* 11 U.S.C. § 1112(b)(4)(A), and

(b) the REIT has been grossly mismanaged because (i) the REIT's management is not running a

value maximizing sale process and has not charged GIC RE or any other party for use of the

Resort Marks or (ii) that the REIT's management is conflicted and can no longer act as

fiduciaries to the estate.  Both fail.

A.    **Five Mile Has Not Shown Both that the REIT has Suffered a Substantial or Continuing Loss and that the REIT is Unable to Rehabilitate.**

26.    To satisfy the factor for "cause" set forth in section 1112(b)(4)(A) of the Bankruptcy Code, the moving party must satisfy two prongs—i.e., both that there is continuing loss **and** that the debtor has no real likelihood to rehabilitate the business. *In re 221–06 Merrick Blvd. Assocs. LLC*, No. 10-45657 (JBR), 2010 WL 5018265, *2 (Bankr. E.D.N.Y. Dec. 3, 2010). Courts must determine whether there is a continuing or substantial loss on a case-by-case basis. *Adbrite Corp.*, 290 B.R. at 215.  To determine whether a debtor has sustained a loss, "a court must make a full evaluation of the present condition of the estate, not merely look at the debtor's financial statements."  *Id.*  Courts have defined a "continuing loss" as a "[n]egative cash flow and an inability to pay current expenses as they come due."  *Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007); *see also In re Halal 4 U LLC*, No. 08-15216 (MG), 2010 WL 3810860, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (noting that the inability to meet basic operating expenses establishes continuing loss).  Moreover, to the extent that another party is incurring the losses, there is no continuing loss to the estate.  *See Merrick Blvd. Assocs.*, 2010 WL 5018265, at *2 (noting that a continuing loss was being absorbed by an owner and not the debtor).  What is clear is that a case should not be converted merely because a debtor is sustaining losses related to administering its estate, but rather requires something higher, a true degradation of estate assets.  *See, e.g., In re BH S & B Holdings, LLC*, 439 B.R. 342, 347–48 (Bankr. S.D.N.Y. 2010) (finding that there was a loss where the debtors had lost over $128 million in the aggregate and where the financial statements reflected an ongoing loss).

27.    Importantly, a short-term postpetition loss "is not grounds to convert or dismiss a bankruptcy case where financial viability is reasonably likely in the near future."  *Adbrite Corp.*,

290 B.R. at 216. Instead, a debtor should be able to retain control of the process as long as it has shown the ability to successfully reorganize. *Id.* at 215. Notably, the ability to "reorganize" under chapter 11 includes the ability to have an orderly liquidation, *see In re East End Dev., LLC*, No. 12-76181 (REG), 2013 WL 1820182, *7 (Bankr. E.D.N.Y. Apr. 30, 2013), and chapter 11 liquidation plans are specifically authorized under section 1123(b)(4) of the Bankruptcy Code. 11 U.S.C. § 1123(b)(4) ("[A] plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests . . ."); *see also In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 654 (S.D.N.Y. 1995) (holding that chapter 11 plans of liquidation are appropriate). In fact, where a debtor files for chapter 11 protection "based on its economic realities and consistent with a legitimate reorganization purpose, liquidation under Chapter 11 is valid." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 986 (Bankr. N.D.N.Y. 1988). Thus, courts in this and other jurisdictions commonly confirm chapter 11 plans of liquidation. *See, e.g., In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 21, 2013) (confirmed plan of liquidation); *In re United Retail Grp., Inc.*, No. 12-10405 (SMB) (Bankr. S.D.N.Y. June 14, 2012) (same); *In re Amicus Wind Down Corp. f/k/a Friendly Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Apr. 20, 2012) (same).

28.    Consequently, to reach the second prong of the test under section 1124(b)(4)(A) of the Bankruptcy Code, a court should first find that a debtor is sustaining a substantial or continuing loss where reorganization is not realistic. *Adbrite Corp.*, 290 B.R. at 215. Only then should a court turn to the question of whether a company has the ability to "rehabilitate." And although it is true that the term "rehabilitate" is a narrower term than "reorganize," courts considering the "rehabilitation" prong typically focus on whether the debtor is making progress

16

with its creditors. *See The 1031 Tax Grp.*, 374 B.R. at 93 (finding that there was no cause to convert a chapter 11 case where debtor continued to work diligently with other stakeholders to propose a chapter 11 plan). Nor is it necessarily appropriate to determine whether the company can rehabilitate at the outset of a case, even where the debtor has plans to liquidate its assets. *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995); *see also In re Gen. Growth Props., Inc.*, 409 B.R. 43, 65 (Bankr. S.D.N.Y. 2009) (holding that "[t]here is no requirement in the Bankruptcy Code that a debtor must prove that a plan is confirmable in order to file a petition" and noting that courts "consistently refuse[] to dismiss on [the inability to confirm a plan] ground before a plan has been proposed"); *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992) (holding that it was inappropriate to convert a case for inability to confirm a plan during the debtor's exclusivity period). Instead, the typical cases where courts have found an inability to "rehabilitate" generally involve chapter 11 cases that have lasted a considerable amount of time without significant progress or a roadmap for exit. *See, e.g.*, *BH S & B Holdings*, 439 B.R. 342 (finding cause to convert a case where no plan had been filed even though the case had been ongoing for two years and the debtor had shut down all operations twenty-two months earlier); *In re Rubio*, No. 09-75163 (AST), 2011 WL 124458 (Bankr. E.D.N.Y. Jan. 13, 2011) (finding cause to convert case where no plan was filed eighteen months after the commencement of the case). This analysis, however, is not appropriate at the outset of a chapter 11 case.

29.    Here, Five Mile cannot satisfy its burden on the gating issue of whether the REIT is sustaining either a substantial or a continuing loss. Instead, Five Mile makes conclusory statements about the REIT's schedules and statements of financial affairs filed at the outset of this chapter 11 case to assert that the REIT must be sustaining continuing losses by administering

17

its estate.  *See* Conversion Motion ¶¶ 26–27.  Five Mile does not attempt to show the extent of
these losses.  In fact, it is likely that Five Mile would be unable to do so because this case is only
in its infancy.

30.    Five Mile also incorrectly asserts that the fact that the REIT is seeking authority
to enter into the DIP Facility shows that it is sustaining a continuing loss.  *Id.* at ¶ 27.  But this is
incorrect—the standard is not that a debtor is paying the costs to administer its estate.  Moreover,
Five Mile's complaints about continuing loss for the administration of a chapter 11 case ring
hollow given that the primary driver of these costs is Five Mile's exceedingly aggressive
litigation tactics.  Indeed, Five Mile has objected to every single substantive action that the REIT
has taken in this chapter 11 case, making increased legal expenses a *fait accompli*.  Simply put,
the Court should disregard Five Mile's complaints about mounting legal expenses.  Thus, at the
outset, Five Mile fails to meet its burden to convert a case to chapter 7 under
section 1112(b)(4)(A) of the Bankruptcy Code.

31.    Moreover, Five Mile is simply incorrect because this is not a situation where the
REIT's assets are perishable or declining in value.  Indeed, Five Mile's proffered witness has
conceded as much in support of Five Mile's objection to the Bidding Procedures Motion.  *See*
Fried Declaration ¶ 6 ("[T]he value of the Resort Marks is unlikely to depreciate in the near
term").[5]  To the contrary, the REIT is working constructively with its true stakeholders to
maximize the value of the Resort Marks through an orderly sale process.  This is a process that is
generally supported by Midland, which asserts a secured claim in the Resort Marks, and the IRS,

---

5    The "Fried Declaration" is the *Declaration of Gabriel Fried in Support of Objection of Five Mile Capital
    Partners LLC to Motion of MSR Hotels & Resorts, Inc. for Entry of an Order (A) Approving Bidding
    Procedures and Bid Protections, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form
    and Manner of Notice Thereof and an Order Approving the Sale of the Resort Marks* [Docket No. 58].

which is likely to hold a significant priority claim.   Even more importantly, the REIT has resources to fund this sale process—the highly favorable proposed DIP Facility and the agreement in principal with Midland to share in the sale proceeds.   It is highly unlikely that a chapter 7 or chapter 11 trustee would have access to such resources.   To the extent further delay in a sale process equates to deterioration of estate value, that is an argument to expedite the process rather than bog the process down in a war of attrition.

32.      Finally, the REIT's use of chapter 11 to effectuate its sale and plan process is an appropriate use of chapter 11 and the REIT has made substantial progress in the two months since the Petition Date.   The proposed Bidding Procedures, DIP Facility, and agreement in principle with Midland demonstrate this progress.   Based on the high level of consensus among the actual stakeholders in the case, the REIT will be able to sell the Resort Marks in an orderly fashion.   The only impediment to this process is Five Mile.   The REIT commenced the chapter 11 cases because the Five Mile threats, although baseless, had a chilling effect on potential purchasers.   And once the REIT is rid of Five Mile, it will  no longer be forced to shoulder the burden of dealing with Five Mile's excessive litigation.

33.      Accordingly, the REIT respectfully submits that Five Mile has not established that this chapter 11 case should be converted pursuant to section 1112(b)(4)(A) of the Bankruptcy Code.

**B.      Five Mile Has Not Shown that the REIT's Management Has Mismanaged the Estate.**

34.      Section 1112(b)(4)(B) of the Bankruptcy Code provides that "cause" exists to convert a case where there has been "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(A).   Important to this inquiry is whether the debtor's management is acting as a fiduciary for the estate.   *Halal 4 U LLC*, 2010 WL 3810860, *4 (Bankr. S.D.N.Y.

19

Sept. 24, 2010); *see also In re Fall*, 405 B.R. 863, 868–69 (Bankr. N.D. Ohio 2009) (finding gross mismanagement where debtor did not perform its fiduciary duties because it sought to pay its management at the same time it was unable to meet other postpetition obligations) *aff'd*, *Fall v. Farmers & Merchants State Bank*, Nos. 08-cv-3012, 09-cv-304, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009).  An example of gross mismanagement is where the debtor's management worked another full time job, failed to properly file required disclosures such as operating reports, and entered into oral agreements for unauthorized postpetition financing, among other acts.  *Gateway Access Solutions*, 374 B.R. at 564–66; *see also In re Hyatt*, 479 B.R. 880, 887–90 (Bankr. D.N.M. 2012) (finding no gross mismanagement where debtor did not have proper accounting controls in place to monitor postpetition loans).  In sum, the inquiry into gross mismanagement of a debtor's estate is a factual one based on the totality of the circumstances and the Court's considered judgment.

35.     Here, Five Mile spends much time asserting that the REIT's management has grossly mismanaged the estate because it has not maximized value for the Resort Marks, has not charged a license fee for the use of the Resort Marks, and has conflicts created by the Five Mile Litigation.  Conversion Motion ¶¶ 31–47.  Five Mile misunderstands the simple facts.  Not once in the Conversion Motion does it mention that the Resort Marks and any proceeds thereof, *including license fees*, have always been Midland's collateral under the Non-REIT Debtors' mortgage loan and the related trademark security agreement.   Mortgage Loan Agreement § 2.5.13; Trademark Security Agreement § 1.  Nor does Five Mile mention that any recovery from the Resort Marks based on rights under the non-recourse carveout guaranties would belong first to Midland because Midland, under the intercreditor agreement between the Non-REIT Debtors' mortgage and mezzanine lenders, always had first priority to a recovery from the

20

Non-REIT Debtors. Guaranty of Recourse Obligations § 5.  So, if the REIT had charged the

Non-REIT Debtors for the use of the Resort Marks, it would have been taking value out of one

entity subject to a Midland lien to another entity subject to a Midland lien.  And, even worse, if

the REIT had tried to turn those proceeds over to Five Mile, the lowest ranking creditor, it would

have been subverting the loan documents, the intercreditor agreement, and the entire purpose of

the corporate structure giving rise to a potential claim under the non-recourse carve-out

guarantees by Midland and the mezzanine lenders, including Five Mile.  *This* may well have

amounted to gross mismanagement.  It was because of these principles that the Court, after a

long trial, found that the REIT had acted in good faith in connection with the Non-REIT Cases.

36.     Since the consummation of the Non-REIT Plan, the REIT has worked with

Midland to establish a sale process to maximize the value of the Resort Marks.  As strange as it

apparently seems to Five Mile, the REIT's management has decided not to terminate the license

agreement, because it does not want to risk alienating the most logical purchaser of the Resort

Marks during the proposed marketing process.  These decisions are not mismanagement but are

considered business judgments entitled to deference.  *See In re Global Crossing Ltd.*, 295 B.R.

726, 744 (Bankr. S.D.N.Y. 2003) (giving "great deference to the substance of the directors'

decision" where the decision "can be attributed to any rational business purpose"); *In re

Chipwich, Inc.*, 54 B.R. 427, 430–31 (Bankr. S.D.N.Y. 1985) (finding that a court should not

interfere with a debtor's exercise of business judgment "absent a showing of bad faith or abuse

of business discretion"); *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) ("[A]

debtor's business decision should be approved by the court unless it is shown to be so manifestly

unreasonable that it could not be based upon sound business judgment, but only on bad faith, or

whim or caprice." (internal citation omitted)).   Accordingly, Five Mile's bald assertions of mismanagement do not amount to anything near "cause."

### C.   Five Mile Cannot Manufacture a Conflict to Show that the REIT Has Mismanaged the Estate.

37.     Last, Five Mile asserts that the REIT's management is conflicted because of the litigation Five Mile initiated against the REIT and certain of its current and former directors.  It is almost inconceivable that a nuisance-value litigator, like Five Mile, can file a complaint made out of whole cloth against a company and its directors, and then when that company seeks to dismiss that litigation, argue they are unable to do so because the creditor has now created a "conflict."

38.     There is no conflict here, the REIT and its directors are aligned—the Five Mile Litigation must be dismissed.  The REIT is entitled to properly determine or estimate the claims against it and, if necessary, to defend against the claims.  The claims against the REIT are meritless and must be decided as soon as possible.

39.     Similarly, the claims against the directors have no value to the estate.  The claims are based upon legal theories that violate every applicable document, court finding, and legal principle.   Regardless, there is a legal standard, short of conversion of a chapter 11 case, designed to address the type of conflict that Five Mile asserts here.  *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901 (2d Cir. 1985) (establishing when a creditor may establish derivative standing in chapter 11 cases); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 577, 579 (3d Cir. 2003) (en banc) (holding that derivative standing is more appropriate than taking either the "too drastic a step" of appointing a chapter 11 trustee or the "more radical" step of converting a case to chapter 7).  It is clear why Five Mile has not taken this route.  First, it would have to

show it is a creditor with standing to assert the claims.  Second, it would have to show that the

claims are colorable.  *STN Enters.*, 779 F.2d at 905.  Finally, it would have to show that pursuing

the claim would be beneficial to the estate, including considering the costs of pursuing the claim.

*Id.* at 905–06.  Instead of making these showings, Five Mile seeks to convert the cases, and

prolong the uncertainty, in an attempt to extract an undeserved payoff.

40.      Accordingly, the REIT requests that this Court adjudicate the Five Mile

Litigation and find that Five Mile does not have a claim against the REIT.[6]

### III.   The Appointment of a Trustee Is Unwarranted Under the Facts and Circumstances of this Chapter 11 Case.

41.      Five Mile's alternative request for a chapter 11 trustee fails for many of the same

reasons as its request for conversion.  It is black letter law that appointment of a trustee under

either section 1104(a)(1) or section 1104(a)(2) of the Bankruptcy Code is an  "extraordinary

remedy," *In re Keeley and Grabanski Land P'ship*, 455 B.R. 153, 162 (B.A.P. 8th Cir. 2011),

"which should not be granted lightly," *In re Parker Grande Dev., Inc.*, 64 B.R. 557, 560 (Bankr.

S.D. Ind. 1986) and "should be the exception, rather than the rule."  *In re Adelphia Commc'ns

Corp.*, 336 B.R. 610, 655–56 (Bankr. S.D.N.Y. 2006) *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).

And, it is equally well-established that "there is a strong presumption in favor of allowing a

chapter 11 debtor-in-possession to remain in possession."  *Keeley*, 455 B.R. at 162 (internal

citations omitted).  This is because, among other reasons, "[t]he presumption in chapter 11 cases

---

[6]   Because Five Mile has failed to carry its burden to demonstrate that conversion or dismissal is warranted under the circumstances, the Court need not make a determination of which of the two remedies is appropriate. Nevertheless, should the Court reach this issue, the REIT reserves its right to submit supplemental briefing on whether conversion or dismissal is in the best interest of creditors and the estate.  In addition, should the Court reach this issue, the REIT reserves its right to argue that there are "unusual circumstances" pursuant to section 1112(b)(2) of the Bankruptcy Code and that the REIT should be given a reasonable period of time to cure the Court's findings on any such grounds for conversion or dismissal.

K&E 26973232

is that 'current management' is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re Ag Serv. Ctrs., L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) (quoting *Petit v. New England Mtg. Servs. Inc. (In re Petit)*, 182 B.R. 64, 68–69 (D. Me. 1995); *see also In re Marvel Entm't Grp.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The basis for the strong presumption against appointing an outside trustee is that there is often no need for one").

42.    Courts are unanimous that "the standard for section 1104 appointment is very high." *Adelphia*, 336 B.R. at 655.  As the party seeking appointment of a trustee, Five Mile bears the burden of showing by a preponderance of the evidence why the REIT's current management should be replaced by a trustee. *Keeley*, 434 B.R. at 162–63.  Moreover, Five Mile must show that appointing a trustee is in the best interest of all stakeholders, not just itself. *See In re Stein & Day, Inc.*, 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988) (refusing to appoint trustee where a trustee would benefit only one creditor while burdening the entire estate).

43.    Five Mile has moved under both sections 1104(a)(1) and 1104(a)(2) and fails on both.  The Conversion Motion does not contain any evidence other than the baseless allegations addressed above.  Moreover, *none* of the REIT's actual stakeholders support the relief requested in the Conversion Motion or have expressed dissatisfaction with the REIT's management.  Accordingly, the Court should deny the Conversion Motion and permit the REIT and its management to complete the sale process.

A.    **Five Mile Fails to Demonstrate "Cause" Under Section 1104(a)(1) of the Bankruptcy Code.**

1.    **Five Mile's Allegation of Purported Conflicts Do Not Rise to the Level of Cause to Appoint a Trustee.**

44.    Under section 1104(a)(1) of the Bankruptcy Code, extreme conflicts involving "fraud, dishonesty, incompetence, or gross mismanagement" may constitute a basis for

24

appointment of a trustee.   *See* 11 U.S.C. § 1104(a)(1).   Mere allegations, however, are

insufficient to justify appointment of a trustee under section 1104(a)(1).   *See Schuster v.*

*Dragone*, 266 B.R. 268, 272 (D. Conn. 2001) (holding that there must be sufficient evidence to

show that the appointment of a trustee is necessary and not mere allegations of misconduct);

*Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. f/k/a GAF Corp. (In re G-I Holdings,*

*Inc.)*, 385 F.3d 313 (3d Cir. 2004) (upholding bankruptcy court's denial of motion to appoint

trustee where there were unproven allegations of self-interest); *In re Cardinal Indus. Inc.*, 109

B.R. 755, 765 (Bankr. S.D. Ohio 1990) (finding no basis to appoint a trustee where there were

"highly contested allegations" that the movant claimed amounted to dishonesty or fraud).

45.   Here, Five Mile asserts allegations of misconduct but has completely failed to

demonstrate any fraud, dishonesty, misconduct, improper dealings, or any other justification for

appointment of a trustee.   Rather, Five Mile's allegations are similar to many of the allegations

that Five Mile asserted in the Non-REIT Cases, each of which the Court soundly rejected.   To

assert misconduct, Five Mile relies on management's purported conflicts of interest with respect

to the Five Mile Litigation and the REIT's sale process.   *See* Conversion Motion ¶¶ 32–47.   As

explained above, the REIT's management is not conflicted because the Five Mile Litigation is

baseless and the REIT is entitled to defend itself.   The proposed sale process for the Resort

Marks is being conducted in consultation with stakeholders and under the Court's supervision to

maximize the value of the REIT's estate.   Importantly, none of the REIT's *true* stakeholders

have joined in Five Mile's request for a trustee.   Accordingly, Five Mile's request for a

chapter 11 trustee under section 1104(a)(1) must be denied.

25

**B.    The Appointment of a Trustee Is Not In the Best Interests of Creditors, Equity Interests, or the Estate Under Section 1104(a)(2) of the Bankruptcy Code.**

46.    The "best interests test" in section 1104(a)(2) of the Bankruptcy Code permits a court to use its discretion regarding whether to appoint a trustee, considering all interests and utilizing "a cost-benefit analysis." *In re SRJ Enters., Inc.*, 151 B.R. 189, 195 (Bankr. N.D. Ill. 1993).  As an initial matter, and as noted above, Five Mile is not a valid creditor of the REIT. Setting this plain fact aside, however, it is clear that the appointment of a trustee is not in the best interests of the REIT's estate because, among other reasons:  (a) the costs of a trustee clearly outweigh any theoretical benefits; and (b) Five Mile seeks the appointment of a trustee for the sole purpose of pursuing meritless litigation.

47.    Five Mile argues that appointment of a trustee would not result in the "hiring of costly professionals to perform routine bankruptcy tasks."  Conversion Motion ¶ 55.  This is simply incorrect.  The trustee and a new set of advisors would undoubtedly take great time and expense to learn about the history of the REIT and its subsidiaries.  And the appointment of a trustee would not absolve the REIT's estate from the requirement to pay administrative expenses, including those for professional fees.  *See* 11 U.S.C. § 503(b)(1)(A).  The appointment of a trustee, therefore, would result in needless costs with absolutely no benefit to the estate.

48.    Moreover, Five Mile's request is a disingenuous attempt to see that new counsel is appointed that is inexperienced in these matters and has no background on Five Mile's long history in this case and the Non-REIT Cases.  It is clear that Five Mile hopes that this new counsel will blindly assert the meritless derivative causes of action outlined in the Five Mile Litigation.  But the Court can determine whether the Five Mile Litigation has any merit in connection with resolution of that litigation without burdening the estate with a trustee and new counsel.  Indeed, as discussed above, this is exactly the process that courts have used in the past

26

in lieu of appointing a trustee or dismissing or converting a chapter 11 case.  *See Cybergenics Corp.*, 330 F.3d at 576–80 (noting that granting a creditor derivative standing to pursue claims is preferable to other alternatives, such as appointing a chapter 11 trustee or converting a case to chapter 7).  The Five Mile Litigation is completely baseless and if pursued will result in zero recovery—as Five Mile's hopeless attempts over the past year have shown.  In sum, this is a complicated case with a long history, and once Five Mile is neutralized, it can be run efficiently by those who know it best.

49.    Accordingly, the REIT respectfully submits that there is no basis to appoint a trustee and that the Conversion Motion must be denied.  The REIT further requests that this Court dispose of the Five Mile Litigation as quickly as possible, so that the estate may focus on maximizing the value of its assets for the benefit of its stakeholders.

*[Remainder of Page Intentionally Left Blank]*

27

## Conclusion

For the foregoing reasons, Five Mile's request to convert the chapter 11 case to chapter 7, or in the alternative, appoint a chapter 11 trustee, should be denied.

Dated:  July 10, 2013
New York, New York

*/s/ Paul M. Basta, P.C.*
_____

James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Chad J. Husnick
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

*Proposed Counsel to the Debtor and Debtor in Possession*