Hearing Date: **July 23, 2013 at 2:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           :
In re:                                                     :  Chapter 11
                                                           :
MSR HOTELS & RESORTS, INC.,                                :  Case No. 13-11512 (SHL)
                                                           :
                 Debtor.                                   :
-----------------------------------------------------------x

# REPLY OF FIVE MILE CAPITAL PARTNERS LLC IN FURTHER SUPPORT OF ITS MOTION FOR AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b) OR, IN THE ALTERNATIVE, APPOINTING A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)

David M. Friedman (DFriedman@kasowitz.com)
Adam L. Shiff (AShiff@kasowitz.com)
Robert M. Novick (RNovick@kasowitz.com)
Daniel N. Zinman (DZinman@kasowitz.com)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel to Five Mile Capital Partners LL*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

REPLY ........................................................................................................................................ 3

I.   Five Mile Has Standing For Multiple Reasons. ............................................................. 3

   A.   Five Mile Must Have A Claim Because Its Rights Arises From The Same
        Contractual Provisions As Midland's Claim, Which The Debtor Concedes. ............ 3

   B.   The Debtor Cannot Deprive Five Mile Of Standing By Disputing Its Claim. ........... 5

II.  The Debtor Does Not Refute That Five Mile Has Established Cause To Convert. ............. 7

   A.   The Debtor Did Not Rebut The Existence Of Continuing Loss And
        Diminution. ............................................................................................................ 7

   B.   The Debtor Did Not Refute That There Has Been Gross Mismanagement. ............ 11

        1.   The Debtor's Unrebutted Neglect of the Marks and Proposal of
             Commercially Unreasonable Bidding Procedures. ......................................... 11

        2.   Midland's Alleged Entitlement to Receive Royalties Is Irrelevant. ................ 14

CONCLUSION ......................................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Bay Area Material Handling v. U.S. Tr. (In re Bay Area Material Handling)*,
   No. 94-15815, 1996 U.S. App. LEXIS 2272 (9th Cir. Jan 25, 1996) .............................. 6, 8, 10

*Bishara v. O'Callaghan (In re O'Callaghan)*,
   304 B.R. 500 (Bankr. M.D. Fla. 2003) ........................................................................................ 5

*Greenfield Drive Storage Park v. Cal. Para-Prof'l Servs., Inc. (In re Greenfield Drive Storage Park)*,
   207 B.R. 913 (B.A.P. 9th 1997) ................................................................................................... 8

*In re Adbrite Corp*,
   290 B.R. 209 (Bankr. S.D.N.Y. 2003) ...................................................................................... 10

*In re Adelphia Commc'ns. Corp.*,
   327 B.R. 143 (Bankr. S.D.N.Y. 2005) ...................................................................................... 12

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ........................................................................................ 9

*In re East End Dev., LLC*,
   491 B.R. 633 (Bankr. E.D.N.Y. 2013) ........................................................................................ 9

*In re HBA East, Inc.*,
   87 B.R. 248 (Bankr. E.D.N.Y. 1988) .......................................................................................... 6

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................................... 12

*In re Integrated Res., Inc.*,
   147 B.R. 650 (S.D.N.Y. 1992) .................................................................................................. 12

*In re Ionosphere Clubs*,
   184 B.R. 648 (S.D.N.Y. 1995) .................................................................................................... 9

*In re Zaleha*,
   162 B.R. 309 (Bankr. D. Id. 1993) .............................................................................................. 5

*Johnston v. Jem Dev. Co.*
   (*In re Johnston*), 149 B.R. 158 (B.A.P. 9th Cir. 1992) ............................................................... 6

*Lennon v. Grimmett*
   (*In re Lennon*), No. 04-1583-PKS, 2005 WL 6771262 (BAP 9th Cir. July 20, 2005)............11

**STATUTES**

*11 U.S.C. § 1104(a)* ...........................................................................................................1, 11

*11 U.S.C. § 1112(b)* ...........................................................................................................1, 11

Five Mile,[1] for its reply in further support of the Motion, states as follows:

**PRELIMINARY STATEMENT**

The Debtor claims in its objection[2] to the Motion that it only has <u>two</u> "actual" stakeholders, Midland and the IRS. (Opp. at 4, ¶ 5). While Five Mile obviously asserts that the number of "actual" stakeholders also includes Five Mile, the salient fact for this Motion is that all of the Debtor's stakeholders can be counted on one claw. That fact, coupled with the Debtor's admitted lack of any business operations, employees or revenue, make it abundantly clear that there is no reason for this REIT to be a chapter 11 debtor.

Midland, of course, is not an actual creditor but an agent for a creditor. In the Objection, the Debtor reveals for the first time its "understanding" that the holder of the right to receive payments under the Mortgage for which Midland is special servicer is now GIC. Opp. at 3, ¶ 3. GIC, by reason of its recent claims trading, appears to be the only party with an economic interest in the putative mortgage debt. Now, even Midland cannot be counted upon to push for the highest value for the estate's assets, as it appears to be acting for a party who wants those assets at the cheapest price. Plainly, this case cries out for the appointment of a disinterested fiduciary.

Indeed, GIC's attempted re-entry into the capital structure through Midland flies in the face of its prior sworn testimony. Just last month, GIC declared under penalty of perjury that <u>all</u> claims under the Mortgage have been <u>fully</u> <u>satisfied</u>. On June 7, 2013, Adam Gallistel, senior vice president of GIC Real Estate, Inc., filed a declaration in the District Court for the Southern District of New York in which he stated under penalty of perjury that on February 28, 2013,

---

[1] Capitalized terms are intended to have the meanings set forth in the *Motion of Five Mile Capital Partners LLC for an Order Converting the Debtor's Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) or, in the Alternative, Appointing a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)*, filed on July 2, 2013 [Docket No. 49].

[2] *Objection of MSR Hotels & Resorts, Inc. to Motion of Five Mile Capital Partners LLC for an Order Converting the Debtor's Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) or, in the Alternative, Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a)*, filed on July 10, 2013 [Docket No. 59] (the "<u>Objection</u>," cited herein as "Opp. __").

"$869,309,308.75 was paid to Midland **in full satisfaction of all claims under the Mortgage Loan.**"[3] It is farcical for the Debtor to submit one overwrought pleading after another claiming that the Court should disregard Five Mile's arguments because they interfere with the Debtor's concern for paying its "true," "actual," "valid" stakeholder (Opp. at ¶¶ 1, 2, 4, 5, 6, 18, 31, 32, 43, 45), when the stakeholder itself asserts in sworn, attorney-crafted testimony that its claims previously have been satisfied in full. Games are being played and Five Mile is not the party playing them.

Aside from these recent developments that cripple the Debtor's theories for remaining in chapter 11, the Debtor has failed to refute the Motion. Instead, the Debtor attempts to avoid the Motion entirely by challenging Five Mile's standing, but this is to no avail because parties with disputed and even contingent claims – which the Debtor admits Five Mile holds – have standing to be heard, including for purposes of seeking conversion. The Debtor also claims it is entitled to stay in chapter 11 because certain other companies have liquidated in chapter 11 before, but this argument fails to address the characteristics that distinguish its case from all those others: This Debtor has: (i) no business even prepetition; (ii) no thought or means of rehabilitating; (iii) only one set of non-operating business assets to sell (which it is seeking to sell outside of a plan); (iv) just three parties in interest; (v) continuing losses; and (iv) management that is steeped in conflicts and befogged by incompetence. We are aware of no debtor that has defeated conversion on these facts.

---

[3] *See Declaration of Adam Gallistel in Support of Brief of [certain GIC entities] in Opposition to Five Mile Capital Partners LLC's Appeal from the Bankruptcy Court's Confirmation Order*, filed on June 7, 2013, Case No. 13-CV-02448-KPF, [Docket No. 15], at 5, ¶ 10, attached hereto as **Exhibit A**.

2

## REPLY

**I.    Five Mile Has Standing For Multiple Reasons.**

  **A.    Five Mile Must Have A Claim Because Its Rights Arises From The Same Contractual Provisions As Midland's Claim, Which The Debtor Concedes.**

  1.    The Debtor has stated multiple times in its Objection and other filings that Midland is one of its "real" stakeholders for whom this case must be operated, and that the Debtor has agreed in principal to allow Midland's claim for default interest against the Debtor. (Opp. at 3, 5, 18, 31, 35). While Midland's claim is secured by certain limited collateral and Five Mile's is not, Midland can have no greater right to a claim against the Debtor than Five Mile because the Debtor granted substantially *the same guaranty to both Midland and Five Mile*. If Midland has a claim, which the Debtor has conceded repeatedly, Five Mile also must have a claim. The Debtor cannot take the legally and factually inconsistent position of allowing Midland's claim in full while claiming in the same pleading that Five Mile does not even have standing to be heard.

  2.    Copies of the Mortgage Loan Guaranty and section 18 of its underlying Mortgage Loan Agreement are attached hereto as **Exhibits B** and **C**, respectively, and copies of the Fourth Mezzanine Guaranty and section 18 of the Fourth Mezzanine Loan Agreement are attached hereto at **Exhibits D** and **E**, respectively. Comparing the two sets of documents shows that, except for some irrelevant provisions regarding the initial financing of the MSR enterprise, the Debtor gave substantively identical guaranties to Midland and Five Mile. It is impossible for the Debtor to concede a large claim to Midland – and, indeed, purport to be structuring its entire case around a supposed wish to repay that claim – while simultaneously claiming that Five Mile has no claim.

  3.    The converse, however, is not true: Five Mile can have a claim under its guaranty even if Midland does not, for at least three reasons. First, GIC has testified that all claims under

3

the Mortgage, of which it appears to be the sole economic stakeholder, have been satisfied in full (*see* Ex. A), whereas there is no dispute that Five Mile has not been paid anything. Second, relevant to one basis (of five) of guaranty liability, Midland, and certainly the Mortgage's economic stakeholder GIC, indisputably consented to the Subsidiaries' sale of the Resorts, whereas Five Mile did not consent and objected vigorously to the sale in the Subsidiaries' bankruptcy cases. Third, in a side deal Midland cut with the Subsidiaries and the (then non-debtor) REIT in connection with the Subsidiaries' February 22, 2013 Confirmation Order, Midland stipulated that it would not assert recourse rights against the REIT. *See Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 22, 2013 [Docket No. 2071] at 61, ¶ 123 (relevant portion attached hereto as **Exhibit F**). Five Mile did not waive its recourse rights.

    4.    The Trademark Security Agreement (the "TSA," submitted together with the 2008 joinder by the REIT attached hereto as **Exhibit G**) does not alter that conclusion. It provides that: the REIT's property only secures debt owed by the REIT itself – a self-evident concept since one cannot secure what one does not owe.[4] The Trademark Security Agreement provides:

> 1.    Grant of Security Interest.
>
> Assignor hereby pledges, assigns, transfers, delivers and grants to Assignee a security interest in, and continuing lien on, all of Assignor's right, title, and interest in and to, and under the following, in each case whether now owned or existing, or hereafter acquired or arising, and whenever located (all of which being hereafter referred to as the Trademark Collateral) as security for payment of all sums due in respect of the Loan and the performance of all terms, conditions and co-

---

[4] The TSA grants a security interest in the IP Assets only to the extent they are associated with the Resorts, and not the extent they have value relating to other actual or potential applications.

4

> venants of this Agreement and any other Loan Document **on Assignor's part to be paid and performed: with respect to, and associated with the Resorts only**, all United States, state and foreign trademarks, service marks, certification marks, collective marks, trade names corporate names . . .

*See* Ex. G at p.1, § 1 (emphasis added). Under the terms of the TSA, Midland thus only has a claim secured by the IP Assets to the extent there is an obligation <u>on the REIT's part</u> to be paid. Again, Midland and Five Mile have the same guarantees such that Midland's admitted claim has no greater validity (and for at least three reasons, probably less) than Five Mile's claim. It is thus impossible that Midland has standing and a claim and Five Mile does not. (The Debtor's willingness to allow the Midland claim while enthusiastically attacking Five Mile's claim is also further evidence of gross mismanagement of the estate and cause for conversion). Five Mile therefore has as much of a stake in the administration of this case and the treatment of IP Assets as Midland, perhaps greater.

### B. The Debtor Cannot Deprive Five Mile Of Standing By Disputing Its Claim.

5. The Debtor's argument that its pending motion to dismiss Five Mile's claims should deprive Five Mile of standing also is incorrect as a matter of law. No doubt many a debtor has fantasized about being able to summarily neuter an unhappy stakeholder simply by lodging an objection to its claims. However, holders of both disputed and contingent claims do have standing to be heard and seek relief. *See Bishara v. O'Callaghan (In re O'Callaghan)*, 304 B.R. 500, 511 (Bankr. M.D. Fla. 2003) ("the fact that a proof of claim is challenged and the claim is disputed would not detract from the status of an entity as a creditor until the claim is ultimately disallowed."); *In re Zaleha*, 162 B.R. 309, 314 (Bankr. D. Id. 1993) ("[T]he term 'party in interest' includes 'creditors;' it therefore includes parties holding contingent, unliquidated, disputed claims . . . Despite the fact the claim may be subject to a good faith dispute regarding its very existence, such a claim need not be determined or allowed before the party will have standing as

5

a 'party in interest.'"); *In re HBA East, Inc.*, 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988) (movants have standing to move to dismiss chapter 11 petition, despite the status of movants' claims as disputed).

6. Although this rule is obvious, at least one court of appeals specifically has held that holders of disputed claims may move for conversion of the case. *See Bay Area Material Handling v. U.S. Tr. (In re Bay Area Material Handling)*, No. 94-15815, 1996 U.S. App. LEXIS 2272, at *1 (9th Cir. Jan 25, 1996) (a putative creditor may not be denied standing to seek conversion simply because its claim is disputed and only minimal proof of a claim is required); *Johnston v. Jem Dev. Co. (In re Johnston)*, 149 B.R. 158, 160 (B.A.P. 9th Cir. 1992) (same).

7. Not only did Five Mile have standing to bring this Motion, for three reasons its continuing standing is not in jeopardy. First, the Motion to Dismiss the Complaint cannot result in the dismissal of Five Mile's claims under the guaranty. As set forth in Five Mile's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint in Its Entirety, dated July 1, 2013, Adv. Pro. No. 13-01365, Docket No. 4, incorporated herein by reference, Five Mile has five independent theories of recourse under the Guaranty. One is based on a plain-language reading of the governing documents. The others require factual determination to adjudicate and therefore are not even subject to dismissal on a Rule 12(b)(6) Motion. *See id*. at 24-25 (explaining Five Mile's allegations regarding failure to deal at arms' length, failure of MSR Intermediate to comply with single purpose entity criteria, failure of MSR Intermediate to conduct business as an independent entity separate and apart from its affiliates, failure of MSR Intermediate to not have any other debt besides financing debt, and whether the REIT's grant of a royalty free license to the Non-REIT Debtors caused loss to Five Mile).

8.  Second, the Debtor expressly admitted in the Objection that Five Mile does hold a contingent claim under its guaranty. Opp. At 1, ¶ 2. No one disputes that Five Mile and the Debtor are parties to a guaranty agreement, the Debtor merely disputes (unconvincingly) that the guaranty has not been triggered. Even if the Debtor were correct, that would still make Five Mile a contingent creditor. The Debtor concedes this in its Objection. *Id*.

9.  Third, in the Subsidiaries' bankruptcy cases, the Subsidiaries admitted (while under the control of the REIT and the REIT's directors, and while represented by the REIT's professionals) that Five Mile is a creditor of the REIT. The Subsidiaries argued that the IRS did not have rights to the proceeds of the REIT's indemnity claims against the Subsidiaries because those claims previously had been assigned to Five Mile under the Guaranty. *See* Confr. Hrg. Tr., dated Feb. 4, 2013 at 31:10-15 (**Exhibit H**) (Mr. Basta: "Now what does that mean, that [the indemnity claim has] been assigned? It's a collateral assignment, right? So what that means is that, if anything comes out of the REIT, and even if the IRS had a claim against the REIT, it doesn't go to the REIT because the REIT assigned its recovery of the formation of this deal over to Mr. Friedman's client"). The validity of Five Mike's guaranty claim against the REIT thus was admitted in prior litigation among identical parties. For these additional reasons, the Debtor's effort to avoid the merits of the Motion by challenging standing is wholly without merit.

II. **The Debtor Does Not Refute That Five Mile Has Established Cause To Convert.**

  A. **The Debtor Did Not Rebut The Existence Of Continuing Loss And Diminution.**

10. The Debtor cannot avoid the fact that it has continuing losses and diminution of the estate and no reasonable likelihood of rehabilitation, which requires conversion under section 1112(b)(4)(A). The Debtor mainly responds by arguing that because chapter 11 can, in theory, provide for liquidating plans, there should be no conversion here. (Opp. at 15-17, at ¶¶ 26-28).

7

That is not the law. Just because a hypothetical company can liquidate in chapter 11 does not mean that this Debtor may or should remain in chapter 11 under the facts present here.

11. The Court of Appeals for the Ninth Circuit has surveyed what constitutes diminution of the estate and no reasonable chance at rehabilitation under section 1112(b)(4)(A) by providing a number of different alternatives:

> Diminution of an estate exists where, for example, the debtor's business has ceased, *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994), or the debtor's liabilities outstrip its assets. *In re CCN Realty Corp.*, 23 B.R. 261, 262 (Bankr. S.D.N.Y. 1982). A debtor lacks "a reasonable likelihood of rehabilitation" where, for example, it lacks income, *In re Johnston*, 149 B.R. 158, 162 (BAP 9th Cir. 1992), lacks operating funds, *In re Great Am. Pyramid JV*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992), or lacks employees, capital, or "continuing revenue-generating activity," *Citi-Toledo Partners*, 170 B.R. at 609.

*Bay Area Material Handling v. U.S. Trustee (In re Bay Area Material Handling),* No. 94-15815, 1996 U.S. App. LEXIS 2272, at *4 (9th Cir. Jan. 25, 1996). *See also Greenfield Drive Storage Park v. Cal. Para-Prof'l Servs., Inc. (In re Greenfield Drive Storage Park)*, 207 B.R. 913, 917 (B.A.P. 9th 1997) ("[C]onversion is appropriate where there is no continuing revenue-generating activity in the best interests of creditors and the estate.").

12. Each of those alternatives is sufficient to require the conclusion that there is diminution of the estate and lack of a reasonable likelihood of rehabilitation, and the Debtor satisfies *all* of them: (i) the Debtor never did business prepetition because the Debtor thought it was an asset-less shell (and certainly any de minimis business ceased prepetition when the Resorts were sold); (ii) the Debtor's disclosures state that the Debtor's liabilities outstrip its assets; (iii) the Debtor lacks income (regrettably, by its own indefensible bad judgment); (iv) the Debtor lacks operating funds; and (v) the Debtor lacks employees, capital or continuing revenue-generating activity. Nowhere in the Objection does the Debtor suggest what its "reorganization" might be or what a confirmable chapter 11 plan would look like given its admitted paucity of

8

creditors (a single administrative claim, a single non-recourse claim, and Five Mile as the single material unsecured creditor, which the debtor disputes). The Debtor does not say what it thinks it is able to accomplish in chapter 11 that cannot be accomplished in chapter 7 without the expense of the preparation and litigation over a disclosure statement and a plan.

13. Furthermore, the authorities cited by the Debtor contradict the Debtor's arguments. As one court makes clear, a "Debtor's non-operating status renders its claim that a Chapter 11 liquidation will generate more monies than one under Chapter 7 speculative, at best." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 986 (Bankr. N.D.N.Y. 1988). Indeed, the authorities cited by the Debtor on this point all involved debtors that entered bankruptcy with operating business. *See In re East End Dev., LLC*, 491 B.R. 633 (Bankr. E.D.N.Y. 2013); *In re Ionosphere Clubs*, 184 B.R. 648 (S.D.N.Y. 1995); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973. In *In re Copy Crafters*, 92 B.R. at 986, the court *converted* the case to chapter 7 after the debtor had ceased business operations subsequent to its chapter 11 filing, with conversion found to be "in the best interests of the creditors and the estate" given the debtor's non-operating status and the totality of the circumstances.

14. Instead of addressing the plain-vanilla facts that the Debtor has no income and has continuing and mounting expenses – emblematic cause for countless conversions – the Debtor casts more unsupported aspersions on Five Mile. Under the Debtor's view, continuing losses and diminution of the estate somehow do not matter if they are caused by a creditor exercising its due process rights to oppose requests for prejudicial relief[5] where the Debtor's overriding purpose seems to be preventing a recovery to Five Mile. The facts should control: the Debtor has no plan to generate income, except by having a sale to liquidate substantially all of its business

---

[5] The Debtor bewails that Five Mile has objected to "every single substantive motion filed thus far in the case" and to "every single substantive action that the REIT has taken." Opp. ¶¶ 20, 30. The Debtor cries wolf. As the docket plainly reflects, Five Mile has filed <u>two</u> objections in this case.

9

property, which the Debtor admits may not generate sufficient funds to pay administrative expenses. It has material on-going expenses. It does not even aspire to rehabilitation.

15. As briefed in Five Mile's Motion, "rehabilitation" requires a continuation of an operating business, and is a much narrower term than "reorganize." (Motion at 16-18). The Debtor responds by arguing that the Court should not consider the "reasonable likelihood of rehabilitation" requirement because "a court should first find that a debtor is sustaining a substantial or continuing loss where reorganization is not realistic." (Opp. at 16, ¶ 28). Incorrect. The Debtor concocted this rule by misconstruing *In re Adbrite Corp*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). *In re Adbrite* held that continuing loss or diminution can be acceptable if there is a plan in place to return the debtor's operations to profitability: "[a] continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization." *Id*. at 215. That concept does not apply here because reorganization has never been within the realm of possibility.

16. Lastly, the Debtor tries to argue that the Motion is premature, stating that it is not "necessarily appropriate to determine whether the company can rehabilitate at the outset of a case" (Opp at 17, ¶ 28) and describing this case as being in its "infancy," (Opp. at 18, ¶ 29). That is extremely disingenuous. Everything the Debtor has said and done in these cases, particularly its Bidding Procedures Motion, has been directed to liquidating the company, and doing it quickly. A rehabilitation – which does not encompass a liquidation – is not a remote possibility here. The Court does not need to wait to conclude confidently that there is no chance at rehabilitation. It is abundantly clear right now. Further delay only allows more unnecessary losses to accumulate. *See In re Bay Area Material Handling*, 1996 U.S. App. LEXIS 2272, *5 ("Where a court finds 'no reasonable possibility of reorganization[,]' it need not delay conversion.") (quot-

10

ing *In re Johnston*, 149 B.R. at 162); *Lennon v. Grimmett* (*In re Lennon*), No. 04-1583-PKS, 2005 WL 6771262, at *1, *4 (BAP 9th Cir. July 20, 2005) ("Where, as here, 'there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case.'") (*quoting In re Johnston*, 149 B.R. at 162).

### B. The Debtor Did Not Refute That There Has Been Gross Mismanagement.

#### 1. The Debtor's Unrebutted Neglect of the Marks and Proposal of Commercially Unreasonable Bidding Procedures.

17. Five Mile's expert, Gabriel Fried of Hilco, explained at length in his June 9, 2013 Declaration in Opposition to the Debtor's Bid Procedures Motion[6], the many ways in which the Debtor's plan to sell the IP Assets is unreasonable and will likely result in a significant waste of value. Among other things, he explains the IP Assets are worth less than they could be because the Debtor has not enhanced their value by securing a revenue stream from GIC for its continued use of the IP Assets and entering into license agreements with other third parties, and that the Debtor should correct this neglect before offering the IP Assets for sale (Fried Opp. Decl. ¶¶ 6-9, 12-15, 24-26); that the Debtor has acted unreasonably by attempting to require that its liquidation be conducted on a tight distress-basis time frame, notwithstanding that there would be little cost and tremendous benefit for the Debtor to take the time needed to ensure that it obtains the highest possible value for the IP Assets (such as by entering into licenses) (Fried Opp. Decl. ¶¶ 17, 29); that the Debtor is failing to exercise reasonable business judgment by selling the IP Assets in their entirety, rather than attempting to sell separate licenses for use and/or components of the IP Assets (Fried Opp. Decl. ¶¶ 6-9, 19, 27-28); and that the Debtor is acting unreasonably by se-

---

[6] Attached as Exhibit A to the July 15, 2013 *Declaration of Gabriel Fried in Support of Motion of Five Mile Capital Partners LLC for an Order Converting the Debtor's Case to a Chapter 7 Pursuant to U.S.C. § 1112(b), or in the Alternative, Appoint a Chapter 11 Trustee Pursuant to 11 § 1104(a)*, submitted with this reply (cited herein as "Fried Opp. Decl.")

11

verely limiting the attractiveness of the assets to competing bidders by requiring the IP Assets to be sold pursuant to whatever transaction structure any emergent stalking horse bidder might select (Fried Opp. Decl. ¶ 21). We refer the Court to the Fried Declaration and Five Mile's objection to the Bidding Procedures Motion for a more fulsome discussion of the Debtor's failures to exercise reasonable business judgment.

18.     The Debtor's response is almost entirely non-substantive. The Debtor attempts to hide behind the business judgment rule (Opp. at 21, ¶ 36) but one does not get a free pass from any and all manner of misconduct, neglect, and incompetence merely by shouting "business judgment!" Indeed, where management's competence has been challenged, claiming they were exercising their judgment is circular. To begin with, the business judgment rule does not even apply because the Debtor's management is conflicted.[7] "The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: '(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (same); *In re Adelphia Commc'ns. Corp.,* 327 B.R. 143, 155 n.1 (Bankr. S.D.N.Y. 2005) (stating *Integrated Resources* five element test has been applied numerous times). The disinterestedness element is not satisfied because the Debtor's management had numerous conflicting roles managing the Subsidiaries, and now has personal interests in minimizing their liability to the Debtor for the waste it has

---

[7]     Five Mile did not "manufacture a conflict" to show mismanagement. The allegations of mismanagement are based on indisputable facts of management's multi-year failure to obtain any revenues from and protect the value of the IP Assets, or even realize the REIT owned the assets. Moreover, Five Mile brought the derivative claims *prior* to the commencement of the bankruptcy case, with no knowledge that the REIT would file for bankruptcy weeks later. Indeed, the REIT asserts, however unconvincingly, that it filed for bankruptcy only because of the pending derivative claims against management, so it logically cannot be the case that the derivative claims were "manufactured" for the purpose of a post-petition motion.

12

caused. Due care is not satisfied because the Debtor and its directors did not even know the debtor owned the IP Assets, and they have done nothing to exercise due care with respect to the IP Assets for years. Finally, the "waste" or "abuse of discretion" element is not satisfied for the reasons set forth in the Fried Declarations – the Debtor and its prepetition management have caused and are still causing exceptional waste and entirely failing to act in a commercially reasonable manner with respect to the IP Assets.

19. The Debtor's only substantive defense of its putative business judgment is its claim that it did not want to upset GIC by asking it to pay market-rate royalties – royalties that GIC would have to pay any other licensor to use its brands for the Resorts if it was not using the Debtor's brands for free. Mr. Fried explains that here, too, the Debtor demonstrates a fundamental misunderstanding of both the market for intangible assets and the parties' present relationship. Fried Decl. ¶ 6. As to the marketing aspect, he explains that IP Assets must be made as attractive as possible to the largest group of potential buyers, and that their current encumbrance by a licensee that pays no royalties would cause a potential bidder to discount value heavily, and conversely, the IP Assets would have more value to any bidder if they are generating revenue streams through licenses. *Id*. The Debtor's failure to take action in this regard has resulted in a lost opportunity and a loss of value.

20. Furthermore, Mr. Fried explains that this is not a "game of chicken" with one winner and one loser. Rather, GIC is faced daily with the prospect of having to rebrand the Resorts if the REIT were to terminate the license, and that would expose GIC immediately to millions of dollars of expenses for removing the Resort Marks from buildings, web sites, napkins, stationary, etc. Fried Decl. ¶ 7. Moreover, one cannot operate in the luxury or near-luxury end of the hospitality sector without brands, such that GIC still would have to license brands for the

13

Resorts from third parties, for which GIC would have to pay market rate license fees, or undertake the very expensive long-term process of developing new brands. *Id*. No one has suggested that the Debtor should terminate the GIC license "on a whim," but that the REIT utilize its contractual rights as a means of approaching GIC with a request for a fair market royalty, which would shift the brand protection costs and licensing opportunity to the REIT and eliminate the risk to GIC of termination. *Id*. The Debtor's failure to take these steps was not a reasonable exercise of business judgment. *Id*. The Objection shows that the Debtor *still* fails to understand its assets and what to do with them

### 2. Midland's Alleged Entitlement to Receive Royalties Is Irrelevant.

21.     Perhaps the Debtor's strangest defense of its neglect of the IP Assets is that the IP Assets, and proceeds therefrom such as license fees, are Midland's collateral. Opp. at 20-21, ¶ 35. The Debtor seems to posit that because some license fees would go to Midland, that somehow negates its gross negligence in failing to obtain any fees. *Id*. This is nonsensical. If the Debtor had collected royalties and paid them to Midland, *then Midland would be owed less money, the Debtor would be less deeply insolvent, and unsecured creditors could receive a greater recovery*. This is no defense to mismanagement whatsoever.

22.     Furthermore, as explained in the Fried Declaration, this argument also displays the Debtor's lack of understanding of the brand licensing business. Value is created by demonstrating to a potential licensee or purchaser that other licensees see value in the brand and that they are willing to pay for the association and the exclusivity that provides. Fried Decl. at ¶ 8. Generating revenue, besides being a good in and of itself (here, enabling the Debtor to reduce debt), increases the capital value of the asset. *Id*. Conversely, in a sale, any category that is locked up by a licensee paying less than fair value for the license or whose terms are non-standard puts the buyer at risk and that risk adversely affects price. *Id*. Thus, rather than defend

14

the Debtor's and directors' inaction and neglect of the IP Assets, the Debtor's arguments only demonstrate how ill-advised it is for current management to remain in possession.

23.    Finally, the Debtor offers that "the Court, after a long trial, found that the REIT had acted in good faith in connection with the Non-REIT Cases." The Debtor provides no citation for its statement, and that is because no such thing happened. This is one of multiple times that the Debtor has laid claim to findings that do not exist, with perhaps the most egregious being its false assertion, found in its Motion to Dismiss the Complaint in its Entirety, that the Court made a finding that Five Mile had consented to the sale of the Resorts.

## **CONCLUSION**

For the above reasons, in addition to those set forth in the Motion and as may be adduced at the hearing on the Motion, Five Mile respectfully requests that the Court to grant the Motion together with such other and further relief in favor of Five Mile as may be just and proper.

Dated: New York, New York
       July 15, 2013

                              KASOWITZ, BENSON, TORRES
                                  & FRIEDMAN LLP

                              By: /s/    David M. Friedman
                              David M. Friedman (DFriedman@kasowitz.com)
                              Adam L. Shiff (AShiff@kasowitz.com)
                              Robert M. Novick (RNovick@kasowitz.com)
                              Daniel N. Zinman (DZinman@kasowitz.com)
                              1633 Broadway
                              New York, New York 10019
                              Telephone:  (212) 506-1700
                              Facsimile:  (212) 506-1800

                              *Counsel to Five Mile Capital Partners LLC*