Hearing Date:  September 3, 2013 at 2:00 p.m.
Objection Deadline:  August 27, 2013 at 11:59 p.m.[1]

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                       :

In re:                           :          Chapter 11
                                         :

MSR HOTELS & RESORTS, INC.,    :          Case No. 13-11512 (SHL)
                                         :

               Debtor.         :

---------------------------------------------------------x

**OBJECTION OF FIVE MILE CAPITAL PARTNERS LLC TO
MOTION OF MSR HOTELS & RESORTS, INC. FOR ENTRY
OF AN ORDER APPROVING THE STIPULATION BETWEEN
MSR HOTELS & RESORTS, INC., MS RESORT PURCHASER LLC,
AND MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, N.A.**

David M. Friedman (DFriedman@kasowitz.com)
Adam L. Shiff (AShiff@kasowitz.com)
Robert M. Novick (RNovick@kasowitz.com)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel to Five Mile Capital Partners LLC*

---

[1]   *See* Case Management Order [Docket No. 11] at ¶ 25.

**TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................................... ii

Preliminary Statement ........................................................................................................ 1

Objections ........................................................................................................................... 3

I.   The Stipulation Unlawfully Makes the Mortgage Debt a Recourse Claim. ...................... 3

II.   For a Multitude of Reasons, the Terms of the Stipulation Are Unreasonable and Outside the Bounds of Business Judgment. ........................................................................ 5

    A.   The Stipulation Lifts the Stay in Favor of Midland With No Showing of Cause. ........................................................................................................................ 5

    B.   The Debtor Could Not Have Exercised Sound Business Judgment in Agreeing to the Stipulation Because it Did Not Inform Itself of Critical Facts. ......................................................................................................................... 8

    C.   The Stipulation Improperly Permits the Debtor to Remove Unknown Millions of Dollars of Assets from the Estate. ......................................................... 11

    D.   The Stipulation is an End Run Around the Sub Judice Motions. ............................. 13

III.   Entering the Stipulation Before a Sale Has Been Consummated is Imprudent Because it Will Immunize GIC from the Consequences of Bad Acts With Respect to the Collateral. ................................................................................................................ 15

IV.   The Stipulation Allowing the Mortgage Claim Against the REIT Also Requires the Allowance of Five Mile's Guaranty Claim Because the REIT Granted Midland and Five Mile Substantially Identical Guarantees. ............................................. 18

Conclusion ......................................................................................................................... 19

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adelphia Commc'ns. Corp.*,
  327 B.R. 143 (Bankr. S.D.N.Y. 2005) ....................................................................13

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010) ....................................................................13

*In re Integrated Res., Inc.*,
  147 B.R. 650 (S.D.N.Y. 1992) ...............................................................................13

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ...............................................................................................11

*In re Remsen Partners, Ltd.*,
  294 B.R. 557 (Bankr. S.D.N.Y. 2003) .................................................................8, 11

*Royal Bank of Pa. v. Grosse (In re Grosse)*,
  No. 96-1204, 1997 Bankr. LEXIS 2351 (Bankr. E.D. Pa. Oct. 15, 1997) ...........9, 11

*In re Spielfogel*,
  211 B.R. 133 (Bankr. E.D.N.Y. 1997) .................................................................9, 11

*Stoner v. Walsh*,
  772 F. Supp. 790 (S.D.N.Y. 1991) ...........................................................................8

**Statutes**

11 U.S.C. § 362 ........................................................................................2, 6, 7

11 U.S.C. § 507 ...............................................................................................12

11 U.S.C. § 510(c) ...........................................................................................17

11 U.S.C. § 541 ...............................................................................................12

11 U.S.C. § 724 ...............................................................................................12

11 U.S.C. § 726 ...............................................................................................12

11 U.S.C. § 1111(b) ...........................................................................................5

**Other Authorities**

Fed. R. Bankr. P. 9019 ...................................................................................9, 11

Five Mile Capital Partners LLC, on behalf of itself and its affiliates ("Five Mile"), objects to the *Motion of MSR Hotels & Resorts, Inc.* [(the "Debtor")] *for Entry of an Order Approving the Stipulation* [(the "Stipulation")] *Between MSR Hotels & Resorts, Inc., MS Resort Purchaser LLC, and Midland Loan Services* [("Midland")]*, a Division of PNC Bank, N.A.* (the "Motion"), and in support of its objection represents as follows:[2]

## PRELIMINARY STATEMENT

The Stipulation should not be approved because it does not compromise disputes with the holder of the Mortgage claims, but instead provides it with more than it is lawfully entitled to claim, including a recourse claim that violates a prior order entered by this Court. As such, the Stipulation does not reflect an exercise of business judgment by the Debtor but, rather, supplies another demonstration that the Debtor's Paulson-supplied management is too apathetic to observe duties to junior creditors and the entire estate. Specific reasons the Stipulation may not be approved include the following:

- The Stipulation provides the mortgage creditor with a full recourse claim against the REIT, whereas the Court's order confirming the chapter 11 plans of the Debtor's subsidiaries expressly decreed that Midland shall not have a recourse claim against the REIT.

- The Stipulation, which allows the mortgage claim *in full*, is inconsistent with the Debtor's simultaneous litigation position that Five Mile does not have a claim. Midland and Five Mile have nearly identical guarantees from the REIT. If the mortgage claim is allowed in full, the Debtor's objection to Five Mile's claim must be resolved in Five Mile's favor.

- The Debtor could not have exercised reasonable business judgment in agreeing to the economic terms of the Stipulation, because the Debtor willfully determined not to value the IP Assets that collateralize for the mortgage debt before doing so. The significance of this failure is multi-fold:

---

[2] Capitalized terms not defined in the Preliminary Statement are intended to have the meaning ascribed in the "Objections" below, except those terms that have been used repeatedly throughout this case (*e.g.*, "GIC," "IP Assets" and "Resorts") are intended to continue to have their prior meanings. Exhibits supporting this objection that were submitted to the Court for use at the hearing commencing on July 23, 2013 are referenced herein by their exhibit binder tab numbers.

o No reasonable debtor would agree to split the proceeds of a collateral sale without first having attempted to inform itself of the value of the collateral.

o The only arguable benefit the estate is getting out of the Stipulation is an "allocation" of 10% of sale proceeds in excess of $20 million.  But without understanding the IP Assets' value, it is impossible to estimate whether the estate in fact is receiving any value from the allocation.  A *bona fide* third party appraisal commissioned by the Debtor in 2011 values the IP Assets at an amount far higher than the outstanding mortgage debt, such that absent the Stipulation the estate still would receive the same net funds.

o All of the Debtor's IP Assets are not collateral for the mortgage loan.  The mortgage creditor only holds a pledge of the portion of the IP Assets' value associated with their use by the Resorts, and not their intrinsic value for other uses and application, such as for branding properties other than the Resorts.  Without having parsed these values, the Debtor cannot demonstrate, or even guess, whether the Stipulation falls within the range of reasonableness.

- The alleged benefit to the Debtor of the Stipulation is illusory.  The Debtor's estate receives 10% of Sale Proceeds in excess of $20 million.  The portion of amounts below $20 million that do not go to Midland nonetheless "shall not be considered property of the REIT's estate."  Under GIC's low-ball bid that the Debtor had tacitly determined to accept, the estate would receive nothing.  As to the Debtor's share of amounts in excess of $20 million, the Stipulation grants the Debtor the unilateral right to allocate those proceeds to its non-debtor affiliate MS Resort Purchaser, such that it may prevent Five Mile or other creditors from receiving any recovery no matter how large the Sale Proceeds may be.

- The Stipulation provides that upon the occurrence of any "Termination Event," the automatic stay shall be modified to permit Midland to foreclose on its collateral outside of the Bankruptcy Court, without ever bringing a motion under section 362(d) of the Bankruptcy Code.  A Termination Event *already* has occurred, such that entry of the Stipulation immediately will lift the stay in favor of Midland.

- GIC has already demonstrated that it is willing to destroy the value of the IP Assets by making frivolous public claims that it already acquired the IP Assets, and suggesting that a competing bidder may be bidding its way into a lawsuit that GIC will bring to assert its ownership.  Depending on the ultimate economic repercussions of GIC's act, GIC's recent conduct may be a sufficient basis to subordinate GIC's interest in the mortgage debt.  Entry of an order allowing the Mortgage claim and liens prior to consummation of a good-faith sale will free GIC of any threat of equitable subordination and equitable disallowance,

2

effectively providing GIC with carte blanche to continue to defame the IP Assets and interfere with their sale.

- The Stipulation is premature until the Court adjudicates the pending motions for appointment of a trustee and approval of bidding procedures, because the Stipulation transfers far-reaching controls over the future of the Debtor's case from the estate to the mortgage creditor. A future trustee should not have its hands bound by the capitulations of the Debtor's board.

For these reasons, as discussed in greater detail below, the Stipulation should not be approved.

<u>**OBJECTIONS**</u>

**I.    <u>The Stipulation Unlawfully Makes the Mortgage Debt a Recourse Claim.</u>**

1.    The Court's February 22, 2013 Confirmation Order, entered in the Subsidiaries' bankruptcy cases with the consent and approval of the REIT, Midland and GIC, decreed that outstanding claims under the Mortgage Loan (1) would remain subject to any defenses of the Debtor, and (2) in all events shall not be a recourse claim against the REIT, but only a claim against collateral securing the Mortgage Loan. The Confirmation Order provides:

> 123. Nothing in the Plan or this Confirmation Order shall (a) affect, or preclude Midland from asserting, any unpaid claim or right, including on account of unpaid interest, that Midland might have against MSR Resorts or MS Resort Purchaser LLC (or their successors or assigns) with respect to any guarantee or grant of lien or security interest for the benefit of the Mortgage Lender in connection with the Mortgage Loan, *provided that* such preserved claim or right is non-recourse beyond the collateral pledged to the Mortgage Lender under (i) that certain Trademark Security Agreement (as such agreement may have been amended from time to time), dated January 9, 2006, among certain of the Debtors and MSR Resorts and (ii) that certain Joinder to and Modification of Trademark Security Agreement (as such agreement may have been amended from time to time), dated May 30, 2008 among certain of the Debtors, MSR Resorts and MS Resort Purchaser LLC; or (b) preclude Midland from enforcing against such collateral, any such lien or security interest; *provided, however,* that all rights, claims, and defenses of MSR Resorts and MS Resort Purchaser LLC (and their successors and assigns) are similarly reserved.

3

*See Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Joint*

*Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant to Chapter 11 of the*

*Bankruptcy Code*, dated February 22, 2013 [Docket No. 2071] at 61, ¶ 123 (relevant portion

attached hereto as Exhibit 1).

      2.      The Stipulation violates the Confirmation Order by making the Mortgage Loan

fully recourse against the Debtor.  In defining apposite terms, the Stipulation provides:

> WHEREAS, on account of the Mortgage Loan and the Trademark
> Security Agreements, Midland asserts a claim against the REIT in
> the amount of $59,890,988.00 as of July 1, 2013 (the "Midland
> Claim") secured in an amount equal to the lesser of the value of the
> Resort Collateral owned by the REIT and the amount of the
> Midland Claim (the "Midland Secured Claim") and unsecured in
> an amount equal to the amount of the Midland Claim minus the
> amount of the Midland Secured Claim, if any (the "Midland
> Unsecured Claim"), and against MS Purchaser in the amount of the
> Midland Claim;

Stipulation at pp. 4-5.  The Stipulation then proceeds to allow permanently the Midland Claim, in

its entirety, as a full recourse claim against the Debtor:

> 1.      The Midland Claim shall be an allowed claim
> against the REIT and the Midland Secured Claim shall be an
> allowed secured claim against the REIT.  The Midland Claim shall
> not be subject to avoidance, reduction, setoff, recoupment, offset,
> recharacterization, subordination (whether equitable, contractual,
> or otherwise), counterclaims, cross-claims, defenses, disallowance,
> impairment, or any other challenges under the Bankruptcy Code or
> any other applicable law or regulation by any person or entity.

*See* Stipulation at p. 5.

      3.      The Stipulation further provides that "the Midland Claim" will not be deemed

released and satisfied until paid in full.  *See* Stipulation at p. 7, § 4(f) ("Upon payment to

Midland of the Midland Payment, the Midland Claim shall be deemed released and satisfied with

respect to the REIT").  This, too, is contrary to Midland having only a non-recourse claim; once

the collateral securing the claim is sold and the proceeds distributed, there is no more claim,

4

irrespective of whether it has been paid in full.  These provisions of the Stipulation are a direct violation of the Confirmation Order.  The Debtor's business judgment cannot extend to rewriting prior orders of the Bankruptcy Court.

4.      Should the parties attempt to argue that section 1111(b) of the Bankruptcy Code creates a recourse claim for Midland, that argument would be mistaken.  Section 1111(b)(1)(A) provides in relevant part:

> (A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless— [. . .]
>
> > (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

11 U.S.C. § 1111(b)(1)(A).

5.      Under section 1111(b), therefore, there can be no deficiency claim because the collateral will have been sold.  While the Debtor's management may not care about diluting Five Mile's claims, they surely cannot do so in violation of the Court's order.  Granting Midland an unsecured deficiency claim to which it indisputably has no legal right demonstrates that the Stipulation is not the product of reasonable business judgment.

## II.      For a Multitude of Reasons, the Terms of the Stipulation Are Unreasonable and Outside the Bounds of Business Judgment.

### A.      The Stipulation Lifts the Stay in Favor of Midland With No Showing of Cause.

6.      The Debtor has fought hard to try to avoid losing control of the bankruptcy case to a responsible and disinterested chapter 7 or chapter 11 trustee, but the Debtor has no compunction about turning over control of the disposition of its business assets to Midland --

even though Midland is merely an agent representing the economic interests of GIC,[3] a party

seeking to acquire the Debtor's assets as cheaply as possible. The Debtor does this by stipulating

that Midland may foreclose on the IP Assets (and then presumably hand them over to GIC)

simply by sending the Debtor a notice, and without filing a motion or obtaining leave of the

Court under section 362(d) of the Bankruptcy Code.

   7. The Stipulation provides: "Midland may upon written notice to the REIT

terminate this Stipulation without further order of the Court upon the occurrence and continuance

of any of the following, unless otherwise consented to in writing by Midland (each, a

"Termination Event," and the effective date of such Termination Event, the "Termination

Date")." The list of Termination Events is lengthy. It includes appointment of a trustee or

examiner with expanded powers, conversion of the case to chapter 7, and failure to auction the IP

Assets before the end of October 2013. Five Mile's expert testified that this is an inadequate

amount of time to maximize value -- including because it has become necessary to resolve the

cloud of GIC's public claim that it already owns the IP Assets. *See* Tr. July 24, 2013 at 289-90.

A Termination Event also includes: "c. The REIT has not obtained entry of the Bidding

Procedures Order by July 31, 2013." This obviously did not and cannot occur. Thus, a

Termination Event will have occurred upon entry of the Stipulation.

   8. A Termination Event has adverse consequences to the Debtor and to all creditors

other than Midland/GIC. The most severe -- which is not even discussed in the Motion -- is that

"upon the occurrence of a Termination Date, the automatic stay set forth in section 362 of the

Bankruptcy Code shall be terminated with respect to the Resort Collateral without any further

action or order of the Court." Stipulation at p. 13, § 17.b. No substantive cause has been shown

---

[3] *See* Debtor's objection to Five Mile's motion to convert the case [Docket No. 59] at 3, ¶ 3, disclosing that GIC
purchased the outstanding mortgage trust certificate on or about June 20, 2013.

to modify the automatic stay and none of the procedural requirements for obtaining such relief have been met. The section 362 requirements are not even discussed in the Motion. Even the long cut-and-paste description of the Stipulation in the Motion omits the lift-stay provision.

9.      Midland, as agent for the ultimate mortgage interest holders, has already collected over $1 billion, including payment in full of all principal, payment of all interest at the non-default rate, payment of over $10 million of fees and expenses, payment of over $7.5 million of default interest. The remaining default interest claim was purchased post-petition by GIC, presumably at a significant discount. Midland could have collected the default interest in the Subsidiaries' bankruptcy cases – its borrowers were solvent by hundreds of millions of dollars – but it elected to subordinate its rights to collect the default interest for the benefit of the junior claims of GIC -- and GIC now owns the default interest certificate! Having received more than a 97 percent recovery where Five Mile and the IRS have received nothing, Midland/GIC are the least sympathetic creditors in the capital structure. The chances that these nearly-repaid creditors could show cause to lift the stay and snatch the Debtor's assets when there has not yet been a full marketing process, the asset is not losing value, and the case is only several months old, are virtually nil. Yet, because a Termination Event already has occurred (and more appear imminent even if the existing event is waived), approving the Stipulation will modify the stay and authorize Midland to dispose of substantially all of the Debtor's business assets outside the purview of the Bankruptcy Court. Here, too, the Debtor has demonstrated that its management is, at best, completely unconcerned with protecting or maximizing the value of the estate's assets. These provisions are extremely unreasonable, without legal support, and contrary to the best interests of the estate.

**B.    The Debtor Could Not Have Exercised Sound Business Judgment in Agreeing to the Stipulation Because it Did Not Inform Itself of Critical Facts.**

10.    Bankruptcy Schedules are prepared and filed under penalty of perjury.  Lest one be caught unaware, it says so right on the Official Form.  Under penalty of perjury, the Debtor scheduled the Mortgage Loan as disputed and contingent.  Docket No. 18 (Tab 13) at 22.  By the time the Debtor's expert witness, Mr. Burian, was deposed in this case, July 18, 2013, the Debtor already had agreed to the terms of the Stipulation and was awaiting authorizations and signatures from Midland to file the Stipulation.  July 18, 2013 Transcript of Deposition of Saul Burian ("Burian Tr.") at 112-14.[4]  However, Mr. Burian testified at his deposition that he did not know the substance of the material dispute with Midland or what the contingency to the claim is.  Burian Tr. at 110-11.  Settling a claim without knowing the reasons it is in dispute is the very antithesis of exercising reasonable business judgment.  *See Stoner v. Walsh*, 772 F. Supp. 790, 801 (S.D.N.Y. 1991) (both disinterestedness and appropriate and sufficient investigative procedures are necessary before business judgment will be allowed to prevail).

11.    In his extremely brief and summary declaration in support of the Motion, Mr. Burian claims that "[t]he Stipulation eliminates the risk attendant with continued costly and uncertain litigation between the Parties, and the allocation of the Sale Proceeds reflects a reasonable compromise regarding this risk."  Docket No. 80 at p. 3.  However, it is impossible for the Debtor to make a credible showing that it balanced the possible costs and benefits of pursuing "continued" [*sic*] litigation when the settlement (capitulation) was negotiated before Mr. Burian knew the basis of the dispute and contingency that was being settled.  This requires denial of the Motion.  *See In re Remsen Partners, Ltd*., 294 B.R. 557, 567-68 (Bankr. S.D.N.Y.

---

[4]    Relevant portions are not attached hereto because the transcript is confidential.  Five Mile will deliver a copy of the transcript to chambers.  All citations should already be in the record of the July 2013 hearing.

8

2003) (rejecting settlement proposed by chapter 7 trustee where "the failure by Trustee's counsel to independently investigate [facts pertaining to the settlement] resulted in an arguably unbridgeable hole in the record"); *In re Spielfogel*, 211 B.R. 133, 140-41 (Bankr. E.D.N.Y. 1997) (rejecting settlement of dissolution action proposed by chapter 11 trustee where the "Court finds that the Trustee did not adequately investigate the value of the estate's interest in the Dissolution Action because he failed to ascertain pertinent facts from the Debtor that might have led to a more realistic valuation"); *Royal Bank of Pa. v. Grosse (In re Grosse)*, No. 96-1204, 1997 Bankr. LEXIS 2351, at *21 (Bankr. E.D. Pa. Oct. 15, 1997) (rejecting settlement under Bankruptcy Rule 9019 where "the Chapter 7 trustee's investigation has been superficial, thus underscoring the lack of protection of the creditors' interest in this matter").

12.     That the Stipulation supposedly benefits the estate by "allocating" Sale Proceeds is of no help to the Debtor, because the Debtor also did not inform itself of the value of the IP Assets prior to agreeing to the Stipulation, although Houlihan is capable of performing such an analysis.  Burian Tr. at 20-21.  If the IP Assets are worth as little as 10% more than the Midland Claim, the Debtor would receive the same amount of net value with or without the allocation. The only evidence of value that exists indicates that the IP Assets are worth *much* more than the Midland Claim.  As the Court heard during the July 2013 hearings, the Debtor obtained a *bona fide* valuation of the Resort Marks on a "fair value" basis in 2011 from outside firm Duff & Phelps, which valued the Resort Marks at over $93 million, not including the Claremont marks. Tabs 24, 26-27.  The Debtor accepted and relied upon these and even higher values in its tax returns (Tab 10), in an internal GAAP consolidation (Tab 11), and in its parent's audited financial statements (Tab 12).  Thus, the only available evidence in the record indicates that the

Debtor is getting no net value from the "allocation" of first dollars because, if properly marketed and sold, the IP Assets will yield much more than the Midland Claim.

13.     However, the more salient point for the present discussion is that the Debtor did not inform itself of the IP Assets' value before entering into the Stipulation. Despite having Houlihan at its disposal, no valuation was performed (Tr. 7/24/13 at 247), nor did the Debtor investigate value drivers such as appropriate royalty rates (Burian Tr. at 21:5-15, 101:8-12), appropriate discount rates (*id.* at 16:17-19, 21:5-15), and the cost to GIC to replace the brands (*id.* at 24:13-26:18). No reasonable debtor attempting to act in the best interest of its estate ever would agree to a split of the proceeds of substantially all of its business assets without first attempting to inform itself of their value, especially in the context of an agreement where the debtor is offering the secured creditor *more* than it is legally entitled to in exchange for nothing other than agreeing to the allocation.

14.     Similarly, by reason of its failure to value the IP Assets, the Debtor cannot know what portion of their value is or is not attributable to uses associated with the Resorts. The Trademark Security Agreement grants the mortgage creditor a security interest in the IP Assets only to the extent they are associated with the Resorts, but not as to their value relating to any other actual or potential applications. The Trademark Security Agreement provides:

> 1.     Grant of Security Interest.
>
> Assignor hereby pledges, assigns, transfers, delivers and grants to Assignee a security interest in, and continuing lien on, all of Assignor's right, title, and interest in and to, and under the following, in each case whether now owned or existing, or hereafter acquired or arising, and whenever located (all of which being hereafter referred to as the Trademark Collateral) as security for payment of all sums due in respect of the Loan and the performance of all other terms, conditions and covenants of this Agreement and any other Loan Document on Assignor's part to be paid and performed: **with respect to, and associated with the Resorts only**, all United States, state and foreign

10

trademarks, service marks, certification marks, collective marks, trade
names, corporate names . . .

*See* Tab 7 at p.1, § 1 (emphasis added).

15.     A valuation very well could indicate that the portion of the IP Assets' value not

associated with the Resorts far exceeds the small portion of Sale Proceeds to be allocated to the

estate.  In fact, it is highly probable that non-Resort uses are more valuable given that there are

only four Resorts but innumerable other properties, goods and services around the world to

which the IP Assets potentially could be licensed.  Without having informed itself of those

values, the Debtor cannot demonstrate whether the Stipulation falls within the range of

reasonableness.  More importantly, the Debtor's extreme lack of diligence ensures that there will

not be an evidentiary record sufficient to enable the Court to approve the Stipulation under the

requirements of *TMT Trailer*[5] and Bankruptcy Rule 9019.  *See In re Remsen Partners, Ltd*., 294

B.R. at 567-68; *In re Spielfogel*, 211 B.R. at 140-41; *Royal Bank of Pa. v. Grosse (In re Grosse)*,

1997 Bankr. LEXIS 2351 at *21.

### C.     The Stipulation Improperly Permits the Debtor to Remove Unknown Millions of Dollars of Assets from the Estate.

16.     Although the Stipulation ostensibly resolves purported issues between the Debtor,

Midland and the mortgage creditor, the Debtor has used it as an opportunity to grant rights to

<u>itself</u>, to the potential harm of the estate and creditors.  First, in a rather astonishing provision,

the Stipulation provides that the first $3 million of Sale Proceeds allocated to the estate shall be

deemed *not* to be property of the estate, and may not be used to pay creditors other than those

pre-selected by the Debtor, irrespective of applicable bankruptcy priorities.  First, the Stipulation

provides that

---

[5]     *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

11

> 20% of the aggregate Sale Proceeds up to $10 million and 10% of any aggregate Sale Proceeds in excess of $10 million and up to $20 million shall be funded to the Sale Escrow (defined below) free and clear of any lien of Midland (the "Sale Escrow Payment") . . .

Stipulation, § 4.c.

17.     Next, the Stipulation provides that "[t]he Sale Escrow Payment shall directly fund an escrow account (the "Sale Escrow") for the purpose of paying" U.S. Trustee fees, no more than $25,000 for a chapter 7 trustee's professionals, and the remainder going to Houlihan, Kirkland and Pyramid.  Stipulation, § 5.  The Stipulation then provides that "[t]he Sale Escrow shall be held in trust for the recipients of the Fees *and shall not be considered property of the REIT's estate*."  Stipulation, § 5 (emphasis added).

18.     No authority permits the Debtor to determine, especially outside of a plan and before the conclusion of its case, that a significant portion of its assets may only be used to pay certain favored <u>unsecured</u> creditors irrespective of whether any claims of equal or greater priority arise during the case, nor to unilaterally declare that up to $3 million of its cash simply is "not property of the estate."  The favored creditors are not even providing any consideration in exchange for this unlawful repudiation of sections 507, 541, 724 and 726 of the Bankruptcy Code.

19.     On top of that, the Stipulation grants the Debtor the capacity to assure that even the 10% allocation of Sale Proceeds over $20 million, and all sale proceeds received after the Midland Claim is paid, will not go to the Debtor's estate or to pay its unsecured creditors.  In the Stipulation, the Debtor has granted to itself the unilateral and unchallengeable right to decide how much of the Sale Proceeds should be directed to its Paulson-controlled non-debtor affiliate, MS Resort Purchaser.  Specifically, the Stipulation provides at section 4(e) that "[t]he REIT and

MS Purchaser will allocate the Company Payment between the entities based on the sale value of each entity's Resort Collateral (the "Sale Allocation")."  Stipulation § 4(e).

20.     This is an open invitation for abuse.  The REIT and MS Purchaser are both under the control of the same Paulson-designated individuals.  That means there can be no arm's-length negotiation or agreement with respect to dividing Sale Proceeds.  It also means that the business judgment rule cannot apply to any allocation because the directors are conflicted by reason of their dual roles.  *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (disinterestedness is a required element for the business judgment rule to apply); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (same); *In re Adelphia Commc'ns. Corp.*, 327 B.R. 143, 155 n.1 (Bankr. S.D.N.Y. 2005) (same).  The Stipulation provides the directors at their discretion can send as much of the Sale Proceeds as they wish to MS Purchaser, which has far less debt, and thence distribute the surplus to their employer, Paulson, as MS Purchaser's ultimate equity holder, while leaving Five Mile and the IRS unpaid.  And one can be assured that if this Debtor's management can devise a way to prevent Five Mile from receiving a recovery, it will.  Furthermore, the Debtor has deliberately failed to value the IP Assets at the present time, when doing so is critical to business decisions and the conduct of the case.  How can it later make a unilateral, behind-the-scenes determination of how much of the Sale Proceeds belong to which entity?  It would be highly imprudent for the Court to authorize the Debtor to act as decisor as to how much sale proceeds should be property of its estate and how much should go to a Paulson-controlled non-debtor affiliate.

**D.     The Stipulation is an End Run Around the Sub Judice Motions.**

21.     The Stipulation also should not be approved because it is an effort by the Debtor to circumvent any unfavorable decision the Court may wish to issue on the *sub judice* motions to approve Bidding Procedures and to convert the case or appoint a trustee.

13

22.     At the July 2013 hearing on the Debtor's proposed Bidding Procedures, the Court heard detailed testimony from Gabriel Fried of Hilco as to why the Debtor's proposed sale process is too abbreviated and too generally misguided to maximize the value of the IP Assets. Among other things, he explained:  that the IP Assets presently are worth less than they could be because the Debtor has not enhanced their value by securing a revenue stream from GIC for its continued use of the IP Assets and entering into license agreements with other third parties, and that the Debtor should correct this before offering the IP Assets for sale (Fried Opp. Decl. dated July 9, 2013 [Docket No. 58] ¶¶ 6-9, 12-15, 24-26); and that the Debtor has acted unreasonably by attempting to require that its liquidation be conducted on a tight distress-basis time frame, notwithstanding that there would be little cost and tremendous benefit for the Debtor to take the time needed to ensure that it obtains the highest possible value for the IP Assets (*id.*, ¶¶ 17, 29). In addition, Mr. Fried testified in open court that GIC's gratuitous public claim to already own the IP Assets further impairs their value and must be resolved before a sale can occur.  Tr. July 24, 2013 at 289-90.  The Court is respectfully referred to Mr. Fried's testimony and Five Mile's submissions and objections to the Bidding Procedures Motion for his full array of opinions.

23.     At the time the Debtor filed the instant Motion, and as of the date of the within opposition, the Court has yet to decide these matters and others relating to the Bidding Procedures, or to adjudicate the motion to convert.  That is not by itself a problem.  The problem is that the Debtor seeks to use the Stipulation to do an end-run around the Court by providing that Midland can take the collateral without leave of the Court if an auction for the IP Assets has not occurred by October 31, 2013, or if a confirmation order or sale order has not been entered by December 14, 2013.  Stipulation p. 9, § 8.  In other words, if the Stipulation is approved it will cease to matter whether the Court in its discretion accepts Mr. Fried's testimony, or

14

disapproves the Bidding Procedures for any other reason, because the Debtor and Midland/GIC have made the Stipulation a tool to compel a sale of the IP Assets on a hasty distress-sale basis regardless of the Court's conclusions with respect to the proposed Bidding Procedures.

24.     Similarly, the Stipulation allows Midland to take the IP Assets (for GIC) if the Court converts the case to chapter 7 or appoints a chapter 11 trustee.  *See* Stipulation at § 8.g., h. The Stipulation thus provides that the consequence of the Court granting conversion of the case or appointment of a trustee will be that there will not be any business assets for the chapter 7 or chapter 11 trustee to administer.  The Stipulation essentially dictates to the Court that the case must be administered in accordance with the Debtor's desires, or no one but GIC gets anything. This is abhorrent.

25.     While one can -- and must -- criticize each of these provision of the Stipulation separately, together they lead to a unified conclusion:  the Debtor has not negotiated any real benefits for the estate, the Debtor neglected to do the diligence and work required to enable it to exercise good business judgment in "negotiating" and accepting the Stipulation, and the Debtor has simply rolled over and given Midland, as agent for GIC's recently acquired interests, not only all that it could have claimed, but more than the law allows.  The Stipulation therefore should be firmly disapproved.

**III.    Entering the Stipulation Before a Sale Has Been Consummated
is Imprudent Because it Will Immunize GIC from the
<u>Consequences of Bad Acts With Respect to the Collateral.</u>**

26.     Even if the terms of the Stipulation were fair and reasonable, an order allowing the Mortgage claims should not be entered at the present time because doing so will free GIC to continue its efforts to damage the IP Assets and interfere with the sale process without the threat of equitable subordination, equitable disallowance or setoff of its interest in the mortgage debt.

15

27.    As explained above, the Stipulation not only allows the "Midland Claim" and liens *in full*, but provides that they "shall not be subject to avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity." *See* Stipulation at p. 5. Given that the estate may be receiving nothing in return for this complete concession, this deal would have been difficult to justify before GIC bought the mortgage debt. Now that GIC has bought the debt, permanent allowance of the mortgage claim and liens at the present time would be highly inappropriate.

28.    As the Court has heard many times by now, since last February GIC has been using the Debtor's IP Assets to brand and operate the Resorts. The Court heard testimony at the July 2013 hearings that it would cost GIC millions of dollars to replace the Debtor's brands at the Resorts (just how many millions was unclear). The Court also received evidence that GIC is attempting to purchase the IP Assets for less than 3% of their value, as reflected in the Debtor's records. The Court will likely also recall that during the Subsidiaries' bankruptcy, GIC attempted to obtain the IP Assets without paying the REIT anything at all, even though some of GIC's professionals learned months before the Subsidiaries' confirmation hearing that the IP Assets in fact belong to the (then non-debtor) REIT, not the Subsidiaries. Last month, the Debtor disclosed that GIC, previously a party with no standing in the Debtor's case, engaged in post-petition claims trading to put itself into the Debtor's capital structure. Finally, the Court received and reviewed GIC's gratuitous and procedurally impermissible July 19, 2013 "statement" that it already owns the IP Assets, having purportedly acquired them in the Subsidiaries' earlier cases, and that it may bring suit to establish its rights to them. Docket

16

No. 75.  While the Court promptly recognized that GIC's "statement" was groundless, the marketplace does not have the benefit of the Court's experience and wisdom.  Potential bidders only have been told that if they buy the IP Assets, they may also have to defend against litigation by GIC in order to retain them.

29.     We posit to the Court:  based on the behavior it has seen from GIC so far, and GIC's indisputably adverse economic interest to a value-maximizing process, is it at all prudent or in the interest of the estate to permanently allow the mortgage debt at the present time, and to foreclose future possibilities of seeking offsets, equitable remedies or other remedies based on harm GIC may cause, or may already have caused, to the estate and its assets?  Among others, equitable disallowance and equitable subordination under 11 U.S.C. § 510(c) are essential tools to redress harm one creditor may cause to others by reordering priorities based upon principals of equity.  Depending upon the ultimate economic repercussions to the estate, GIC's recent conduct already may be a sufficient basis to subordinate GIC's interest in the mortgage debt, which no doubt was purchased at a steep discount for strategic rather than economic purposes.  Five Mile is not prepared to make such an assertion today, but it is very much concerned that if the Court enters an order allowing the Mortgage claim and liens prior to consummation of a sale, GIC will be at much greater liberty to further attempt to chill bidding.  Removing the potential for offsets and equitable remedies with respect to GIC's interest in the mortgage debt would allow GIC to interfere with the sale of the IP Assets with greater impunity.  Accordingly, allowance of the Mortgage claims should not be granted at the present time or prior to the completion of a full, fair and properly conducted sale process, and consummation of all transactions.

17

**IV.    The Stipulation Allowing the Mortgage Claim Against the REIT Also
Requires the Allowance of Five Mile's Guaranty Claim Because the REIT
Granted Midland and Five Mile Substantially Identical Guarantees.**

30.    As previously argued by Five Mile, although Midland's claim is secured by certain limited collateral and Five Mile's is not, Midland can have no greater right to a claim against the Debtor than Five Mile because the Debtor granted substantially the same guaranty to both Midland and Five Mile.  That is, if Midland has a claim, Five Mile also must have a claim. Now that the Stipulation is before the Court and the Debtor has gone on record seeking its approval, the Debtor can no longer take the legally and factually inconsistent position that Five Mile does not have a claim or lacks standing to be heard.

31.    Copies of the Mortgage Loan Guaranty and section 18 of its underlying Mortgage Loan Agreement were submitted to the Court as Tabs 3 and 4, respectively; copies of the Fourth Mezzanine Guaranty and section 18 of the Fourth Mezzanine Loan Agreement were submitted as Tabs 5 and 6.  Comparing the two sets of documents shows that, except for some irrelevant provisions regarding the initial funding of the REIT structure, the Debtor gave substantively identical guaranties to Midland and Five Mile.

32.    Moreover, the TSA does not give Midland any greater claims, but only collateral for its claims.  By its express terms, the TSA provides that it secures only payment of sums due in respect of the Loan and the performance of terms, conditions and covenants of this Agreement and any other Loan Document "**on Assignor's part to be paid and performed:**  with respect to, and associated with the Resorts . . ."  *See*, Tab 7 (emphasis added; quoted at greater length at paragraph 14, above).[6]

---

[6]    Section 3(b) of the TSA, previously referred to by the Debtor, only addresses the mechanics of transferring the Trademarks if there is a claim.  The TSA does not by itself, as the Debtor has previously argued, create any liability or claim.  If it did, Midland's entire guaranty agreement would be superfluous.  So would the TSA's limitation to securing obligations "on Assignor's part to be paid."

33.    When Five Mile raised this argument during the July 2013 hearings, the Court correctly responded that the Stipulation was not yet before the Court for consideration.  Now, it is.  The Debtor's arguments that Midland has a full claim against the REIT while Five Mile has none must come to an end.  These positions were inconsistent and irreconcilable from the beginning.  By requesting the Court to allow Midland's legally identically (albeit secured) guaranty claim in full, the Debtor has waived any argument that no claim exists under Five Mile's substantially identical guaranty documents.

## CONCLUSION

For the above reasons, Five Mile requests the Court to deny the Motion.

Dated: New York, New York
   August 27, 2013

       KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP

       By: /s/ Robert M. Novick
       David M. Friedman (DFriedman@kasowitz.com)
       Adam L. Shiff (AShiff@kasowitz.com)
       Robert M. Novick (RNovick@kasowitz.com)
       1633 Broadway
       New York, New York 10019
       Telephone:  (212) 506-1700
       Facsimile:  (212) 506-1800

       *Counsel to Five Mile Capital Partners LLC*